1bm0nin1                          Markman Hearing

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  TOMITA TECHNOLOGIES,

4                  Plaintiff,

5            v.                              11 CV 4256

6  NINTENDO CO., LTD.,

7                  Defendant.

8  ------------------------------x
                                    New York, N.Y.
9                                   November 22, 2011
                                    11:00 A.M.
10
   Before:
11
                        HON. JED S. RAKOFF,
12
                                        District Judge
13
                           APPEARANCES
14
   STROOCK & STROOCK
15       Attorneys for Plaintiff
   BY:   KENNETH LAWRENCE STEIN
16       ALEXANDER SOLO

17

   KAYE SCHOLER LLP
18       Attorneys for Defendant
   BY:   SCOTT G. LINDVALL
19       JAMES BLANK STEPHEN
         JOSEPH ELLIOTT
20

21

22

23

24

25

1BM0NIN1                           Markman Hearing

 1            (In open court)

 2            THE CLERK:  Tomita Technologies v Nintendo.

 3    11 CV 4256.  Will the parties please identify yourselves for

 4    the record.

 5            MR. STEIN:  Ken Stein, with my colleague, Alex Solo.

 6            THE COURT:  Good morning.

 7            MR. LINDVALL:  Good morning, your Honor.  My name is

 8    Scott Lindvahl.  With me is Jim Blank and Steve Elliott

 9    representing Nintendo and, also, is Dr. Frahm, who is from the

10    University of North Carolina.  He submitted two declarations on

11    our behalf.

12            THE COURT:  Thank you for your patience.

13            I'm going to impose on it some more, because as a

14    result of the Thanksgiving holiday, I have to squeeze a whole

15    bunch of things in today that I didn't expect.  So you will get

16    your full two hours, but it's going to be truncated with --

17    we'll go from now until 12:00 and then we'll go from 2:00 to

18    3:00.  So I apologize in advance for that.  But I've got to

19    deal with these other matters, as well.

20            So I think the best way to proceed is term by term.

21            So let's hear, first, from plaintiff's counsel.  I

22    think the first term that's in dispute is video image pick-up

23    means; yes?

24            MR. STEIN:  Yes.

25            Stand up there?

1            THE COURT:  Wherever you like.

2            MR. STEIN:  Okay.

3            Well, the issue with respect to this term is

4   straightforward.  The question is whether or not the term

5   should be construed as a means plus function limitation under

6   Section 112 paragraph 6, which is what Nintendo asserts.

7            Plaintiff's position is it should just be construed as

8   an ordinary claim, as an ordinary claim term that doesn't

9   invoke the provisions of that section of code.  Under 112 6, if

10  a term expresses a means for performing a specified function,

11  it's construed to -- with reference to the specification, in

12  particular to cover the corresponding structure in the

13  specification and equivalents thereof.  The general rule is

14  that if the claim term uses the word "means," there is a

15  presumption that that section of the code is invoked.  But

16  there are many exceptions to that general rule, one of which is

17  if the term doesn't -- or the claim doesn't express a function

18  corresponding to the term, then the section -- the presumption

19  is overcome.  And that's --

20           THE COURT:  Let me interrupt you.  I don't think it is

21  a good use of anyone's time to simply repeat what is already in

22  your papers, which I have read.  So, really, this oral argument

23  is an opportunity to either bring to the Court's attention

24  something that you didn't have a chance to raise earlier, or

25  something that you think needs greater clarification.  But you

1    can assume I have read your briefs, so you don't need to repeat

2    them.

3            Frankly as I saw plaintiff's argument on this term, I

4    didn't know that you had anything to say, other than what was

5    in your brief, but maybe I'm wrong.

6            MR. STEIN:  My argument, up to now, is that?

7            THE COURT:  I'm just -- you know, look, you can spend

8    your two hours however you want to spend them.  But, so far,

9    all you're doing is repeating what is in your brief, which is

10   not a good use of your time.

11           MR. STEIN:  Well, I think that the brief does set

12   forth our position.  There is, in the slide there, to the

13   extent that -- I'm not sure all of these references were in the

14   brief in that third bullet point, the third, but the

15   specification claims clearly use the term to refer to a

16   structural element.  And it's used throughout.  It refers to --

17   refers to the pick-up means including refers to its

18   cross-point, refers to the fact there is two of them, talks

19   about the distance between these things, talking about a

20   structure, not just talking about function.  And I think that

21   the specification is pretty clear on that point.  In fact, it

22   basically uses the term, you know, it's one reference there

23   where is just basically using it interchangeably with the term

24   "camera."  There is no function recited at the an.  We don't

25   believe it should invoke those provisions of the code.

1           THE COURT:  Okay.  Let me hear from defense counsel.

2           MR. STEIN:  By the way, we have a set of the slides.

3   It may be easier for to you see them under certain

4   circumstances.  If we can give a copy up to you.

5           THE COURT:  Sure.

6           MR. BLANK:  Your Honor, may I approach, hand up our

7   slides as well?

8           THE COURT:  Yes.

9           MR. BLANK:  Your Honor, I'm going to make this real

10  brief.

11          We are on video image pick-up means.  Initially, the

12  plaintiffs said no construction is necessary.  And then when we

13  exchanged constructions, they said it's a device that picks up

14  video images.  And then in their corrected opening brief, they

15  changed their construction to say:  Video image pick-up means

16  should be construed as a device that picks up video images such

17  as a camera.

18          There is no dispute here that two the video image

19  pick-up means is a camera.  I'm not going to go through the

20  law.  And the function is, as set forth in the specification,

21  picking up an object.  It's two references in the specification

22  that tell you that the function is picking up the object, and

23  the specification does exactly what it's supposed to do.  It

24  associates that function to the structure, which are the

25  cameras.  Specifically says.  And there are the two citations

1    right there.

2              And that's all I have to say on this.  I think it is

3    straightforward.

4              I would suggest that rather than going right in the

5    order that the claim terms appear, that we move on to the

6    cross-point measuring means terms, which are really quite

7    fundamental to this case and, I think, probably if they agree,

8    a better use of our time than going to the next term, which I

9    think is really fully briefed.

10             THE COURT:  That's fine with me.  I think it makes a

11   certain sense.

12             Does plaintiff's counsel agree with that?

13             MR. STEIN:  I agree, though I want to make a quick

14   response to what --

15             THE COURT:  Yes, go ahead.

16             MR. STEIN:  My response is that we added cameras to

17   our construction of the video image pick-up means based on the

18   back and forth between the parties trying to resolve the issue,

19   so it was not.  It was part of that.  We agree that it is --

20   pick-up means, we don't think that the case law supports

21   construing that claim term as a means-plus function limitation.

22             THE COURT:  Okay.

23             MR. STEIN:  I think that perhaps the -- I think that

24   the next term, along the lines of what Mr. Blank suggested,

25   should be optical axes.  There is a fundamental dispute between

1    the parties when it comes to claims construction as to whether

2    the claims cover the parallel embodiment of this invention as

3    disclosed in the patent.  And they define the term optical axes

4    so that it not only excludes that preferred embodiment, it

5    renders one of the asserted claims, claim eight, nonsensical

6    and, they claim, indefinite.  And the case law that is cited in

7    the brief established that those results are rarely, if ever,

8    correct.  It is just contrary to standard claim construction

9    principles.  It's based on an effort by them to establish

10   noninfringement positions.  The accused product appears to have

11   their cameras aligned in parallel arrangement.  They are trying

12   to exclude that from the scope of the claims.  And so they're

13   construing this optical access and many other terms in a manner

14   that will, you know, in their view, support their

15   noninfringement position.

16          The two configurations of cameras that are described

17   in the patent were both well known, and they're taking a

18   position just narrowly focused on this term, but without

19   looking at what the specification of the patent is really

20   describing and without giving, really, weight or meaning to

21   what the invention is here.  The invention doesn't relate to,

22   you know, this narrow construction of what the cross-point

23   means.  The invention relates to establishing that distance to

24   what the patent calls cross-point or the convergence point.

25   And then reflecting that distance when the image is displayed.

1           If we go back to that slide there, which is a -- it

2    might be easier to see it there to read.  You know, their brief

3    and their arguments, they make it -- it almost makes it sound

4    like this other parallel, the other arrangement of cameras

5    wasn't known in the art.  It was well known in the art.  Our

6    expert talked about it.  And, by the way, they challenge our

7    expert in our case, xxx Mr. Marriott.  He is one of the leading

8    authorities on 3D technology in America.  He has been working

9    in the field for over 30 years.  He founded the leading

10   conference on 3D technology in the country.  He has worked --

11   he consults for the Navy on 3D technology.  He consults for

12   Boeing relating to 3D technology.  And I think it might be that

13   he is one of the foremost authorities on 3D technology in the

14   country.  So they mentioned that his undergraduate, well, he

15   has a degree, undergrad in psychology and clinical psychology

16   degree from Harvard.  Clinical -- it's not clinical psychology,

17   it is applied psychology.

18           THE COURT:  I get the idea.

19           MR. STEIN:  Yeah.  I mean -- sorry.  He has been

20   involved in the design of these systems with various people.

21   He says he has papers on the design of stereoscopic systems.

22   He has patents relating to the design and structure of these

23   systems.  So, again, I mean he is one of the foremost

24   authorities here.  He stated in his declaration that, you know,

25   explained how, you know, these two different configurations and

1    how they work.

2          Nintendo came back and criticized it in their

3    responsive briefs saying that some of what he said didn't cite

4    to extrinsic evidence here.  I mean these things are well known

5    in the field.  This paper here was from 1992.  You know, we'd

6    actually like to submit it to the Court.  I provided it to

7    Nintendo yesterday.  But it supports exactly what we're saying

8    in terms of this term optical access.

9          If you look on the left side, it depicts the two

10   standard camera arrangements 3D pick-up device.  One, being

11   sort of xxx toed in, and the other being parallel.  And it

12   might be hard to read, but in this particular figure, even

13   though the concept was well known in, you know, whether or not

14   it uses the terminology or not.  But it, on the left side, it

15   talks about the camera and the lens optical access being the

16   same.  When you are xxx toeing them in, normally, there is no

17   reason to shift the images so that the optical axes would be

18   different.  In the parallel arrangement, the -- there is

19   various techniques for offsetting, capturing part of the image

20   or directing or using part of the image, either by shifting a

21   chip behind the lens, or using other techniques which Mr. xxx

22   Marriott mentioned in his declaration.  And in that embodiment,

23   the line of sight of the camera is actually not the optical --

24   the optical axes of the lens, so to speak, it's where the

25   camera is pointing or looking.  And in this particular paper,

1  it refers to that as the camera's optical access.  And I mean

2  that's the crux of -- I mean that's one of the crux of the art

3  here, if the -- whether or not the Court will construe the term

4  "optical access" to give meaning to what was in the patent, the

5  parallel camera embodiment, and construed in a way that I

6  believe -- well, anyone skilled in the art would construe it.

7  We know what's going on here.  People skilled in the argument

8  know what's going on, as to how these two things work, how they

9  focus and change the convergence point, basically where the two

10 cameras are looking and meet.  And as described in the patent

11 and as claimed, Nintendo is asking the Court to construe the

12 claim to exclude that embodiment and render that claim invalid,

13 or to hold that claim invalid, we believe that it is, you know,

14 that that is contrary to the law and the Court should reject

15 that approach.

16          THE COURT:  All right.

17          MR. STEIN:  With the Court's permission, we would like

18 to give you the paper, that figure, that I just showed.

19          THE COURT:  Have you given it to your adversary?

20          MR. STEIN:  I did.

21          THE COURT:  All right.

22          All right.  Defense.

23          MR. LINDVALL:  Your Honor, I think -- as my colleague,

24 Mr. Blank, said, all of these terms were -- cross-point xxx

25 measure means, the optical axes cross-point, and CP

1    information, all interrelate.  And I suggest to your Honor

2    maybe we do all of those together.

3              THE COURT:  Okay.

4              MR. LINDVALL:  And Mr. Stein, if you are ready, you

5    can continue going, rather than just hop back and forth.  Your

6    Honor, will o what you want to do, but it makes most sense to

7    do it that way, I believe, because they do interrelate.

8              THE COURT:  Why don't you go ahead and he can respond.

9              MR. LINDVALL:  Sure, your Honor.

10             Okay.  Could we have slide 21, please.

11             Slide 21, your Honor, I'm sure you have seen this over

12   and over again.  We have some fundamental differences in how

13   it's to be construed.  I think key part here is to understand

14   that Tomita is asking you to construe optical axes to mean

15   lines of sight.  They showed you a paper a couple of minutes

16   ago that they have come up with since yesterday.  And I'll show

17   you in a minute, it doesn't even mention lines of sight and

18   optical axes in the same context.  In fact, lines of sight is

19   not even used in that paper.

20             So Let me move on.  If we can turn to slide 23,

21   please.  And this is in our brief, but I wanted to emphasize

22   that the intrinsic evidence, which is what the Court really has

23   to pay attention to here, first and foremost, before you look

24   at extrinsic evidence, it's clear that optical axes is as we

25   define it.  It's an imaginary line.  If you look at figure 14,

1  which is in the patent, it's a line that comes out of the

2  camera.  And it's a line of symmetrical -- it's a symmetrical

3  axis, say -- trying to explain.  Like the earth has an axis, it

4  rotates on the axis, the same way with the camera.

5         And the actual term, optical axes, if you look at the

6  term axis by itself -- we didn't make this point in our brief,

7  but axis itself, connotates that there is a line of -- there is

8  a symmetrical, maybe a solid around it, which goes around it.

9  The term lines of sight can mean any type of line of sight.  If

10  we turn to slide eight very, very quickly please.  I'm sorry,

11  slide seven.  Slide seven kind of demonstrates this.  And this

12  is a demonstrative, this is not out of the patent, but from Dr.

13  Frahm's declaration.  If you have lines of sight, there is no

14  symmetry.  The line of sight can come from any of the lenses or

15  any of the cameras, and can go on any of the object, or even

16  could seen point to somewhere in space.  And you could have

17  multiple cross-points, multiple I guess optical axes.  And the

18  patent never contemplates that.  The patent contemplates having

19  one cross-point, which we'll cover in a minute, which is where

20  the optical axes intersect.  And that cross-point was key to

21  this patent.  It is where everything else is measured.  It is

22  where the offset to the images are measured.  Very important

23  concept.  And you can't have these multiple cross-points.  And

24  that's where the lines of sight would get.

25         The optical axes, we go back to slide 23, please.

1    Slide 23, figure 14, is very clear.  It shows a CL1 and CL2.

2    And those lines are down the middle of each camera.  And the

3    camera is toed in so that you get an intersection of the two

4    optical axes CL1 and CL2.  And if you look at the language in

5    specification, there is a strong implication there is only one

6    optical axes, an optical axes of the first and second camera.

7    Each camera has its own optical axes.  Lines of sight, each

8    camera would have virtually infinite amount of lines of sights.

9    And the cameras are disposed in a such a manner that the

10   optical axes intercept.  That means, what that is telling us,

11   is that you have to physically configure the camera so you move

12   this optical axes, so you can get an intersection.

13           Now, let's turn to slide 24, please.  Slide 24, your

14   Honor, we've included in your -- the slides that we gave you.

15   At the back, we have inserted the patent application.  This

16   patent application is the patent application which is cited in

17   the 644 patent in column 1.  And as you see from the cite here,

18   prior art is cited in specifications considered intrinsic

19   evidence.

20           Mr. Tomita was the inventor of this patent

21   application.  As you can see up here, it is in 2001.  And if

22   you look at this patent application he, again, uses optical

23   axes in a very consistent way that we have defined it.  He has

24   a similar figure 14, little bit different language, but set up

25   exact same way.  In other words, Mr. Tomita is using the term

1  optical axes in a consistent way, in both his patent

2  applications, which is cited in the patent, and the patent

3  itself.

4          Turn to slide 25.  The intrinsic evidence, the patent

5  itself, is clear what an optical axes is.  Not only is it clear

6  in intrinsic evidence, the extrinsic evidence supports it.  It

7  is consistent with the intrinsic evidence, which is important.

8  We're not trying to contradict the specification here.  This is

9  Dr. Fraum's declaration, a part of it.  Dr. Frahm, in both of

10  his declarations, I think cited to five or six dictionaries,

11  not papers, but dictionaries, which define optical axes in a

12  consistent fashion, which is consistent with our definition.

13          Here is some of them, and I'm not going to go through

14  them, but the federal standard, for example, is the dictionary

15  for the government, that all federal government contractors

16  have to use, established by experts in the field.  And in each

17  case, these definitions are consistent with the definition that

18  we have proposed to the Court to accept for optical axes.

19          As you can see in each case, the optical axes is

20  linked to an axis rotational symmetry.  And if you remember

21  back in figure 14 of the patent, it's exactly what you saw with

22  the optical axes.

23          Now, let's move to Tomita's support.  They called --

24  they said optical axes should be lines of sight.  As I showed

25  you on that one slide, lines of sight could be at virtually

1    infinite lines of sight from the camera.  And they say optical

2    axes should be the lines of sight.

3           Now, Mr. Merritt's opinion, if you look at it -- and

4    we have cited it here, but you can look at it right here.  It

5    is pure conclusion.  There is no support.  There is no -- we

6    didn't draw up on any citations here.  He doesn't cite any

7    papers, any dictionaries, doesn't cite to anything.  All he

8    does is make this bold statement.  Even the paper that you just

9    saw earlier by Mr. Stein, he didn't point to a part where it

10   says lines of sight was the same as optical axes.

11          The only thing that that paper has, and we'll discuss

12   that in a minute, is some -- actually, we can understand some

13   cryptic aspects about optical axes.  And I'll show you some

14   issues that we have with that paper in just a moment.

15          But, again, Mr. Merritt statement is just a

16   conclusory, no-supported statement.  It doesn't have any

17   dictionaries, they haven't attached any dictionaries, any

18   papers, or anything else to support their definition of optical

19   axes.

20          Dr. Frahm, to the contrary, has I think five or six

21   dictionaries and several articles, all of which consistently

22   define optical axes with the specifications.

23          Now, it's interesting.  If you look at their opening

24   brief, Tomita's opening brief, and then you look at the reply

25   brief, the reply brief switches gears.  I think they realized

1    when they saw Dr. Fraum's deposition, with all of these

2    dictionary definitions, they had to come up with a different

3    strategy.  And the new strategy is let's -- the idea is that

4    the patent redefined the term optical axes.  Optical axes has

5    an ordinary meaning to one skilled in the art.  But an inventor

6    is allowed to redefine a term like that.  But it has to be very

7    clear in the specification.  Because there is a notice function

8    of the patents.  And patent owners, like Nintendo, have to look

9    at this and say whether we infringe or not.  So there has to be

10   a clear sign in the patent that there has been a redefinition.

11          Now, what is important here is optical axes has an

12   ordinary meaning.  It is not some special term that was

13   created.  So it has an ordinary meaning in the art, as it has

14   already been established, it is consistently used with the

15   intrinsic evidence.  It would be very difficult for them to

16   overcome the presumption that the ordinary meaning has been

17   redefined as something else.

18          I cite a case here, at least in our brief, that shows

19   right here that you must clearly express that intent in the

20   written description.  And this is -- the whole reason for that

21   is people like Nintendo who read this will assume that optical

22   axes has its ordinary meaning, unless there is something clear

23   in the specification that's going to tell them we redefined it.

24          Okay, this is the -- the sole intrinsic evidence that

25   is cited by Tomita to say that the term optical axes has been

1    redefined.  And this is an excerpt out of the patent.  What

2    they cite in their patent, your Honor, is what's in this red

3    box, okay.  If you look at everything in context, the paragraph

4    before their red box, this discusses optical axes in relation

5    to cameras.  And that's important.  That's what we're talking

6    about.  We're talking about optical axes of cameras.

7            In this paragraph which Tomita refers your Honor to,

8    there is no mention of cameras.  It talks about lines of sight,

9    but there is no mention of optical axes, there is no mention of

10   cameras.  All it talks about lines of sight as it relates to

11   computer graphics, or image producing; nothing to do with

12   cameras.  You really to have look that in perspective.  Does

13   that meet the standard of a clear intent of a redefinition of

14   optical axes?  We would submit it is not.  I don't think any

15   reasonable person reading this would understand this excerpt of

16   the patent to be a redefinition of optical axes.

17           Now, there is one last argument that's a new argument

18   that they brought up in a reply brief, so we didn't have a

19   chance to brief it.  But I would like to --

20           THE COURT:  Yeah, well, that's really the kind of

21   thing that this oral argument is all about.

22           MR. LINDVALL:  Yes, your Honor.  But like you said,

23   they did switch gears a little bit on optical axes in the reply

24   brief, that's why I'm spending a little more time on it.

25           THE COURT:  That's fine.

1          MR. LINDVALL:  They claim now, for the first time,

2     that if the Court construes optical axes as we do, in other

3     words, the ordinary meaning, that that will force you to

4     exclude a preferred embodiment.  And they then conclude that

5     the law says you can't exclude a preferred embodiment,

6     therefore you have to make optical axes, you have to create it.

7     So it is their definition.

8          Well, they're wrong on the facts and on the law in

9     that situation, and I'll explain to you why.

10          First, the parallel camera configuration.  There is a

11     real question of whether that is even an embodiment or not in

12     the patent.  But let's go through that.  The only reference to

13     the parallel relationship in the cameras is two recitations in

14     the patent.  And those two areas, those two parts of the patent

15     where they are recited, are just exact same language as how to

16     claim eight.  There is no discussion of how a parallel camera

17     will operate, there is no drawings that show a parallel camera.

18     There is no discussion on how it would work.  And in fact, if

19     you look at the section of the patent called best modes, that's

20     where you find the preferred embodiments, there is no mention

21     of the parallel camera configuration.  The word "parallel" is

22     not even in that section.

23          In fact, what I'll show you in a minute which we have

24     talked about a little in our brief but in different context,

25     there appears to be an express disclaimer of a parallel camera

1    arrangement in the best mode section.  In fact, during

2    prosecution, there was this concept of a parallel relationship

3    camera in the best modes section.  And it used those terms,

4    parallel relationship.  And during prosecution, they actually

5    deleted that part in the specification to get rid of the

6    parallel relationship.

7            All right, these are the two instances in the

8    specification, not in the best mode or preferred embodiment

9    section, but in the specification.  And as you see, here is

10   this claim eight.  And here is the two instances, because

11   they're the same language, that are in the specification but

12   not in the preferred embodiment section.  And as you see, they

13   are the same language.  It is just parroting the same language.

14   That's it.  There is no discussion of how it works or anything

15   else.

16           Now, Tomita says, figure 1, shows a parallel camera

17   arrangements.  At first blush, you would say these cameras are

18   parallel.  But if you look at the -- look at the description of

19   figure 1, figure 1 is a block diagram.  Block diagrams are used

20   in patents all of the time.  They are functional blocks, they

21   are not intended to show configurations.  And that's exactly

22   what the patent says, figure 1 is a block diagram.  It is not

23   supposed to show the configuration, the physical configuration

24   of the camera.

25           Figure 14, however, which is what we have been

1    pointing your Honor to, is a -- it's showing a configuration of

2    the cameras.  It actually shows the camera being tilted and it

3    shows the optical axes, they're identified as CL1 and CL2.

4    Figure 1, optical axes are not identified.  These lines are not

5    even discussed in the specification.

6           If you look at the description of figure 1 in the

7    specification, there is no mention of figure 1 being parallel.

8    In fact, there is no mention of the configuration of figure 1

9    at all, the physical configuration of the cameras.

10          Now, this is a -- you are going to see this several

11   times today, this is a very interesting statement.  This is

12   again in the best mode and preferred embodiment section.  And

13   this is where Tomita makes its statement.  He says if the

14   distance to CP, that's cross-point, which we have not covered

15   yet, is infinite, there is no CP information 12.

16          What does that mean?  Can we look at slide eight.

17   Slide eight, this is not out of the patent, I don't want to --

18   but this is something we have created to show this instance.

19          In this situation, is what we have in the patent, we

20   have the optical axes coming up, they intersect and create a

21   cross-point.  Well, in a parallel configuration, the optical

22   axes never intersect.  Because they go to infinity, they're

23   parallel.  By definition, they can't intercept.  So you can't

24   create a cross-point.  If you can't create a cross-point, by

25   definition, you are not going to have any cross-point

1    information.

2              Could we go back to slide 34.  So it's interesting.

3    In the specification, they recognize this issue.  They admit

4    that it -- the distance to CP, the cross-point, is infinity,

5    which I just showed you, there can't be any CP information.  So

6    what is the impact of that?  Well, let's look at claim one.

7              The impact of not having any CP information, in other

8    words a parallel configuration, is this claim doesn't cover

9    that situation.  Because this claim says the cross-point

10   measuring means for measuring CP information, it outputs

11   information including the CP information.  If you don't have

12   any CP information, you can't have an output.  And then you

13   actually use that CP information for offsetting and displaying

14   the video images based upon the cross-point information.

15             If -- again, parallel configuration, no intersection.

16   So you have no cross-point, you can't have any cross-point

17   information and, therefore, there is nothing to display.  So

18   that particular embodiment, the parallel one, cannot be covered

19   under this claim.  And it can't be covered, by definition,

20   under claim eight, because claim eight, since it is dependent

21   on claim one, includes these limitations.

22             Okay, your Honor.  What I would like to show you here

23   is just further support for our position.  In the prosecution

24   of this patent, in the Section on best modes, there was

25   actually a reference to cameras that were gonna be disposed in

1    a parallel relationship, as you see here.  This is the

2    preliminary amendment made in the prosecution of the patent.

3    And this is in the best mode section.  They deleted in a

4    parallel relationship.  They deleted that reference to the

5    camera, how it would be disposed, or how it would be

6    configured.  And as you see, now, in the parent, the 664

7    patent, column 8, lines 11 through 18, that deletion is

8    obviously not shown there.  There is no more in a parallel

9    relationship.  I mentioned before, in the best mode or

10   preferred embodiment section of the patent, there is no mention

11   of parallel at all, because it was taken out in the

12   prosecution.  The only -- a reasonable competitor, or a

13   reasonable person like Nintendo, who is looking at the patent

14   and looks at the prosecution history, what can we conclude from

15   that?  They take out parallel relationship, they must have

16   decided not to try to cover parallel camera configuration.

17   Because there is no description about it.

18           The other interesting thing, you look at the briefs

19   and you'll see Tomita never has addressed this issue, this

20   problem they have.  Never given an explanation, never submitted

21   a declaration from Tomita saying why it was deleted or anything

22   else.

23           Now, there is case law.  This goes to preferred

24   embodiment.  This was new, they brought in their reply brief.

25   We have not had a chance to address it.

1          In general, the rule is you interpret claims, so you

2   do not exclude preferred embodiment to the patent.  We don't

3   dispute that.

4          However, where it is clear in a specification that

5   there has had been a disclaimer, then that rule doesn't apply.

6          I think I'm a missing a slide here.  Sorry, your

7   Honor.

8          THE COURT:  That's all right.

9          MR. LINDVALL:  Just a moment.

10         If you look in your packet, your Honor, this doesn't

11  have it.  There is a slide, 37, which is different than this

12  slide.  And I apologize for that.

13         THE COURT:  Hold on.  Okay.

14         MR. LINDVALL:  And, I'd really like to emphasize this,

15  this case is not cited in our brief, because they didn't bring

16  it up in the argument until the reply brief.  This is a very

17  important case for us, okay.

18         Now, we're talking about optical axes, okay.  And

19  Tomita's position is, your Honor, if you define optical axes

20  like Nintendo says so, you are going to exclude preferred

21  embodiment.  So what Tomita really wants you to do is ignore

22  the ordinary meaning of optical axes completely.

23         All right, we got it up there now.  Ignore the meaning

24  of optical axes.  And redefine it in some way that will include

25  the preferred embodiment.  What this case says, and if you read

1   the case you'll see it is right on point.  It says: If you have

2   a term like optical axes, in this case it was partially, which

3   has an ordinary meaning, the Court is --

4          THE COURT:  You know, this is really just the flip

5   side of the argument you made a few minutes ago, right?  You're

6   saying that if there is an ordinary meaning, it is presumed.

7   If there is a specialized meaning, it has to be clearly stated.

8   And all this is saying is that if there is no specialized

9   meaning stated -- I have not read the case, but obviously,

10  because it was not brought to my attention previously, but from

11  what you are quoting here -- if there is an ordinary meaning

12  that doesn't encompass the preferred embodiment, but they have

13  given you, in clear language, the special meaning, too bad for

14  them, is what this seems to be saying, yes?

15         MR. LINDVALL:  That's correct, your Honor.

16         And what it means is that rule about excluding further

17  embodiment does not apply.  Because they intend, or they lead

18  you to believe that that rule trumps the heavy presumption of

19  ordinary meaning, and actually forces you to change the

20  ordinary meaning, your Honor.  What this case says is no,

21  ordinary meaning governs.

22         There is a disclaimer, I'm not going to bother you.

23  We have talked about disclaimers, the law is clear on that.  We

24  have cited this in our case, in our thing, so there is no need

25  to go on that again.

1          Again, what we have done is we have used both the

2    intrinsic evidence, 14 in this description, and extrinsic

3    evidence, which is completely consistent with the intrinsic

4    evidence for our construction.

5          Tomita, though, doesn't provide any I think credible

6    intrinsic evidence, or no extrinsic evidence to support its

7    definition of lines of sight in an optical axes.

8          Now, your Honor, I would like to bring up one thing.

9    They provided you with this -- this paper.  They provided it to

10   us yesterday.  If I may approach, your Honor?

11          THE COURT:  Yeah.

12          MR. LINDVALL:  This --

13          THE COURT:  Same thing they handed up before.

14          MR. LINDVALL:  Well, it looks the same, but the

15   interesting thing is we started looking at this paper a little

16   more carefully.  And if you look at page 4 of this version,

17   which is on the author's website, Andrew Woods' 3D, and he has

18   got it up on the screen now, you will see this idea of camera

19   axis and lens axis is not even on this version of the paper.

20   I'm not sure what version was used, or where it was used.  But

21   if you look at the paper they handed to you, your Honor, and

22   look at the same diagram and compare them.

23          THE COURT:  Yeah.

24          MR. LINDVALL:  Okay.  Here, he has it side by side.

25          Okay, up on the screen we have a side-by-side version.

1BM0NIN1                         Markman Hearing

1    The paper they handed you has this lens camera axis and camera

2    optical axes, but that language is not used in the paper that

3    we got from this author's website.  The only point I'm trying

4    to make there is this is not a credible piece of extrinsic

5    evidence.  It took us, literally, 15 minutes to find a paper,

6    the same paper, which didn't even have this language on it.

7    And we have the URL website that we got it from right at the

8    top.

9           So to the extent that this is their only extrinsic

10   evidence, I submit your Honor, it is not even a reliable

11   document from that standpoint.

12          The other thing about this document, if you look at

13   the preceding page of what they gave you, the second page to

14   this document --

15          If you could blow that up right there.

16          -- this is the first diagram you see in the document.

17   It completely supports our position.  You have the two cameras,

18   looks a lot like figure 14 in the patent.  Two cameras, total

19   configuration, convergence point, and optical axes were both

20   identified.

21          So, if anything, at least this diagram is consistent

22   in both papers.  And it shows where the optical axes is.  And I

23   would also like to submit to your Honor there is no discussion,

24   whatsoever, in the patent, or any distinction between a camera

25   optical axes and a lens optical axes.

1          I asked Dr. Frahm this morning, I said have you ever

2   heard of a difference between the two.  And he says, no, I

3   never heard the difference between a lens optical axes and a

4   camera optical axes.  The dictionaries don't make a

5   distinction, they just call it an optical axes.

6          The patent doesn't make a distinction, it just calls

7   it an optical axes.  It doesn't call it a camera or a lens

8   optical axes.

9          So to the extent they rely on this extrinsic evidence

10  we submit it is not credible.

11         That's all I have, your Honor.

12         THE COURT:  All right.  Let me hear from plaintiff's

13  counsel.

14         MR. STEIN:  Start with the last point first, which is

15  I just received this paper, the other copy of it.  The paper,

16  really, that we gave you was the one that was in the

17  proceedings of a conference back in 1993.  The version they got

18  off the web, I'm nature sure what it was, maybe it was a draft,

19  maybe a different version of it.  But the paper that we gave is

20  in the proceedings of that conference and have the language --

21         THE COURT:  Well, if you look at the top of the

22  version they gave me, it purports to be from the proceedings

23  too.  The only difference, perhaps, is the version you have

24  given me is the -- purports to be the copyrighted version,

25  which maybe gives it a greater air of finality than the other

1BM0NIN1                         Markman Hearing

1    version.  I'm not sure I would -- I doubt very much that

2    anything material is going to turn on the difference between

3    these two.  I was just curious.

4              MR. STEIN:  My understanding is that the version that

5    we gave you is taken from the conference proceedings

6    themselves.  Though, I agree that --

7              THE COURT:  Well, but if you look at the -- your

8    version -- and I really don't want to spend a lot of time on

9    this.  But your version says at the bottom:  Proceedings of the

10   SPIE Volume 1915, stereoscopic displays and applications Roman

11   Numeral IV, San Jose, California, February 1993, copyright

12   1993, Curtin University, Andrew Woods.  Their version says at

13   the top, taken from Andrew Woods' website, stereoscopic

14   displays and applications, Roman IV, proceedings of the SPIE

15   Volume 1915, San Jose, California February 1993.  I don't know

16   why I should pick one of these over the other.  On the other

17   hand, nice thing about both of these things is that neither of

18   them were cited in your briefs, so I am tempted to say forget

19   about it, I won't consider either one.

20             MR. STEIN:  Well, the reason why we brought it up now

21   was it is Nintendo's emphasis in their --

22             THE COURT:  Well, wait a minute.  Let's forget about

23   your reason, and let's talk about the law.  You had a moving

24   brief, they had an answering brief, you had a reply brief.  You

25   didn't include the article you handed up today in any of those,

1BM0NIN1                        Markman Hearing

1   did you, in either your moving or answering brief?

2            MR. STEIN:  We did not, your Honor.

3            THE COURT:  Okay.  And they would have a better

4   argument, perhaps, for adding something because you got the

5   last shot.  But I think the law is that both of you were

6   limited to your briefs without permission by the Court, so.

7            MR. STEIN:  Excuse me.  We actually had parallel

8   briefs, so we both filed opening briefs.

9            THE COURT:  That's true, that's true.

10            MR. STEIN:  And --

11            THE COURT:  So I come back to my point, which is, both

12   of you are limited to what is in your briefs except upon

13   permission of the Court.  I will consider whether or not to

14   consider these articles, but I don't want to waste any more

15   time.

16            MR. STEIN:  Okay, thank you.

17            THE COURT:  But what I thought was interesting was

18   this sort of implicit question of, on the one hand there appear

19   to be cases that say that if a definition of a term used by one

20   party would exclude the preferred embodiment, that's very

21   strange and not likely the proper meaning.  But, on the other

22   hand, they point to a case which was not in their briefs, but

23   here they are on more solid ground for having the Court

24   consider it, because it is a reported case, and responds to

25   something in your reply brief which says, at least based on

1    what they have quoted from it, that:  If the ordinary meaning

2    of a term would exclude the preferred embodiment and,

3    therefore, you have to give it some specialized meaning in

4    order to include the preferred embodiment, and the patent

5    holder has not, in the patent, specified this specialized

6    meaning, then the patent holder is out of luck.

7            Now, I am reminded, when I hear all of that, assuming

8    that that is an accurate description of these competing cases,

9    of the famous law review article that appeared about 50 years

10   ago from Carl Llewellyn  of Yale in which, talking about not

11   patent construction, but general legal construction, he pointed

12   out that there is a cannon of instruction for every situation

13   and an opposite cannon of construction for every situation.

14   And it's an example, if you will, in terms of construction

15   canons of Newton's second law, for every cannon there is an

16   equal and opposite cannon.  So equal in force, but opposite in

17   direction.  So, if these cases are correctly cited, and I don't

18   know yet, there seem to be competing canons of patent

19   instruction here, so which should I use?

20           MR. STEIN:  Well, I don't think there are competing

21   canons here.

22           The first point is that Tomita did define the term

23   "cross-point" in the patent to mean convergence point, which we

24   cited in our briefs.  And convergence point has a well-known

25   meaning in the art.  And it applies both to toed-in camera

1    configurations and parallel camera configurations.  It means

2    the point of zero parallax, which is what is described in the

3    brief.  So there is a definition of cross-point provided in the

4    patent that applies to all of the embodiments.  Nintendo's

5    counsel cited another patent by --

6            THE COURT:  Well, I mean that's a fair point, but this

7    comes up in the context of the definition of optical axes.

8            MR. STEIN:  Right, but -- but the cross -- the

9    cross-point is -- it's the cross-point of optical axes.  And it

10   is -- it is defined, that cross-point is defined in the patent

11   to be the convergence point.

12           THE COURT:  Uh-huh.

13           MR. STEIN:  Another point, if we can turn to slide 18.

14   To the extent that Nintendo is arguing that it spell out a

15   special definition, of course that special definition can be

16   supplied by implication.  And, here, not only does the patent

17   refer to the convergence point, and I was going to mention that

18   the other Tomita patent that Nintendo's counsel referred to,

19   even more so proved the parallel between the cross-point and

20   convergence point.  And, you know, noted in numerous places

21   that where he was talking about cross-point, he meant

22   convergence point.  So here, the patent is -- not only

23   describes, but claims this parallel arrangement.  And it

24   mentions that -- the cross-point, or defines basically --

25           THE COURT:  Let me just say, are you saying, now, just

1    so I understand your present position, are you saying that your

2    patent uses optical axes in the ordinary meaning, or in a

3    special meaning?

4              MR. STEIN:  Well, I think the ordinary meaning that

5    would be understood by those skilled in the art when the claims

6    in the patent are talking about the optical axes of the camera,

7    is not -- is our definition.  That would be the ordinary

8    meaning.  They cite the dictionary definitions about the

9    optical --

10             THE COURT:  Okay, all right.  So you are saying you

11   are using the ordinary meaning that would be given to that term

12   by someone skilled in the art, not especially defined.

13             MR. STEIN:  I missed the last thing.

14             THE COURT:  Not especially defined.

15             MR. STEIN:  What I'm saying is that in the context of

16   the patent, those skilled in the art, where they read the

17   phrase, they see the phrase "cross-point of optical axes" would

18   understand that that meant the convergence point.  I mean if

19   you pick out optical axes, and take it out of context --

20             THE COURT:  What I'm trying to find out -- I'm just

21   trying to find out what your position is.  Let me see if I can

22   give an example from ordinary language.

23             So let's take the word character.  And if you just see

24   that in the sentence, Ophelia is one of the characters in

25   Hamlet -- in the play Hamlet, that's one -- that's an -- you

1BM0NIN1                         Markman Hearing

1    wouldn't have to further define what a character meant.

2    Everyone would know that would mean one of the fictional

3    persons portrayed in the play.

4          But if you said the critic said, When I think of all

5    of the weird things she does, I have to say that Ophelia is

6    quite a character, that's a very different meaning of

7    character.  That is a specialized meaning, albeit one provided

8    by implication, not by any specialized definition.

9          So it's really partly a question of intonation in the

10   way that sentence is spoken.  So I just want to find out what

11   your position is.  Are you saying that you're using optical

12   optical axes in the patent should be read with that given the

13   ordinary meaning that one person skilled in the art would give

14   it in this context, or are you saying we are using it in a

15   specialized way, but it's one that is there by implication.  I

16   just want to find out which of those two you are saying.  I

17   think it's one of those two, yes?

18         MR. STEIN:  I guess I don't have a clear distinction.

19   I thought you were going to go a little bit differently with

20   that, because the distinction is not crisp in my head, I

21   thought you were going to say --

22         THE COURT:  Forget my, probably not very good because

23   it was off the top of my head, kind of analogies, just tell me.

24   Please answer these questions if you can, yes or no.

25         Are you saying that optical axes should be given its

1    ordinary meaning.  I understand you don't agree with them as to

2    what the ordinary meaning is, but are you saying it should be

3    given its ordinary meaning?

4              MR. STEIN:  I don't want to be evasive, but going back

5    to your example for a moment, you can't determine the ordinary

6    meaning of a word.  Words, many words, can have multiple

7    meanings.  And you have to look at the context of the word.

8              THE COURT:  That's why I added context in the original

9    question, so I couldn't figure out why you were rejecting that.

10   But, all right, are you saying that its ordinary meaning in

11   this context to a person skilled in the art would be what you

12   say it is?

13             MR. STEIN:  Yes.

14             THE COURT:  Okay.  So then, if that's true, you're not

15   saying that it has some specialized meaning, are you?  You're

16   saying its ordinary meaning, in context, as would be apparent

17   to someone skilled in the art.  Whereas a specialized meaning,

18   at least from what these cases seem to bear on it, is more

19   where you say two and two normally equals four, but we're going

20   to define it, especially because we're not going to use a base

21   10 arithmetic, we're going to use a different kind of

22   arithmetic under which two and two equals eight.  That's

23   specialized.  You have to spell it out because no one would

24   understand that, when they saw two and two equals eight, in

25   which you gave it a specialized meaning, correct?

1          MR. STEIN:  Well, again, I don't want to be evasive --

2          THE COURT:  No, no.

3          MR. STEIN:  -- the term -- and I hope I'm not coming

4    across that way -- but the term cross-point of the optical axes

5    of pick-up means has a meaning specialized to this field.  If

6    you take the term optical axes out of context, and you just

7    look it up in the dictionary, no, that's not the --

8          THE COURT:  No, no.  Well, all right.  I understand

9    that -- now I think there is a difference, maybe I can put it

10   this way, and then we're going to break because I must be at

11   another meeting, which I'm already one minute late for.  And

12   we'll continue again at 2:00, and maybe you ought to think

13   about this some more.

14         If you look it up in the dictionary, you will often

15   see, you know, the primary meaning, and then you'll see a bunch

16   of secondary meanings that clearly only apply in specialized

17   context and, usually, the dictionary indicates the specialized

18   context, in ophthalmology, this term means such and such and so

19   forth, whereas in ordinary everyday language it doesn't.

20         But, if you are giving a word a definition that no one

21   would put in any dictionary, even a specialized dictionary, you

22   are just choosing to define it in the specialized way, which

23   you are permitted to do, that's something different.  So that

24   arises, for example, all of the time with acronyms.  We're

25   going -- we're going to call this method that we're seeking to

1BM0NIN1                      Markman Hearing

1   patent the JT23.9 method.  You wouldn't fine JT29.9 in any

2   dictionary.  But they then spell it out:  As used here, it

3   means blah, blah, blah, blah.  That's a specialized meaning.

4   That's not an ordinary meaning in context.  It's a specialized

5   meaning.  I'm only raising all of this because there seems to

6   be -- it seems to be you are trying to ride two different

7   horses here.  And I just want to try to find out which one, in

8   fact, is your preferred horse.

9             So we'll reconvene at 2:00.

10            (Recess)

11            (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                            AFTERNOON SESSION

 1                THE COURT:  Please be seated.  All right, so let's

 2   continue where we left off.

 3                MR. STEIN:  Okay, to get back to the question we left

 4   off with, I guess, again, we believe that the meaning of

 5   optical axes, that we're giving its ordinary meaning to one

 6   skilled in the art in the context of the specification.

 7   However, if we're -- and I don't know if under the law we can't

 8   argue these two things in the alternative.  But if we're going

 9   to choose between one, we're going to --

10                THE COURT:  You can -- you can argue them in the

11   alternative, I didn't mean to suggest that you couldn't.  But

12   the -- I wanted to find out what was your preferred position,

13   which is the former.

14                MR. STEIN:  The preferred -- well, I mean we're

15   interpreting the terms as they're being used within the patent.

16   So the preferred -- I mean we're giving it the meaning within

17   the patent.  If that differs from what your Honor determines

18   the ordinary meaning is, then we're -- we believe that the

19   specialized use of the term, as is used within the patent, is

20   the one that should control.

21                THE COURT:  Well, the reason -- and I don't think we

22   should spend more time on this, because we only have an hour

23   left and we have other things to cover.  It seems to me that it

24   is not at all uncommon in patents, as in life, that words

1    gather their meaning from the context and, therefore, one

2    skilled in the art, whether the art is, in this case, a patent

3    art or a more everyday experience, something like baseball, or

4    social occasions, or whatever, will define a term according to

5    its context.

6             What I was trying to inquire about, maybe

7    inarticulately, is there are also situations where one takes a

8    term that has either an ordinary meaning, or sometimes no

9    meaning at all, and one gives it a specialized meaning.

10   Sometimes that's apparent from the context.  But, more often,

11   it is apparent only because you posit a definition.  So, for

12   example, if one was talking college football and one referred

13   to SEC, one would be referring to the Southeast Conference.  If

14   one was talking securities law and one referred to the SEC, one

15   on would be referring to the Securities and Exchange

16   Commission.  And anyone skilled in the art of either college

17   football or securities law, would instantly recognize, from the

18   context, which you were referring to.

19             But, if you wanted to have the term SEC refer to

20   sometimes edible chocolate in the context of a cooking case,

21   you would have to define it as such.  It wouldn't leap out just

22   from having the terms, this chocolate, as SEC, would be

23   meaningless.

24             So, I think where this is going, the reason I spent

25   even this much, perhaps inordinate amount time is that your

adversary is suggesting that you are giving a specialized

meaning to the term "optical axes." And that you have not

especially defined it. And that its meaning would not be

apparent from the context specialized meaning. And, therefore,

your adversary says you're out of luck if you have not defined

it. And that's, really, it was in the context of that argument

that I was asking it, but let's move on to other matters.

          MR. STEIN: Okay. One argument that Nintendo makes or

a number of them, relate to this concept of disclaimer and

argues that Tomita disclaimed the paralegal camera arrangement

and, therefore, cannot be within the scope of claims. That

argument basically turns the document disclaimer on it head.

There can't be a disclaimer of something that is explicitly

claimed. And Nintendo hasn't cited a single case for the

proposition that something that is explicitly said in a claim

is disclaimed. It is just contrary to the document.

          The studies, on slide 13, which is being displayed

right now, the disclaimer, I don't know if it says there, is

the consideration of the prosecution, history and arguments

made, to determine whether the applicant clearly and

unambiguously -- this is very important, it has to be clear and

unambiguous disclaimed or disavowed any interpretation during

prosecution in order to obtain a claim allowance. Well, if you

look at slide eight, eight, expressly claims the parallel

arrangement. So the argument and the doctrine are a 180

1    degrees out of kilter.  They just don't go together.  And there

2    can be no disclaimer here.

3          The claim expressly recites the pick-up means being in

4    a parallel relationship, and that there is a cross-point in

5    that configuration.  And I mean the bottom line is that

6    Nintendo doesn't want the claims to cover the parallel

7    relationship, because it supports their noninfringement

8    argument.  But the claims claim it, the patent describes it,

9    and they can't get around it.  So, you know, they -- you know,

10   they talk about one part of the claim -- one part of this fact

11   where language was deleted.  But the language is basically

12   identical language in other parts of the spec.  But it is all

13   besides the point, because there is no clear and unequivocal

14   disclaimer.  It is right there claiming there is a parallel

15   relationship with the pick-up means, and it's reciting a

16   cross-point.

17         Nintendo also argues that -- relates to I think they

18   cite a place in the patent where it talks about a distance to

19   cross-point is infinite.  There is no -- I think it says there

20   is no SET information.  But the distance to the cross claim is

21   only infinite under Nintendo's construction in a parallel

22   arrangement.

23         Under Tomita's construction, which is consistent with

24   the spec and what everybody skilled in the art knows, is that

25   there is a cross-point meaning convergence point, even in the

1    parallel arrangement.  That is not infinite.  So even in a

2    parallel arrangement, there would be a cross-point that is not

3    infinite.

4          Another point, I think it goes back a little bit to

5    the discussion earlier, but the dictionaries can override the

6    way the terms are used within the patent.  And we cite case law

7    to that effect and, you know, refer to the brief for that.  But

8    to the extent there is an inconsistency between Nintendo's use

9    of dictionary definition and what is plainly described and

10   claimed in this patent, the patent governs.  The patent is

11   written -- that specification is the foremost resource for

12   determining what the claims mean.  And you can't use extrinsic

13   evidence to change the meaning of terms as they're described in

14   the specification.

15         Nintendo also points to claim, figure 1, saying that

16   it doesn't depict the parallel arrangement of cameras.  Yet, if

17   you look at figure 1, it is parallel to claims -- discussed

18   parallel arrangement cameras.  There is no reason why someone

19   skilled in the art would assume they are anything but parallel.

20         And final point I would like to make, if you look at

21   slide 18, the specialized meaning may be implicit in the

22   specification.  It doesn't need to be, you know, redefined as

23   termed to mean X, Y, Z.  And we cite cases to that effect in

24   our briefs and we'll rely on our notes.

25         And then the mystery of that earlier paper which

1    confirms that one skilled in the art were using optical axes to

2    mean camera access in the manner we suggest.  The mystery of

3    why two different versions is solved.  If you look in the end

4    of the version produced by Nintendo, there is a link to the pdf

5    version, which is the version that we gave you.  Okay.

6              THE COURT:  Thank you.

7              MR. LINDVALL:  May I have a couple of brief comments,

8    your Honor?

9              THE COURT:  Yes.

10             MR. LINDVALL:  If we can first turn to slide 39,

11   please.

12             The comment relating to the law that if the claim has

13   express language, you can't disclaim it.  Well, the SciMed case

14   says exactly the opposite.  Even if the claim -- even in the

15   plain language of the claim and embodiment or something else

16   can cover it, if there is a disclaimer in the specification,

17   which is what we showed you, then it can be deemed outside of

18   the scope of the claim.  And the SciMed case has been cited

19   frequently, even today in federal cases.

20             Slide 23, please.  There was some comment that we are

21   relying just on extrinsic evidence and, somehow, our extrinsic

22   evidence is inconsistent with the intrinsic evidence.

23             Well, this slide 23 lays it clearly out.  The

24   intrinsic evidence shows what optical axes is and how it has

25   been defined.  And it is defined exactly, or as far as I'm

1    concerned exactly, consistent with the extrinsic evidence.

2    There is no inconsistency between the extrinsic evidence and

3    the intrinsic evidence with respect to optical access.

4           If you look at the reply brief and you actually look

5    at their slides they have here, what you have here is Tomita's

6    clearly attempting to create a specialized meaning of optical

7    axes.  And if you look at the one section of the patent they

8    rely on that they claim redefines the term optical axes, you'll

9    see it is clearly not redefined in optical axes.  That section

10   that they rely on, doesn't even mention the word "camera" or

11   "optical axes" in it.  It only mentions the words "lines of

12   sight."  So there is clearly no, or at least a clear intent

13   that optical axes was redefined as opposed to its ordinary

14   meaning.

15          Your Honor, that's all I have.

16          What I suggest we do is that we continue with the

17   cross-point measuring means.  And the next term is

18   "cross-point."

19          THE COURT:  Yes, that's fine.

20          MR. LINDVALL:  I don't know how you want to do this.

21   Would you like to go to cross-point or continue?

22          THE COURT:  Why don't you go, and then we'll have

23   plaintiff.

24          MR. LINDVALL:  That's fine, your Honor.

25          Okay, if you turn to slide 42, please.

1BM0NIN1                    Markman Hearing

1           Now, this is the claim language where cross-point

2      comes up.  And as you see, it's the cross-point of optical

3      axes.  And this is an important point, because with the optical

4      axes intersect, as the patent says several times, defines the

5      cross-point.  And it says right in the claim, cross-point CP of

6      optical axes.  So that's plain language.

7           Now, if we look at the constructions, proposed

8      constructions, Nintendo says there is a point of intersection

9      of optical axes between each of the cameras, which lies on the

10     surface of an object, okay.  Now, Tomita's construction is

11     convergence point.  And I think there is some agreement between

12     these two definitions.  And let me show you on this slide here.

13          First of all, I think there is agreement between the

14     parties that the intersection of the optical axes defines the

15     cross-point.  And as you see here, we site intrinsic evidence

16     up here that is, again, figure 14, which optical axes CL1 and

17     CL2 of the first and second cameras, right here, respectively

18     are intersected as formed.  That the CP, cross-point, on the

19     surface of an object.

20          And if you look at Mr. Merritt, Tomita's expert, he

21     says the convergent point is defined by where the lines of

22     site, of course lines of sight is what they define as optical

23     axes.  From the left camera and the right camera, intersect or

24     cross in space in front of the cameras.  So Mr. Merritt says

25     that it is where these lines intersect in front of the camera.

1     So it looks like the parties agree that cross-point is

2     where there is an intersection of the optical axes.  It's

3     obviously a disagreement on what each party believes an optical

4     axes is.

5     So what is the dispute here?  The dispute goes on

6     whether the cross-point lies on the surface of an object

7     captured by the cameras.  And Tomita's view is that there is no

8     such limitation.  The cross-point could be anywhere.  It

9     doesn't have to be on the surface of an object, it could be in

10    space somewhere.  In other words, you could have these optical

11    axes in the cameras floating in space.

12    So let's move to that.  Now, your Honor referred to

13    this earlier, I believe.  Cross-point, both parties agree, is

14    not a term, an ordinary -- a person of ordinary skilled in the

15    art would understand how they mean.  So it's unlike optical

16    axes, as an ordinary mean, cross-point is a term that has been

17    made up for this patent.  And what the case law says in that

18    situation, when you have a term that a patentee has made up

19    that doesn't have an ordinary meaning, it is limited by the

20    scope of what the specification says.  And we cite two cases

21    here.  It says when you have a term that has no accepted

22    meaning to one of ordinary skill in the art, you construe it

23    only as broadly as it is provided for the patent itself.

24    Same type of quote here.  These two federal circuit

25    cases.  This one was the term marker substance and this is

1BM0NIN1                    Markman Hearing

1   route key.  These are two terms that both parties agree have

2   ordinary meaning.  So, therefore, you look at the

3   specification, you don't go broader than the specification.  So

4   whatever the specification says about cross-point, that is the

5   limit.  It's unlike some other type of terms.

6              Okay.  So let's look at the specification and find out

7   what cross-point means.  And we have two instances here.  For

8   example, where it says a cross-point, CP, on the surface of an

9   object to be picked up as.  Again, it shows a cross-point here

10  on CP on figure 14, object surface.  It shows line on surface

11  of the object.  Again, in another part of the patent, this is

12  actually a very good definition.  The intersection of these

13  axes, the optical axes is the cross-point, CP, which is present

14  on a plane of the object.

15             Two very clear instances in the specification that the

16  cross-point first has to be intersection of the axis of the

17  optical axes, and also has to be present on a plane of the

18  object.  And it actually makes sense with this patent.  Because

19  what you are doing, you have to find this cross-point as a

20  reference point for how everything else is going to look in the

21  three-dimensional space.  So you want to have that point to be

22  something on an object so you can see the offset for the other

23  objects in space.

24             So if you have a cross-point somehow floating in space

25  somewhere, that is not going to give you a reference point for

1BM0NIN1                        Markman Hearing

1   anything.  So the only way you see cross-point being used is

2   present on the  objects.

3         Now, this I think is very like the positions here,

4   slide 47.  We have up here, we have a patent, the

5   specification.  The specification says, quote, intersection of

6   these axes is the cross-point, CP, which is present on a plane

7   of the object.

8         Very, very clear what cross-point is.  Look at the

9   brief, reply brief.  This is what Tomita's position is.  While

10  the cross-point maybe on the surface of an object captured by

11  two pick-up means, there is no requirement that there be an

12  object located at the cross-point.

13        Completely contrary to what the specification says.

14  So their position is opposite, or completely contrary or

15  contradicted by the specification itself.

16        And, as you recall, the cases I cited earlier where

17  you have a term like cross-point that doesn't have an ordinary

18  meaning, then the Court is limited or the patentee is limited

19  to the scope to just what is in the specification.

20        So the way of other arguments, those are in our brief,

21  I don't think there is any reason to go on.  But I believe that

22  cross-point should be defined both as intersection of the

23  optical axes, which I don't think is really at any dispute and,

24  second, that cross-point must lie on the space of an object.

25        Thank you.

1          THE COURT:  Thanks very much.  Let me hear from your

2     adversary.

3          MR. STEIN:  One part of the patent that they failed to

4     focus on was the phrase, says it right there, at this time a

5     cross-point parentheses, convergence point, CP, on the surface

6     of an object.  Then it goes on.  It's clear from the context of

7     the patent that cross point means convergence point.

8          And it's clear, for many reasons, but it goes to what

9     the patent is actually about.  And it is about displaying, in

10    one aspect, an object that's being picked up by the cameras at

11    a distance when it is being viewed that reflects how far away

12    it was when it was being picked up.

13         Now convergence point is a very well-known concept in

14    this field.  In fact, I don't think there is any dispute

15    between the parties or the experts that the convergence point

16    is a point at which there is zero parallax between a left eye

17    image and right eye image.  That means if you looked at an

18    object that was at a convergence point, it would be in exactly

19    the same position in the left eye image and the right eye

20    image.  If you viewed it on the screen, it would appear on the

21    screen.  And so what the patent is describing is, you know, one

22    aspect that we mentioned, is that you capture that information

23    when you are taking the picture, but then you're -- typically,

24    you are focusing on an object, but it is not required by the

25    claim language, but typically focusing on an object, or

1    fixating on an object, and you want to display that object at a

2    particular point, you know, in space, like reflects how far

3    away it was previously.

4            Now, turning to -- and by the way, convergence point,

5    I don't think there is any dispute between parties or experts,

6    is a well-known concept both in this toed-in camera

7    configuration and a parallel camera configuration.  So when

8    Nintendo is talking about excluding the parallel camera

9    configuration, it doesn't really have anything to do with what

10   this aspect of the invention is directed at.  This aspect of

11   the invention is displaying things, you know, based on

12   conditions that were present when an image was picked up.  And

13   it's -- the same is true regardless of the camera

14   configuration.

15           Now, if you turn to the figure -- I think we might

16   have to -- here, 14.  The figure they keep showing on the

17   screen, a slide of it.  But anyway, that shows that toed-in

18   camera arrangement.  The cross-point is going to be where the

19   cross-point is in that configuration, regardless of whether

20   there is something there or not.  Means describe, as an example

21   in the specification, it describes there being an object there.

22   Typically, you would fixate on an object, that where those

23   lines cross -- well, here is a good example.  I mean -- on the

24   left side, it shows the distance to the cross-point there.

25   Actually, in that particular example, it doesn't depict an

1    object there.  But the lines will cross where they cross.

2              In the parallel configuration, you know, it will be a

3    distance where there is zero parallax, depending on how you

4    offset the images, you know, based on how the -- how the images

5    are offset with respect to each other.

6              So it's irrespective of there actually being an object

7    there.  But as an example in the spec, it describes this aspect

8    in connection with fixating on an object.  But it is not

9    required.

10             I think that's all I -- I have on that one.  I think

11   the rest is in the brief.  And, really, the main issue here is,

12   you know, what optical axes means.

13             THE COURT:  Thanks very much.

14             Let's go to whatever response.

15             MR. LINDVALL:  I have 30 second response.  This

16   concept of a zero parallax, you can read a patent a hundred

17   times and you won't see that concept that a cross-point is

18   defined as somewhere where there is a zero parallax.  It is

19   defined as an intersection of the optical axes.

20             Thank you, your Honor.

21             THE COURT:  Okay.  What other terms did the parties

22   want to address at this point?

23             MR. LINDVALL:  Your Honor, I think in the cross-point

24   measuring means, we still have CP information, and then we have

25   the cross-point measuring means.

1           THE COURT:  Okay, why don't you go ahead.

2           MR. LINDVALL:  Okay.  If you turn to slide 50, please.

3    As you see in the -- the cross-point measuring means, this is

4    another term that is in that clause, CP information.  We

5    briefly alluded to that earlier with respect to the disclaimer

6    and specification.

7           The parties' positions, and we are quite a bit

8    different on this area, but we, Nintendo, says that the CP

9    information, again -- wait, let me back up for a second.  I'm

10   sore, your Honor.

11          CP information, like cross-point, is not a term an

12   ordinary person skilled in the art would understand.  It's like

13   cross-point is something you have to look to the patent to look

14   at.

15          So, if you asked Dr. Frahm or Mr. Merritt, and you

16   asked them if they ever heard of CP information, or cross-point

17   information, they would say no.  And I don't think there is a

18   disagreement on that.  So it's not a term that an ordinary

19   person skilled in the art understands.  Therefore, under the

20   case law I cited earlier, you look at the specification, and

21   you cannot go any broader than the specification.

22          So, the construction that we're proposing here is that

23   it has -- the CP information has two pieces of information.

24   One is it has the distance between the two cameras, and the

25   second, it has a distance between the cameras and the

1    cross-point.  And that's called CP information.  That's how it

2    is used in the patent numerous times.  The additional thing

3    that we believe it requires, and this is because of the very

4    clear disclaimer and specification, is that there is no CP

5    information when the cross-point is infinite.  And I'll show

6    you this express language in the specification related to that.

7             So let's move to slide 55.

8             So, as I mentioned before, there is no dispute CP

9    information, is it's not an ordinary term someone skilled in

10   the art would understand.  So, therefore, we go to the

11   specification.  And virtually every instance in the

12   specification where CP information or cross-point information

13   is referenced or discussed, is discussed with just two pieces

14   of information in it.  One is the distance between cameras, and

15   the distance from cameras to the cross-point.  And we have a

16   number of citations here.  And then slide 55, they are in our

17   brief, there is no reason to go through every one of them.  If

18   you look through those, you will see they support what I just

19   said.

20            Now, this is the important part.  This is our negative

21   limitation, or negative part of our definition that we believe

22   has to be in there.  And in the specification, and this comes

23   right out of the specification, it says, Even if the distance

24   to CP is infinite, there is no CP information.

25            Now, where the cross-point is infinite -- if we can go

1    back to slide eight, I believe.  Slide eight shows the

2    situation where you have the cameras are parallel, the optical

3    axes are now parallel.  So these two optical axes will never

4    intercept, so the cross-point will be at infinity; in other

5    words, you will never get a cross-point.  In that particular

6    instance, the specification says, in black and white, that

7    there will be no CP information.  And the reason there isn't

8    any CP information, because the distance, there is no CP.  So

9    you can't have any CP information to give.

10           So if we go back to the slide I was just on, it was

11   slide 55 -- I mean 56.  So that there is express disclaimer in

12   the specification, and you remember the SciMed case I talked

13   about, I don't know care whether they said that claim 12 or

14   claim 8 should be expressly covered it or not, SciMed says if

15   there is expressed disclaimer in the specification, it's too

16   bad, that is what the patent is telling the world the coverage

17   of the patent is.

18           So, here, we have the distance to CP is infinite, like

19   I just showed you, that's where you have a parallel situation,

20   there is no CP information, so that situation, that disclaimer

21   should be reflected in the definition of CP information.  The

22   jury, or whoever the trier of fact is going to be in this

23   situation, should understand that the claims are limited in

24   that situation.

25           Now what is the impact of no CP information. Let's

1    see.  I had another slide.  Earlier, I told you about the

2    impact of the claim itself, claim one.  Claim one, please.

3           Claim one, if you see it, it requires CP information.

4    There is a measuring of the CP information.  There is an output

5    of CP information.  And then the actual CP information is used

6    to create the video image.  So CP information with respect to

7    claim one, and that means all of the dependent claims.

8    Remember, there is only one independent claim in this case.

9    And everything is else is dependent on claim one.  And that

10   means all of the limitations of claim one find their way into

11   the dependent claims.

12          So you need the CP information.  Essentially, what

13   this means, now, is this disclaimer -- go back to slide 56,

14   please.  The disclaimer says where you have a CP is infinite,

15   parallel situation, parallel optical axes, you don't have any

16   CP information.  You don't have the CP information, you don't

17   fall within the scope of claim one, because there is several

18   limitations you do not meet.  And because you don't fall under

19   the scope of these limitations, since all of those limitations

20   are incorporated by reference -- are found by reference in the

21   dependent claims, you don't -- the claims scope of the

22   dependent claims are not covered in that situation.

23          This slide right here, again, there is the SciMed

24   case.  It says if the specification makes clear that the

25   invention does not include a particular feature -- in this case

1    it would include CP information, where you have a CP of

2    infinity, then that's outside of the reach of the claims of the

3    patent.  That's even if the claims, for example, claim 8 is

4    broad enough to cover that situation.

5            The claims do not trump over a disclaimer in the

6    specification.

7            The other case I cite there, which is not in our

8    brief, is disclaimed subject matter must be reflected in claim

9    construction.

10           In Other words, Courts typically in this situation, so

11   there is no confusion, will put the disclaimer and reflect it

12   in the actual claim construction like our proposed definition

13   does.

14           That's so that there will be no confusion with respect

15   to the trier of fact about the claim scope.

16           With respect to CP information, your Honor, unless you

17   have any questions, that's all I have right now.

18           THE COURT:  All right.  Let me hear from your

19   adversary.

20           MR. STEIN:  I'll address Nintendo's counsel's point

21   first.  The sentence that he refers to, the supposedly -- well,

22   the statement that they -- where is that -- it's -- it all

23   boils down to the Court's construction of what optical axes

24   means.  So if the Court agrees with Tomita's construction, then

25   even in the parallel embodiment, the cross-point would not be

1    at infinity.  So if that term is included within the

2    construction, within -- that extra sentence at the end is

3    included in the construction, I think it just would end up

4    being very confusing to the jury, for one, because it sort of

5    comes out of nowhere, in a way.  I mean because we're dealing

6    with a situation where there is a cross-point for the parallel

7    camera arrangement and I don't know how Nintendo would use that

8    second sentence in that scenario, but if they bring it up or

9    try to argue that there is no cross-point information because

10   it was parallel, that would be contrary to Court's construction

11   of other terms.

12        And I think it brings up another canon with respect to

13   this rule of doing Markman, which is that the Court should

14   focus on issues that would be addressed in other issues in the

15   case.  Like infringement.  And validity.  And if there

16   is some term or some -- maybe some aspect of a term that isn't

17   going to be important for that particular -- those issues, then

18   I think just putting that phrase or putting that kind of

19   language in is just very confusing.

20        So there are three issues with respect to this term.

21   That was one of them.  The other one was -- and it is not

22   entirely clear, but it seems like Nintendo's position is that

23   the cross-point information must be a numerical value for the

24   distance to the cross-point, as opposed to information from

25   which that distance can be derived.  And as we explained in our

1BM0NIN1                        Markman Hearing

1    brief and explained earlier, what is important is that the

2    display means -- when the image is displayed, that the distance

3    is reflected.  It doesn't necessarily require that a numerical

4    value get transmitted from the pick-up means to the display

5    means, as long as information from which that distance can be

6    derived is transmitted there.

7            And then the other related issue is whether the

8    cross-point information must include the distance between the

9    pick-up -- between the two pick-up means.  And, again, as

10   described in the specification patent, the purpose of the

11   cross-point information is to convey information regarding that

12   distance.

13           Now, the patent has examples of it.  Another

14   fundamental rule that that term shouldn't be limited to the

15   examples in the specification.  So, here, as long as the term

16   information is very broad, quite often in the spec it talks

17   about cross-point information on that distance.  It is not --

18   essentially, the spec is not limited to numerical information.

19   And it is not restricted in the type of cross-point information

20   that must be conveyed.  Most important is that the display,

21   when it is being displayed, that that circuitry on that end has

22   the information from which it can determine the distance to

23   where the object was when it was being picked up.

24           Thank you.

25           THE COURT:  All right.  In about a minute or two, I'm

1BM0NIN1                          Markman Hearing

1    going to have to take a five-minute telephone conference.

2    Again, I apologize for having to balance a bunch of different

3    things.  But we'll pick up right after that.

4              But let's' start anyway on the next item and see how

5    far we can go.

6              MR. LINDVALL:  This will be a quick rebuttal.  I'll

7    start with the next one.

8              Slide 53, please.  With respect to the whether

9    cross-point information has to be determined.  If you look at

10   the claim language, it says, Measuring CP information.  The

11   word "measuring," we looked in dictionaries, we used the

12   ordinary meaning of measuring.  Measuring is like when you take

13   out a ruler, you quantify it, you measure something.  That's

14   why we came up, it has to be numerical value, because the term

15   measuring is a term that -- that -- it's an ordinary term that

16   is easy to understand, it's right from the claim itself.

17             The last area I'm going to start, your Honor, and this

18   will be longer than a minute or two, I don't know if you would

19   like to break now or not.

20             THE COURT:  Maybe that makes sense.  Why don't we take

21   a quick break, and reconvene in about five minutes.

22              MR. LINDVALL:  Okay, thank you thank you.

23             (Recess)

24   1bm0nin3                     Markman Hearing

25             THE COURT:  Going to go no more than another 20

1    minutes, but that should be sufficient.  I'm grateful to

2    counsel for the way you are moving things along very nicely.

3              MR. LINDVALL:   Thank you.

4              All right.  The last term, cross-point measuring,

5    means is the whole claim term itself, a phrase on 59.  It's

6    cross-point measuring means for measuring CP information, which

7    we have talked about, on the cross-point of optical axes of

8    said pick-up means.

9              The position of Nintendo is that this makes this claim

10   invalid, for following reason.  This is undisputed.  Both

11   parties agree it's a means plus function claim.  A means plus

12   function claim is the obligation of the patentee is to

13   specifically disclose the structure in the patent.

14             And then the means that that function -- the means

15   plus function claim is then limited to just that structure or

16   its equivalents thereof in the patent.  So it's an obligation

17   that they have to meet by using the means for language that

18   they show structure in the patent.

19             Now, the question is what is structure.  And that's

20   the question.  It goes to whether or not this claim is

21   indefinite or not.

22             Now, why we say that this claim is indefinite, is

23   because we do not believe it shows adequate structure to one

24   skilled in the art.  And we're going to walk you through that

25   argument.  I'm going to try to stay away from what is already

1    in our brief and try to highlight some points.  First, I want

2    to make one note with Tomita's construction, if you do find

3    that this claimed term is not indefinite, they're

4    construction -- and they do this for all means plus function,

5    has a problem in it.  They try to show structure, but they use,

6    for example, more compromises.  If this Court construes a claim

7    it can't say, for example, here is the structure.  You have to

8    identify the structure.  And it's only that structure, or

9    equivalents thereof, that the claim is limited to.  It's not an

10   example of the structure.  Means plus function means you have

11   to identify the structure, not an example of the structure.  So

12   they're required, under the law, to actually specify the

13   structure in the specification that they say their means plus

14   function claim is limited to.  They can't give you that

15   example.  This isn't like a normal claim, where it is not a

16   means plus function.  The means plus function section 112,

17   paragraph 6, requires that identification of the structure in

18   the patent.

19        So what we've done is we have looked at the structure

20   that they have identified, what they call the structure here.

21   And what I would like to do is show the Court that that is not

22   structure at all.  If you look at this -- first, these -- what

23   I'm showing the Court is the structure that they have

24   identified, or they have called it structure.

25        You can see, for example, they identify box 403.  Box

1   403 is not a structure.  It just says CP measuring means.

2   That's -- that doesn't tell one skilled in the art how you

3   measure CP.  Measuring means by what type of algorithm with the

4   computer or what have you.  It just says CP measuring means.

5   Same thing with box 12.  Doesn't relay any structure to one

6   skilled in the art.

7        They have identified several parts in the

8   specification.  For example, here's an excerpt right here at

9   the top left corner, cross-point measuring means calculates the

10  cross-point position based on the angle of the interception of

11  the optical axes.  Again, it is a form of it, it doesn't give

12  any structure to one skilled in the art.

13       And I'll try to be a little clearer on what I mean by

14  structure in a minute.  They also talk about, for example, a

15  cross-point data input device 12 which measures the distance

16  between cameras and CP.  What is that device?  There is no

17  description of what that device is in the patent.  And they are

18  required to do that.

19       This is another example, right here, in accordance

20  with the present invention, the distance between the image

21  pick-up means can be measured based on triangulation

22  techniques.  What are those techniques?  Its not described.

23  And I'll show you some cases in a minute that use very similar

24  situation that use the similar type of language that says,

25  well, there is well known techniques that can be used to do

1  this, this, and this.  The Federal Circuit says, no, that is

2  losing structure, the claim is indefinite because of that.

3        Okay, let's look at their expert.  I think this

4  highlights the whole issue we have here.  Mr. Merritt in his

5  declaration consistently fails to identify any structure.  He

6  does two things wrong here in his declaration.

7        First thing, he doesn't point to anything in the

8  specification that actually discloses the precise structure.

9  He even goes one step beyond that.  He also says, well, devices

10  that measure CP information were well known to people having

11  ordinary skill in the art.

12        First of all, as we all agree here in the courtroom,

13  CP information is not a term that one ordinary skilled knows

14  what it is.  So how would they know about any devices that

15  measure CP information.  Again, the patent does not disclose

16  any of these devices that measure CP information.  And I've

17  got additional examples here, where all he says is that these

18  circuits were doing that, were also known to persons who

19  ordinary skilled in the art as per determining cross-point

20  information.  Again, since we didn't know what cross-point

21  information was, how would one skilled in the art know what

22  circuits to build.  This is not the situation where the

23  specification says, well you used an analogue and digital

24  circuit.  Well, any electrical engineer will know what an

25  analogue digital circuit looks like, there is a number of

different variations.  No, this is a circuit that used to

measure or calculate cross-point information.  Not known to one

skilled in the art.

Again, he says with respect to laser based distance

measuring technique, laser distance measuring devices were

known to persons of ordinary skill in the art.  Doesn't mention

any.  Doesn't point to any of them in the patent.  He just said

that they were well known.  It is insufficient as a matter of

law.

So, what this really shows is that Mr. Merritt has

failed to identify in this specification and that's the key

part.  The structure of any known devices or circuits, which

accomplish the function of the cross-point measuring means.  He

fails to identify in his declaration any known devices or

circuits that accomplish that function.

And this case here, this is a very important case.

Biomedino, Water Tex Company.  This case is a situation --

trying to explain this, trying to put it in plain terms.  The

obligation of a patentee who claims something means plus

function language, has to actually disclose the structure, the

precise structure in the specification.  He or she doesn't do

that, fails to do that, it makes the claim indefinite.  And

there is an obligation to do that.  Just saying there is

techniques, or devices that can do, it is not sufficient.  For

example, in that case, this case right here, very similar to

1    this case.  In this situation, the function was automatically

2    operating said valving, and automatically operating valves.

3    Simple plumbing-type of situation.  And the federal circuit

4    says, The parties also agree that the only reference in the

5    specification to the control means, are the box labeled

6    control -- you remember their box that they had in figure 6.

7    And they also said a statement that the regeneration process

8    maybe, quote, controlled automatically by known differential

9    pressure, valving, and control equipment.  So the specification

10   says there is known equipment that can do this function.  And

11   the federal circuit said, no, that's not sufficient.  That

12   claim is indefinite and it is invalid.

13          So, at the end of this case, this is on slide 66,

14   Biomedino case, it says here, this is careful to read, this the

15   inquiry is whether one skilled in the art would understand this

16   specification itself to disclose a structure, not simply

17   whether the person would be capable of implementing the

18   structure.

19          So by just saying there are devices that can do

20   something, or there is equipment that can do something, that is

21   not far enough.  They have to describe what equipment it is.

22   Maybe even identify it by name, or manufacturer, or something.

23   Doesn't have to be every last little detail of the circuit, or

24   every last little design thing, but it has to be sufficient so

25   one skilled in the art could understand what the device would

1    be, or what the equipment would be.  It says, accordingly, a

2    bare statement that known techniques or methods can be used

3    does not disclose structure.  And you saw in the specification

4    here, they talk about laser techniques are known.  This says

5    the federal circuit says, bare statements about known

6    techniques is not sufficient.  To conclude otherwise would

7    vitiate the language of that statute requiring corresponding

8    structure, material, or access provided in the specification.

9    So what has happened here is Mr. Merritt has failed to identify

10   anything in the specification that describes the device, or

11   describes the circuit, or describes the technique that they

12   claim are structure.  And, therefore, as a result of that, it

13   makes this claim indefinite.

14           And it would make, invalidate all of the claims.  Let

15   me give you an example.  Here is a part of the specification it

16   talks about the laser distance measuring technique.  So it says

17   here you can measure the distance between the cameras and CP by

18   means of laser distance measuring technique based upon

19   information of angle between the optical axes.  I can show you

20   case law that says just by saying there are techniques out

21   there, is insufficient as a matter of law.  He doesn't talk

22   about what the techniques are.

23           And I believe that is, with respect to this, your

24   Honor, that is all I have.

25           THE COURT:  All right.  Let's hear from your

1    adversary.

2          MR. STEIN:  I think the -- the difference here is,

3    between the parties, is that we believe Nintendo is

4    misapprehending the law when it comes to establishing the

5    corresponding structure of this specification.

6          It's Nintendo that bears the burden of proof on this

7    issue.  And, as I'll discuss in a moment, Nintendo's expert

8    doesn't dispute that the circuits mentioned, the circuits and

9    the circuitry and the disclosure in the patent would be

10   sufficient for one who is skilled in the art to actually build

11   a circuit.  And these circuits, by the way, are very

12   straightforward.

13         But if you turn to that slide there, the question here

14   is -- you know, as it says there, some of this is in our brief,

15   so maybe it doesn't -- maybe it shouldn't be repeated, but

16   anyway is whether ordinary artisan would know how to interpret

17   the specification and actually build the circuit.  And the --

18   the disclosure of circuitry, together with a description of its

19   operation is, in fact, sufficient to satisfy the requirements

20   of Section 112-6.  And in our brief, we cite the Telecordia

21   case, for example, where the federal circuit found there was

22   sufficient structure where the patent showed a controller

23   circuit as a black box where nothing in the figures described

24   the details of its inner circuitry -- it's on page 7 of our

25   reply brief -- because an ordinary artisan would know how to

1    interpret the specification and actually build the circuit.

2              Now, in this case, for the cross-point measuring

3    means, the specification describes four implementations of the

4    of a cross-point measuring means.

5              If you can turn to slide 30.  And Merritt in his

6    supplemental declaration, stepped through those and explained

7    that one skilled in the art would understand how to -- the

8    implementation of a circuit based on that description.  And I'm

9    not talking about, you know, complex things here.  I mean the

10   first one, for example, the inclination angle between the

11   optical axes of the left and right eye camera, well that you

12   know potentially is just a measurement of like -- of a toed-in

13   arrangement of the angle that the cameras are toed-in, for

14   example.  The pick-up position of an object in the two pick-up

15   means, this patent, you know, that -- that concept image --

16   let's see the words Mr. Merritt uses.  Anyway it's in the --

17   it's in the disclosure, but they're well-known.  In fact, image

18   recognition, the conferences on it, just a very -- it's a very

19   well-known thing to do, identify images or objects within a

20   captured image in this context.  In fact, Nintendo's expert has

21   written, you know, papers on -- in that area that goes back,

22   you know, far earlier than this patent.

23             The third one there, it says information obtained from

24   a laser distance measuring technique.  Well, Nintendo is not

25   disputing that there are laser distance measuring devices.

1    It's just a matter of taking the input from that.  Information

2    input by an operator.  Again, it's just a matter of a circuit

3    that would capture the information input by a user.

4         Notably, Nintendo just basically gives attorney

5    argument.  Their expert never says that this is an adequate

6    disclosure to one skilled in the art.  And we presented

7    evidence that it is.  And, you know, some of the cases cited by

8    Nintendo involve situations where the patent owner was

9    basically simply saying that the means -- that means for doing

10   this function were known.  Here, this isn't what's happening

11   here.  For example, here, there are four different

12   implementations that are set forth in the patent.  It is not --

13   it is not all limitations.  It identifies four in particular.

14   And based on the descriptions back in -- and as supported by a

15   declaration of Merritt, we believe that that is sufficient

16   under the color of law.

17        THE COURT:  All right.  So we have time, I think, only

18   for one more term.  So pick whichever you would like to.

19        MR. LINDVALL:  Could I have a quick rebuttal, your

20   Honor?

21        THE COURT:  Yes, your Honor.

22        MR. LINDVALL:  I would like to draw your attention --

23   we had the one case.  There is another case that I believe is

24   cited for a different proposition in our brief.  It's called

25   Medical Instrumentation.  The cite is at 344 F 3d 1205.  And in

1    that situation, it -- the pinpoint cite 1212, there was an

2    argument, the patentee said in means plus function situation,

3    certain software programs were widely available from well-known

4    sources, or available from other software developers that could

5    do what the function said it would do.

6         The Federal Circuit responded:  However, that is not

7    correct inquiry.  The correct inquiry is to look at the

8    disclosure.

9         And the federal circuit emphasized disclosure of the

10   patent and determined if one skilled in the art would have

11   understood that disclosure to encompass software for

12   digital-to-digital conversion, had been able to implement such

13   a program, not simply whether one skilled in the art would have

14   been able to write such a software program.

15        THE COURT:  All right.  So I'm going to leave it to

16   plaintiff's counsel to pick whatever last term he would like

17   to --

18        MR. STEIN:  Well, there is another indefiniteness

19   argument that Nintendo makes that is unlike the other ones,

20   which relates to the term stereoscopic feeling.  And that --

21   that term is -- so, basically, the issue here is that Nintendo

22   is arguing that that term is subjective and, therefore,

23   indefinite.  But the patent is talking about adjusting the

24   stereoscopic feeling.  It's not talking about measuring it or

25   quantitating it in any way.  And then it describes in the

1    specification how one adjusts the stereoscopic feeling, namely

2    by setting the offset between the right eye and left eye

3    images.

4              So, in fact, I think it -- oh.  And in Mr -- or Dr.

5    Frahm's, Nintendo's expert's last declaration, he states

6    that -- or explains stereoscopic feeling, stating that -- let's

7    see.  Explaining that the 664 patent addresses how to display a

8    stereoscopic image, with the same stereoscopic feeling that the

9    original scene had when the image was captured.  And I put

10   stereoscopic feeling in quotes, but it is clear from, even his

11   own statements that understand what the term means.

12             MR. BLANK:  Your Honor, we're going to rest on our

13   briefs on this particular term, stereoscopic feeling.

14             I'm surprised they selected that one and avoided

15   offset presetting means, which is in the independent claim one,

16   which I wanted to address.

17             THE COURT:  All right, well, I'll give you -- we can

18   take another five minutes and address that.

19             MR. BLANK:  Let me get through this as quickly as

20   possible.

21             Again, we're going back to claim 1, the only

22   independent claim in the patent.  And it has a requirement for

23   an offset presetting means for offsetting and displaying said

24   video images.  And we can see it here at the very bottom of

25   claim 1.

1          Now, the parties agree that this is a mean plus

2   function element.  It's governed by Section 112-6.  But the

3   first dispute with respect to the function, your Honor, is

4   whether or not the function includes a preset function.  And

5   Nintendo's position is that it does.  To me this says that it

6   does not.  They say that including it will not closely track

7   the language of the function.

8          Well, the language itself in the claim is offset

9   presetting means, for offsetting and displaying.  So it is --

10   presetting is right before the word "means."  And then there is

11   more function after the words "for."  And we have cited

12   throughout our brief the case law that makes clear that when

13   you're determining what the function is for a means plus

14   function element, you look at the words both before and after

15   the words "means for."  And that's exactly what we have done

16   here.  Moreover, the specification, specifically column 9,

17   lines 3 through 4, specifically talks about an offset

18   presetting means for presetting an offset value.  So it's both

19   in the claim and in the specification.  It's right there.  So

20   they choose to basically read it out and say it's not

21   important, we're just not going to include it as part of our

22   proposed construction for the function.  And we say that that

23   is erroneous.  It must be a part of the function.  It's

24   explicitly in the claim and it's described in the

25   specification.

1            Now, our position, and Mr. Lindvall has gone through

2      the law indefinitely on this.  And I want to go through this

3      quickly here.  Is that, again, there is no corresponding

4      sufficient structure described in the specification to one of

5      ordinary skilled in the art for each of the three functions,

6      the presetting function, the offsetting function, and the

7      displaying function.  Let me just go back again.  Here, with

8      respect to Tomita's proposed construction, if you look at this,

9      again, they used the words "comprises," a circuit and manual

10     entry unit.  And then it sets the offset.  They're proposed

11     construction doesn't even deal with the three functions.  It

12     deals with setting the offset.

13           Well the functions are:  One, presetting; two

14     offsetting; and three, displaying.  There is no mention here of

15     displaying.  So how can this possibly be right.  At a bare

16     minimum, it is missing the structure for displaying.  And it

17     doesn't say that.  It says set the offset, which I'm not even

18     sure what that means.  I don't know if that means preset, the

19     offset, or if it means offsetting.  And as they have done in

20     the other for cross-point measuring means, again, they --

21     they're going to leave the trier of fact at sea here.  They go

22     and identify the structure as, for example, and then they

23     identify all of these figures, I don't know six or seven of the

24     figures.  And then all of this -- all of these passages from

25     the specification.  And they're basically telling the trier of

1    fact you'll find it in there, go find the structure in there.

2    And they're going to have their experts just point to something

3    in that statement from those passages of the specification and

4    try to read that onto Nintendo's product by saying, oh, it's in

5    here, it's in here someplace.  But that cannot be a proper

6    claim construction for the trier of fact.

7         Now, let's look at the specification in terms of the

8    offset presetting means, where they actually used the language

9    in the specification.  And, again, they simply do it in the

10   form of boxes.  So if we look at this slide here, we see an

11   offset presetting means 106.  And here it is misspelled, but I

12   assume that they again it is offset presetting means.  If you

13   look at the patent, your Honor, there is no discussion

14   whatsoever in the patent or linkage, which is required under

15   112-6 between these boxes 106 and the corresponding structure.

16   There is no association of these boxes 106, offset presetting

17   means with any structure, which is the quid pro quo of what you

18   have to do under 112-6.

19        Now, you have got more.  They also have listed offset

20   presetting means here as number 122 in the specification.  In

21   figure 9 they say it is box number 122.  However, in figure 13,

22   box number 122 is listed as a position determining means.  But

23   in either case, but in the specification, element number 122 is

24   discussed only as a position, viewer position determining

25   means.  Again, there is no discussion in the specification or

1     linkage with 122 as an offset presetting means with any

2     structure.

3          And again another, appears to be another mistake, here

4     they refer to offset presetting means 105.  There is nothing in

5     the figures on 105.  And a manual entry unit 105.  There is no

6     association of element 105 with any structure at all for the

7     offset presetting means in the specification.  And it doesn't

8     even show up in the figures.

9          So, for all of those reasons, you know, we say we

10    believe that, given that lack of corresponding structure, the

11    claim is indefinite.  And just want to make one more point.

12         There doesn't seem to be an argument that if you don't

13    find the claim indefinite, that figure 2 has the -- what would

14    be the corresponding structure.  Figure 2 shows the display

15    control circuit 100.  Tomita argues that figure 3 is an

16    alternative embodiment to figure 2.  That is just wrong.

17    Figure 3 is a more detailed description of the display control

18    circuit in display control circuit 100 in figure 2.  That's

19    what the specification says.  Figure 2 is a block diagram

20    showing the configuration of the stereoscopic video image pick

21    up and display system shown in figure 1.  And then figure 3 is

22    a block diagram showing the display control circuit.  That is

23    the display control circuit that is right here in figure 2.  So

24    this is, if you are going to find structure, you are going to

25    find structure right here in figure 3.

1          And, if you look at Tomita's corrected opening brief,

2     they say that it is display control circuit 100 that at least

3     determines the offset.  Again, going back to their

4     construction, they don't tell you what does the displaying and

5     they don't tell you what does the presetting.  They are only

6     focused in on part of the function.

7          So, if we actually look -- and I'll move through this

8     quickly.  If you are going to fine it nonindefinite, we

9     respectfully submit that you find that the corresponding

10    structure is what Nintendo has specifically identified in its

11    brief and in Mr. Frahm's declaration.  It's specifically for

12    presetting.  I'm not going to go through it all.  It's right in

13    our brief.  And in Frahm's declaration.  Looking at figure 3,

14    display control circuit.  We have highlighted here what it is

15    that is required, the elements or the components.  And the

16    signals that are required to perform this function are set

17    forth right here.

18         For offsetting, again, looking at figure 3, we've

19    identified the elements and the specific signals that are

20    needed to perform that offsetting function.  It's in Frahm's

21    declaration 34.

22         And for the display function we have identified, again

23    in figure 3, the corresponding structure or elements that are

24    required to carry out that particular function.

25         So, that's what I to have say on that.  I think that

what we have identified as quote/unquote structure would be the

correct corresponding structure in the event the Court doesn't

find the claim indefinite.

Thank you.

THE COURT:  Thank you.  Let me hear from plaintiff's

counsel.

MR. STEIN:  The issues with this limitation,

especially with respect to structure, largely overlap with the

cross-point measuring means.

The issue is real.  There is disclosure that circuitry

is used to perform this function.  The question under relevant

case law is whether or not there is adequate -- whether the

description of that circuitry that's in the specification is

what's needed for an artisan to actually build the circuit that

performs -- that you know could perform the function here.  Our

expert said it does and explained why.

Nintendo's expert basically didn't, just said that he

didn't find an adequate level of description within the

specification like he did with cross-point measuring means,

although the details of the circuit, of which those details are

not required under the law, he didn't say that he would be

unable to build the circuit based on the description and

specification.

With respect to the functions, Nintendo breaks the

function of this limitation into three separate things.  In

1   particular, there is to preset, an offset for, and to offset.

2   And it's not -- it's not even clear how Nintendo is construing

3   those functions as being separate functions.  I mean if the

4   patent -- in the patent, the offset presetting means must

5   offset the images before they are displayed.  I mean in that

6   sense they're it's gonna happen before.  So the use of the word

7   presetting means is natural, doesn't necessarily invoke two

8   separate steps of to preset and then to offset.  And it's --

9   and I think that that -- looking at subpoena specification and

10  in our briefs, it is clear that that does not really even make

11  sense in the context of the patent.

12          And well, I guess -- jut emphasize the point on the

13  structure.  There is circuitry disclosed.  There is a

14  description of the operation.  And under the cases we cited,

15  that is sufficient to satisfy the requirements of 112-6.

16          THE COURT:  All right.  And then we'll hear very brief

17  rebuttal from defense counsel.

18          MR. BLANK:  Two points.

19          Presetting is in the claim.  And I pointed out for

20  your Honor a portion of the specification that specifically

21  breaks that out as a separate function.  Which it is, it is a

22  value that is determined in order to calculate the preset

23  before the two figures, two left and right eye images, are

24  offset.  Something that is done in advance of that.  That's all

25  I'll say on that.

1            And I didn't hear Mr. Stein say anything with respect

2      to what we said was the, in the event that the claim is not

3      found to be indefinite, and I didn't hear Mr. Stein say

4      anything that our, what we say, the corresponding structure is

5      incorrect, and I submit that it is correct.

6            THE COURT:  Yeah.  Well, given that, we'll give him a

7      chance to say something on that point.

8            MR. STEIN:  Figure 2 is a separate embodiment from

9      figure 3, Nintendo never explains how figure 3 is a refinement

10      of figure 2, or how it -- how the two map onto each other, and

11      figure 1 as being in further description --

12            THE COURT:  Okay.  So I thank counsel for both sides

13      for your excellent argument.  I'm sorry we had to do this in

14      bits and pieces, but I think we did cover most of what needed

15      to be covered.  And the Court will reserve judgement, by

16      getting you a determination I think quite promptly.

17            So thanks very much.

18            (Adjourned)

19

20

21

22

23

24

25