**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TOMITA TECHNOLOGIES USA, LLC, and TOMITA
TECHNOLOGIES INTERNATIONAL, INC.,

                                        Plaintiffs,

                        v.

NINTENDO CO., LTD. and NINTENDO OF AMERICA
INC.,

                                        Defendants.

11 Civ. 04256 (JSR)
ECF Case

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,**
**IN THE ALTERNATIVE, FOR A NEW TRIAL**

## TABLE OF CONTENTS

Page

I.      BACKGROUND ................................................................................................ 1

II.     LEGAL STANDARD ....................................................................................... 2

III.    TOMITA HAS FAILED TO PROVIDE SUFFICIENT EVIDENCE OF
        INFRINGEMENT............................................................................................. 3

        A.      There is Insufficient Evidence that the 3DS Utilizes Any of the Three
                Structures, or Their Equivalents, of the "Cross-Point Measuring Means" ............ 5

        B.      There is Insufficient Evidence that the 3DS Performs the Function of the
                "Cross-Point Measuring Means" .......................................................... 8

                1.      The 3DS does not have or determine a "cross-point (CP) of optical
                        axes."........................................................................... 9
                2.      The 3D Camera Application Does Not Measure Cross-Point
                        Information. ................................................................... 10
                3.      The AR Games Application Does Not Measure Cross-Point
                        Information. ................................................................... 11
        C.      There is Insufficient Evidence that the 3DS Performs the Function of the
                "Offset Presetting Means" ................................................................ 12

                1.      The 3DS does not use cross-point information to offset images. ............. 13
                2.      The 3DS does not use the size of the image which is displayed............... 13
        D.      There is Insufficient Evidence that the 3DS Uses a "Preset Value" in
                Performing the Claimed Function of Offsetting .................................... 14

        E.      There is Insufficient Evidence of Induced Infringement ..................................... 15

        F.      There is Insufficient Evidence to Find Infringement Under the Doctrine of
                Equivalents.......................................................................................... 16

IV.     THERE IS INSUFFICIENT EVIDENCE THAT THE '664 PATENT IS NOT
        INVALID ........................................................................................................ 17

        A.      The Claims of the '664 Patent Are Not Enabled ................................................. 17

        B.      Claim 1 of the '664 Patent is Invalid in Light of Matsugu '408.......................... 19

V.      TOMITA HAS NOT PROVIDED SUFFICIENT EVIDENCE THAT IT IS
        ENTITLED TO DAMAGES ........................................................................... 20

VI.     A NEW TRIAL IS NECESSARY DUE TO PROCEDURAL ERRORS
        CAUSING THE JURY TO REACH A SERIOUSLY ERRONEOUS RESULT ........... 22

A.      A New Trial Is Necessary Because of the Failure to Instruct the Jury on Claim Construction ............................................................................................... 22

B.      A New Trial Is Necessary Because the Court Did Not Resolve the Dispute Over the Claim Terms "Cross-Point" and "Optical Axes" ................................... 23

C.      A New Trial Is Necessary Because of the Improper Admission of Mr. Merritt's Unreliable Testimony .......................................................................... 25

VII.    CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Abbott Labs. v. Sandoz, Inc.*,
  566 F.3d 1282 (Fed. Cir. 2009)....................................................................................16

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*,
  501 F.3d 1307 (Fed. Cir. 2007)....................................................................................15

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)....................................................................................22

*Amgen Inc. v. F. Hoffman-LA Roche Ltd*,
  580 F.3d 1340 (Fed. Cir. 2009)....................................................................................16

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003)....................................................................................18

*Atlas Powder Co. v. Ireco, Inc.*,
  190 F.3d 1342 (Fed. Cir. 1999)....................................................................................19

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
  501 F.3d 1274 (Fed. Cir. 2007)...............................................................................17, 18

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
  651 F.2d 122 (2d Cir. 1981).........................................................................................15

*Brown v. 3M*,
  265 F.3d 1349 (Fed. Cir. 2001)....................................................................................19

*Caceres v. Port Authority of New York and New Jersey*,
  631 F.3d 620 (2d Cir. 2011)...........................................................................................3

*Caruolo v. John Crane, Inc.*,
  226 F.3d 46 (2d Cir. 2000).............................................................................................3

*Cordis Corp. v. Boston Scientific Corp.*,
  561 F.3d 1319 (Fed. Cir. 2009)....................................................................................22

*Cordis Corp. v. Boston Scientific Corp.*,
  658 F.3d 1347 (Fed. Cir. 2011)......................................................................................7

*Creative Internet Adver. Corp. v. YahooA, Inc.*,
  476 F. App'x 724 (Fed. Cir. 2011)............................................................................22, 23

Page(s)

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
424 F.3d 1168 (Fed. Cir. 2005)........................................................................23

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ..............................................................................4

*Ecolab Inc. v. Paraclipse, Inc.*,
285 F.3d 1362 (Fed. Cir. 2002)........................................................................23

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*,
389 F.3d 1370 (Fed. Cir. 2004)..................................................................6, 8, 23

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir. 1997)....................................................................17, 18

*Global-Tech Appliances, Inc. v. SEB S.A.*,
__ U.S. __, 131 S. Ct. 2060 (2011)....................................................................15

*Highland Capital Management LP v. Schneider*,
607 F.3d 322 (2d Cir. 2010)...............................................................................3

*Kirsch v. Fleet Street, Ltd.*,
148 F.3d 149 (2d Cir. 1998)..............................................................................22

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012).........................................................................20

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)............................................................................21

*Lear Siegler, Inc. v. Sealy Mattress Co.*,
873 F.2d 1422 (Fed. Cir. 1989).........................................................................16

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
481 F.3d 1371 (Fed. Cir. 2007).........................................................................18

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007)..................................................................4

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)....................................................................20, 21

*Mirror Worlds, LLC v. Apple Inc.*,
784 F. Supp. 2d 703 (E.D. Tex. 2011)................................................................21

*Mirror Worlds, LLC v. Apple Inc.*,
692 F.3d 1351 (Fed. Cir. 2012)...........................................................................5

Page(s)

*Motionless Keyboard Co. v. Microsoft Corp.*,
   486 F.3d 1376 (Fed. Cir. 2007)..................................................................................16

*MTX Comm'ns Corp. v. LDDS/WorldCom, Inc.*,
   132 F. Supp. 2d 289 (S.D.N.Y. 2001)...........................................................................4

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)....................................................................................3, 25

*O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008)........................................................................23, 24, 25

*Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*,
   No. 2011-1218, __ F.3d __, 2013 WL 1200270 (Fed. Cir. Mar. 26, 2013) .............4

*Rohm & Haas Co. v. Brotech Corp.*,
   127 F.3d 1089 (Fed. Cir. 1997)..................................................................................5, 9

*Saffran v. Johnson & Johnson*,
   No. 2012-1043, __F.3d__, 2013 WL 1338910 (Fed. Cir. Apr. 4, 2013)...................7

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
   594 F.3d 1360 (Fed. Cir. 2010)..................................................................................15

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008)............................................................................18, 19

*Stumbo v. Eastman Outdoors, Inc.*,
   508 F.3d 1358 (Fed. Cir. 2007)..................................................................................16

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004)..................................................................................22

*Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*,
   90 F.3d 1558 (Fed. Cir. 1996)....................................................................................17

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .................................................................................21

**STATUTES**

35 U.S.C. § 112.......................................................................................................7, 17, 23

Fed. R. Civ. P. 50...............................................................................................................1

Fed. R. Civ. P. 59...........................................................................................................1, 3

Pursuant to Fed. R. Civ. P. 50(b) and 59, Nintendo submits this memorandum of law in support of its renewed motion for judgment as a matter of law or, in the alternative, motion for a new trial as to Tomita's claims and Nintendo's counterclaims regarding U.S. Patent No. 7,417,664 (the "'664 patent," Margulies Dec.[1] Ex. 2).

## I.   BACKGROUND

On March 13, 2013, the jury returned a verdict finding Nintendo liable for infringement of claim 1 of the '664 patent and awarded Tomita damages of $30,200,000.  Because there is insufficient evidence to support the verdict, Nintendo hereby renews its motion for judgment as a matter of law of non-infringement and invalidity.

No reasonable jury could find that the Nintendo 3DS ("3DS") infringes the only asserted claim – claim 1 – either literally or under the doctrine of equivalents for each of the following independent reasons:

- There is insufficient evidence that the 3DS uses any one of the three structures that the Court construed as corresponding to the claimed "cross-point measuring means."

- There is insufficient evidence that the 3DS performs the function of "measuring CP information on the cross-point (CP) of optical axes" of its outer cameras.  The undisputed evidence shows that the optical axes of the outer cameras of the 3DS are parallel and do not intersect to form a "cross-point."  Moreover, the evidence shows that the 3D camera feature determines an offset (not a cross-point) based solely on brightness of the individual pixels that make up the two images captured by the cameras, not based on distance information.  In addition, in the AR games feature, the evidence establishes that the distance to the AR card is not the distance to a cross-point, and the AR games application does not measure cross-point information.

- There is insufficient evidence that the 3DS performs the function of the "offset presetting means."  Specifically, Tomita failed to prove that the 3DS (either the 3D camera or AR games feature) performs offsetting based upon "cross-point information" or "information on the size of the image."

---

[1] All trial exhibits cited herein are attached as exhibits to the accompanying Declaration of Paul I. Margulies.  All trial transcript excerpts cited herein are attached as Exhibit 1 to the Margulies Declaration.

- There is insufficient evidence that the 3DS uses a "preset value" in performing the function of the "offset presetting means." Tomita failed to identify a default or preset value that serves as the basis for calculating the claimed offset, as required by the Court's claim construction decision.

In addition, there is insufficient evidence of induced infringement, as Tomita did not advance this claim at trial nor object to the omission of any jury instruction on it, thereby abandoning the claim.

Moreover, no reasonable jury could find that claim 1 is valid:

- Clear and convincing evidence shows that claim 1 is not enabled in the case of two cameras having parallel optical axes, as in the 3DS. If claim 1 is deemed infringed in these circumstances, as the jury found, then claim 1 must be enabled to the same degree. However, no reasonable jury could find that the patent teaches how to practice such an embodiment without undue experimentation.

- Clear and convincing evidence establishes that claim 1 is invalid in view of the Matsugu '408 prior art patent, which discloses each and every element of claim 1.

Critically, Tomita's "proof" of infringement and rebuttal on validity consisted entirely of the conclusory and unreliable testimony of its expert, Mr. John Merritt. As the Federal Circuit has repeatedly found, evidence of this nature is insufficient to sustain a verdict of infringement or to defeat a showing of invalidity.

Alternatively, Nintendo moves for a new trial because: (1) the jury reached a seriously erroneous result; (2) the jury was not instructed on the Court's claim construction; (3) claim construction disputes were not resolved prior to submission of the case to the jury; and (4) unreliable testimony by Mr. Merritt regarding the operation of the 3DS source code was admitted. Nintendo also moves for remittitur or a new trial on damages because Tomita's use of the entire market value of the 3DS as the royalty base, without apportionment for the non-accused features, is insufficient to prove damages.

## II.    LEGAL STANDARD

Judgment as a matter of law should be granted "when a party has been fully heard on an

issue and a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Caceres v. Port Authority of New York and New Jersey*, 631 F.3d 620, 622 (2d Cir. 2011) (internal quotations omitted); *Highland Capital Management LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010).

The legal test for granting a new trial under Rule 59 is less stringent. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000) (citation omitted). Nevertheless, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.* (citation omitted). Notably, the Second Circuit is "especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance." *Nimely v. City of New York*, 414 F.3d 381, 400 (2d Cir. 2005) (citations omitted).

## III.    TOMITA HAS FAILED TO PROVIDE SUFFICIENT EVIDENCE OF INFRINGEMENT

Tomita's sole evidence of infringement was the testimony of Mr. Merritt. Mr. Merritt is an experimental psychologist (Margulies Dec. Ex. 1, Trial Transcript ("Tr.") 359:6-10), and conceded that he lacks the expertise to understand the computer programming code (C++ source code) used by the 3DS. Tr. 364:22-365:8, 422:25-423:9, 438:19-20. Yet it is this software that dictates how the accused 3D camera and AR games features of the 3DS function and operate. Tr. 257:7-13, 291:15-19, 364:14-21, 387:13-16, 387:21-388:4, 408:3-6, 409:16-20, 723:22-724:8. As he acknowledged, understanding the source code is crucial to the issue of infringement. Tr. 364:15-21.

Because Mr. Merritt did not understand the 3DS software, he relied solely on Ken

Amron.  Tr. 362:4-7, 364:10-13, 438:19-24.  Mr. Merritt admitted that if Mr. Amron's

understanding of the 3DS source code was incorrect, then his own opinions would be incorrect.

Tr. 436:22-24 ("Q. If Mr. Amron is incorrect in his interpretation of the code, then your

conclusions are incorrect? A. I assume that's true, yes.").

     Mr. Amron, however, was not a witness at trial and was not subject to cross-examination,

thereby depriving Nintendo of its ability to challenge the factual bases of Mr. Merritt's opinions.

*See* Tr. 1074:3-7 (Court noting that, "despite the very heavy reliance on him, he was not

produced as a witness").  Lacking expertise in software, Mr. Merritt merely parroted Mr.

Amron's conclusions for these crucial aspects of his infringement testimony, rendering Mr.

Merritt's opinions unreliable.  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th

Cir. 2002) ("A scientist . . . is not permitted to be the mouthpiece of a scientist in a different

specialty.  That would not be responsible science."); *Louis Vuitton Malletier v. Dooney &*

*Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) ("a party cannot call an expert simply as

a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as

the basis of his testimony").  In addition, there is no evidence in the record as to Mr. Amron's

qualifications to read and analyze source code.  *See* Tr. 362:8-364:4.  Nevertheless, Mr. Merritt

accepted Mr. Amron's conclusions after a 45-minute meeting, even though he had not previously

met Mr. Amron and was unaware of Mr. Amron's qualifications.  Tr. 361:25-362:3, 385:9-13,

386:18-387:9.  An expert would not reasonably rely upon Mr. Amron's conclusions in these

circumstances and a reasonable jury would give little or no weight to such unvalidated opinion.

*See Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, No. 2011-1218, __ F.3d

__, 2013 WL 1200270, at *20 (Fed. Cir. Mar. 26, 2013) (holding admission of expert testimony

based on an unreliable source was abuse of discretion); *MTX Comm'ns Corp. v. LDDS/*

*WorldCom, Inc.*, 132 F. Supp. 2d 289, 292-93 (S.D.N.Y. 2001) (excluding expert testimony as unreliable where it was based on unverified information provided by a third-party without any indication that the third-party provided "accurate or reliable expert information").

With the source code beyond Mr. Merritt's expertise, his opinion on infringement consisted of observations as an ordinary user of the 3DS. *See, e.g.,* Tr. 307:8-13 ("You can plainly see [measurement of CP information] when observing the behavior of the 3DS."), 314:7-19, 319:14-320:7, 323:3-14, 337:1-21, 346:10-347:4, 348:23-349:6, 466:13-467:5. However, Mr. Merritt's cursory observations of the 3DS provide no evidence as to how the accused 3D camera and AR games features actually operate and function. *See, e.g.,* Tr. 621:9-622:2, 714:15-715:4, 723:22-724:8. Conclusory expert testimony, such as Mr. Merritt's, is insufficient to sustain a finding of infringement. *See Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (affirming judgment as a matter of law of non-infringement where expert's "conclusory statement is . . . insufficient to allow a reasonable juror to find that Mirror Worlds has met its burden of proof"); *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997) (affirming verdict of non-infringement where patentee "offered nothing more than its expert's general opinion that the accused product or process infringed the patents").

Mr. Merritt's cursory and unreliable opinions pervade Tomita's evidence and are insufficient to support the jury's verdict. For each of the reasons set forth below, Nintendo is entitled to judgment as a matter of law of non-infringement. In the alternative, a new trial should be granted to remedy the admission of Mr. Merritt's unreliable testimony.

A.    **There is Insufficient Evidence that the 3DS Utilizes Any of the Three Structures, or Their Equivalents, of the "Cross-Point Measuring Means"**

Because "cross-point measuring means" is a means-plus-function claim term, Tomita was required to identify structure in the 3DS that is identical or equivalent to the corresponding

structure in the patent specification that performs the identical function of this claim element. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004).  Structure is equivalent if it performs the identical function in substantially the same way, with substantially the same result. *Id*.

The Court construed "cross-point measuring means" to require the corresponding structure of "a cross-point data device that determines the cross-point information as described" in the patent.  D.I. 52 at 2.  The Court further explained, based on the patent specification, that cross-point information is measured "by any of **three** different techniques."  D.I. 64 at 17 (emphasis added).  These three techniques for measuring the distance between the cameras and the cross-point are: (1) a "laser distance measuring technique;" (2) "based upon the inclination angle between the optical axes of the left-eye and right-eye cameras;" and (3) where "an operator inputs the distance."  '664 patent, 9:23-28.

Tomita never identified in the 3DS any structure that is "identical or equivalent" to one of these techniques.  Mr. Merritt indiscriminately referenced "two camera pick-up devices," "software routines," "the system on chip," "all that mess of integrated circuits," "other circuits around," "the bus that transfers information around," "a display," "the touch pad," "the circle pad," and the "3-D slider."  Tr. 325:11-328:7, 404:25-405:8 ("I'm not really sure where it happens.").  He never testified, however, that any of these items measures cross-point information using one of the three techniques that the Court identified as corresponding structure.  Rather, the only evidence before the jury was the testimony of Nintendo's expert, Dr. Frahm, who testified that the 3DS does not have structure that is identical or equivalent to any of the three structures identified by the Court. *E.g.,* Tr. 846:21-847:3.

Unable to identify any of the three techniques as being present in the 3DS, Mr. Merritt

instead presented testimony, and Tomita argued, that an alleged fourth structure for the cross-point measuring means "calculates the cross-point based upon the position of picking-up of an object" in the camera images.  *See* Tr. 460:15-461:6, 465:25-466:11, 666:22-667:3.  However, this is contrary to the Court's claim construction and must be rejected.  *Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011) ("we must disregard the testimony of Cordis's expert . . . because . . . that testimony was based on an incorrect understanding of the claim construction").  Indeed, at trial the Court sustained Nintendo's objection to Tomita's use of slides with this alleged fourth structure (*see* Tr. 307:14-308:5) and overruled Tomita's objection to a Nintendo slide omitting the alleged fourth structure.  Tr. 663:25-670:5.  Moreover, this alleged fourth technique cannot serve as corresponding structure under 35 U.S.C. § 112(6) because the patent specification does not "clearly link[] or associate[] that structure to the function recited in the claim."  *Saffran v. Johnson & Johnson*, No. 2012-1043, __F.3d__, 2013 WL 1338910, at *9-10 (Fed. Cir. Apr. 4, 2013) (citation omitted) (rejecting purported structure as "fragmentary statements taken out of context from the specification").

    Even if this alleged fourth technique were corresponding structure (which it is not), there is insufficient evidence that the 3DS uses it.  There is no dispute that the 3DS camera hardware itself cannot focus on objects (Tr. 402:12-19), so the alleged structure must exist in software.  Because of Mr. Merritt's inability to analyze the source code, Tomita relies on his observations of the 3DS to divine this alleged structure in the source code.  However, as Mr. Delattre explained, this is insufficient: "From a user perspective, when you look at the 3DS, you see that it's adapting to the scene. . . . But that's the result of your algorithm. It's not the way you do it. There are multiple ways to do things."  Tr. 621:9-622:2 (noting that he personally "came out with three different algorithms to implement the same feature").

Contrary to Mr. Merritt's vague and conclusory testimony (*see, e.g.,* 466:3-11 ("I *think* that it does this function") (emphasis added)), both Mr. Delattre and Dr. Frahm testified that the 3DS does not recognize or make use of objects.  Mr. Delattre explained that the 3D camera application does not "care" about or "look at" objects.  Tr. 620:23-621:8; *see also* Tr. 610:13-16 (noting that 9-zones are fixed regardless of objects), 623:8-19 ("There could be millions or no object.  It's just not something we have the information, and we don't use."), 647:8-17.  Even Mr. Merritt conceded that the comparison between left and right images performed by the 3D camera application is based on a "pattern" rather than objects.  Tr. 415:18-416:3.  Dr. Frahm's review of the source code confirmed that the 3DS does not focus on objects.  *E.g.,* Tr. 716:6-9, 717:7-10, 802:25-803:3, 813:6-18, 847:4-12, 847:18-848:15, 852:16-21.

**B.      There is Insufficient Evidence that the 3DS Performs the Function of the "Cross-Point Measuring Means"**

Tomita also failed to present sufficient evidence to prove that the 3DS performs the identical function of the cross-point measuring means, namely, "measur[ing] CP information on the cross-point (CP) of the optical axes of the two video pick up means."  D.I. 52 at 2 (internal quotations omitted); *see Frank's Casing*, 389 F.3d at 1378.

While Mr. Merritt asserted that the 3DS measures CP information, he failed to provide any explanation or evidence as to *how* CP information is allegedly measured.  *See* Tr. 303:9-305:5, 306:3-7, 307:8-13, 314:7-316:6, 319:14-320:7, 322:17-323:2, 324:24-325:10, 460:15-461:6, 466:3-11.  Instead, Mr. Merritt offered unsupported conclusions based, once again, on his observations.  *See, e.g.,* Tr. 305:2-5 (noting that 3D camera application measures cross-point information "by knowing what it's doing and sending that information along with the images"), 307:8-13 ("You can plainly see [measurement of CP information] when observing the behavior of the 3DS."), 314:9-19 ("I could see that it was *somehow* measuring the distance to things out

there in front of it") (emphasis added).  This conclusory expert testimony is insufficient evidence to support the jury's verdict.  *See Rohm,* 127 F.3d at 1092.

Moreover, in contrast to Mr. Merritt's conclusory opinions, the record is clear that the 3DS does not perform the function of the cross-point measuring means, as set forth below.

### 1. The 3DS does not have or determine a "cross-point (CP) of optical axes."

Claim 1 requires the measurement of "CP information on the cross-point (CP) of optical axes of" two cameras.  '664 patent, 21:55-57; D.I. 52 at 2.  Thus, to prove infringement, Tomita must show that the optical axes of the 3DS's two outer cameras intersect to form a cross-point.  *See* Tr. 392:11-19, 424:21-425:4.  It is undisputed, however, that the optical axes of the 3DS's cameras are parallel and do not intersect.

As an initial matter, both Mr. Merritt and Dr. Frahm agree that the outer cameras of the 3DS are arranged in parallel.  Tr. 403:4-6, 697:15-18.  It is also undisputed that the image sensors (*i.e.*, chips) of these cameras are centered in a fixed position directly behind the camera lenses.  Tr. 396:18-397:8, 848:25-849:4.[2]  Moreover, Mr. Merritt explained that the optical axis of each camera extends from "the center pixel of each of the chips . . . through the center of the lens," thus it too remains fixed in place.  Tr. 263:4-19; *see also* TR 373:10-20.

It is also undisputed that the optical axes of the 3DS's outer cameras are parallel.  Mr. Merritt asserted that the 3DS infringes claim 8 (before Tomita dropped that claim), explaining that this requires the 3DS to have parallel optical axes.  Tr. 390:3-5, 391:4-14.  Dr. Frahm similarly confirmed that the outer cameras of the 3DS have parallel optical axes.  Tr. 849:5-10.

---

[2] Though the Court construed the '664 patent to cover "systems with parallel video image pick-up means" because of the possibility of having "laterally shifting computer chips located behind the cameras' lenses " (D.I. 64 at 7), both experts agreed that the image sensors in the cameras of the 3DS are fixed in place and do not shift.  Tr. 403:7-10, 693:11-13.

It is a basic mathematical axiom that parallel lines – such as the optical axes of the outer cameras of the 3DS – cannot intersect.  *See* Tr. 393:14-16, 696:18-697:1, 845:1-10.  The '664 patent explains that, in this circumstance, no cross-point can exist.  '664 patent, 10:51-52 ("there is no CP information" where "the distance to CP is infinite," *i.e.* the optical axes are parallel); Tr. 782:6-22.

Even if the optical axes of the outer cameras of the 3DS were not perfectly parallel, there is no evidence that the 3DS performs any operation which depends on their intersection.  *See* Tr. 849:8-10.  Mr. Merritt suggested that imperfectly parallel optical axes might intersect "seven light years away" (Tr. 374:18-22), but surely Tomita does not contend that the 3DS measures or is capable of measuring the distance to such a cross-point.[3]  Accordingly, there is no evidence that the 3DS has cameras with optical axes that form a cross-point.

## 2.    The 3D Camera Application Does Not Measure Cross-Point Information.

The record is clear that the 3D camera application does not measure cross-point information.  Alexandre Delattre, the author of the Mobiclip software used by the 3D camera application to calculate an offset between left and right images, explained his algorithms and source code in detail.  *See generally* Tr. 609:16-620:15; Margulies Dec. Ex. 3, Trial Ex. IJ.  Mr. Merritt does not dispute how this software functions.  *See* Tr. 414:21-416:6.

All of the relevant evidence at trial demonstrates that the 3D camera application determines an offset (not a cross-point) based solely on brightness of the individual pixels that make up the two images captured by the cameras.  *E.g.,* Tr. 608:8-14, 609:14-17, 610:4-9, 614:19-23, 621:1-5 ("What we need is the brightness information from the pixels, from the left

---

[3] Mr. Merritt also concedes that not all imperfectly made cameras on the 3DS would have intersecting optical axes.  For example, the optical axes could be divergent, and thus would also fail to intersect at a cross-point.  Tr. 374:23-375:2.

image and from the right image. That's all we need."), 715:5-10, 715:25-716:5.  Moreover, both

Dr. Frahm and Mr. Delattre testified that "no distance information" – such as cross-point

information – is used in calculating the offset of the images.  Tr. 614:19-23, 620:23-25, 622:25-

623:3, 715:25-716:5.  Specifically, Mr. Delattre testified that the 3D camera application does not

"use any information about the distances between the cameras or from the cameras to a cross-

point."  Tr. 636:1-4; *see also* Tr. 721:6-21 ("there is no cross-point information used").

### 3. The AR Games Application Does Not Measure Cross-Point Information.

The 3DS AR games application estimates the distance from the device to an AR card.

However, this distance to the AR card is not the distance to a cross-point or cross-point

information, and the AR games application does not measure cross-point information.  Dr. Ito,

the author of the AR games software, explained that this distance is approximated "based on the

shape and size of the AR card," as seen in "a photograph of the AR card."  Tr. 682:22-683:21.

Dr. Frahm confirmed this by reference to the AR games source code.  Tr. 724:9-728:24.

Mr. Merritt could only testify that some distance is measured between the 3DS and the

AR card, without identifying where a cross-point might be on the card.  Tr. 418:8-16, 419:9-16,

419:25-420:4.  Mr. Merritt also did not know how the distance to the AR card is actually

determined.  Tr. 419:9-420:4.  Nor could he articulate why such a distance was cross-point

information.  He testified that he did not know which part of the AR card was being used in the

distance measurement (Tr. 419:9-16), but agreed that the whole AR card could not be a cross-

point.  Tr. 418:25-419:6.  At best, Mr. Merritt postulated that "the optical axes do converge on

the card under some conditions," but provided no testimony as to what those conditions allegedly

are.  Tr. 419:3-6.[4]  In short, the entire basis for Mr. Merritt's opinion that the AR games

application measures cross-point information is "I see it doing it so I assume it does it with some

combination of routines."  Tr. 420:3-4.

In contrast, Dr. Ito testified  – and Dr. Frahm confirmed – that the AR card need not be

placed at any particular position within the field of view of the cameras for the application to

work; it need not be at a hypothetical "cross-point," and thus the distance to the card cannot be

cross-point information.  Tr. 682:6-10, 730:16-22; *see also* 682:14-21 (noting purpose of

distance measurement, which is unrelated to cross-point information).  Moreover, Dr. Ito

explained based on the source code that the distance is estimated using only a single camera.  Tr.

683:8-21. Dr. Frahm corroborated this detail and explained that the use of a single camera cannot

produce a cross-point, as the Court's construction requires "measur[ing] CP information on the

cross-point (CP) of the optical axes of the **two** video pick up means."  Tr. 728:25-730:3

(emphasis added); D.I. 52 at 2.  Critically, because Mr. Merritt did not know how the distance

between the 3DS and the AR card was determined, he could not rebut Drs. Ito and Frahm's

testimony.  Tr. 419:17-420:4.

### C.   There is Insufficient Evidence that the 3DS Performs the Function of the "Offset Presetting Means"

To support a finding of infringement, Tomita must have identified structure in the 3DS

that performs the function of the claimed "offset presetting means."  *See* D.I. 52 at 2-3.

However, Tomita did not present sufficient evidence to prove that the 3DS (either the 3D camera

or AR game features) performs offsetting based upon "cross-point information" or "information

on the size of the image."  '664 patent, 21:63-65; Tr. 425:21-426:24.

---

[4] Tomita also elicited a statement by Dr. Ito regarding a "focal distance."  Tr. 685:23-686:9.  Dr.
Ito testified that this distance has "no relationship" between the camera geometry, and thus it
cannot be cross-point information.  Tr. 684:6-8.

1.      **The 3DS does not use cross-point information to offset images.**

Mr. Merritt testified that the existence of an offset does not prove infringement.  Tr.

425:21-24 ("The offset could have come from anywhere.").  However, Mr. Merritt offers only a

few conclusory statements that cross-point information is used to perform offsetting in the 3DS,

without explaining *how* the cross-point information is used or even *how* he knows that it is used.

*E.g.,* Tr. 338:22-339:11.  Regardless, as discussed above, the 3DS does not have a cross-point of

optical axes, and does not measure any CP information.  *See also* Tr. 723:5-9.  Consequently it is

impossible for the 3DS to perform offsetting of images based on cross-point information.

2.      **The 3DS does not use the size of the image which is displayed.**

It is undisputed that the claim language "size of the image which is displayed" refers to

the physical size of the image as it appears on a display screen.  Mr. Merritt explained that "it's

the size of the image to be displayed.   If it fills the screen, then it's synonymous with the screen

size."  Tr. 429:10-23, *see also* Tr. 345:17-19 ("the software shows that it's basing what it does on

the size of the display that it's going to be shown on"), 430:22-431:4.  Dr. Frahm agrees that the

claim term refers to the physical image size on the screen.  Tr. 732:13-733:5.  This is consistent

with the language and purpose of the patent itself (*e.g.,* '664 patent, 2:56-3:2) and the Court's

summary judgment decision.  D.I. 82 at 5, 13.

Mr. Merritt's opinion that the 3DS satisfies this claim element is based on the use of a

"scaling factor" that adjusts from 512 pixels "as the image flows from the cameras" to 400

pixels, corresponding to the 3DS display.  Tr. 436:11-16, 437:15-24.  This pixel-based scaling

factor, however, cannot fulfill the claim's requirement to use the physical size of the image,

because resolution in pixels does not correspond to physical size.  *See* Tr. 733:25-734:2, 735:7-

13.  Mr. Merritt conceded that pixels are not an indicator of physical size (*see* Tr. 396:3-17) and

Dr. Frahm agreed.  Tr. 733:6-14, *see also* Tr. 733:15-24.  Although Mr. Merritt relies on various

Nintendo documents concerning image "size," he acknowledged that each discusses "size" only in terms of pixels.  Tr. 443:13-445:7, 447:14-448:8, *see also* 734:3-24.  Thus, the 3DS cannot literally infringe this claim limitation.  Indeed, the Court only discussed that this pixel-based scaling factor *could* satisfy the claim limitation under the doctrine of equivalents.  D.I. 82 at 14.  However, as explained below, Tomita has not actually made an argument for infringement under the doctrine of equivalents.  *See infra* at III(F) (discussing doctrine of equivalents).

### D.    There is Insufficient Evidence that the 3DS Uses a "Preset Value" in Performing the Claimed Function of Offsetting

Pursuant to the Court's claim construction, the "offset presetting means" limitation "requires a default or preset value for the ratio in order to perform the function of offsetting the two images."  D.I. 64 at 18 (emphasis added).  This "default or preset value" is an offset value for the two images that "preserve[s] a constant ratio between different distances, thus producing consistent stereoscopic effect."  *Id.*  In other words, this preset value would serve as the baseline offset between left and right images from which the claimed offset presetting means determines the new offset.  This "value would not constitute a part of the function the means performed, but instead data that the means used to perform that function."  *Id*.  Thus, there must be sufficient evidence that the 3DS actually utilizes a "default or preset value" that is used to "perform the function of offsetting the two images" to support a finding of infringement of claim 1.  *Id.*

Tomita failed to identify a default or preset value that serves as the basis for calculating the claimed offset, as required by the Court's claim construction decision.  Although Mr. Merritt uses the word "preset" (*e.g.,* Tr. 269:21-270:2), he always used it interchangeably with the word "offset."  He makes no reference, however, to the default or preset ratio required.[5]  Moreover,

---

[5] This is not surprising, as Mr. Merritt's expert reports (which were never supplemented) make no reference to the preset value.

Mr. Merritt does not identify any equivalent structure in the 3DS that performs the identical function to the default or preset ratio.  In short, Tomita has presented no evidence regarding this claim limitation and thus there is no evidence from which a reasonable jury could find that this element is present in the 3DS.

*   *   *

For each of the foregoing reasons, judgment of non-infringement should be entered.  In the alternative, a new trial should be granted.

### E. There is Insufficient Evidence of Induced Infringement

In order to prove induced infringement, Tomita had to provide sufficient evidence that Nintendo's actions induced infringing acts and that it knew or should have known its actions would induce actual infringements.  *ACCO Brands, Inc. v. ABA Locks Mfrs. Co., Ltd.*, 501 F.3d 1307, 1312 (Fed. Cir. 2007).   Moreover, Tomita was required to prove that Nintendo had actual knowledge that the induced acts constitute patent infringement.  *Id.*; *Global-Tech Appliances, Inc. v. SEB S.A.*, __ U.S. __, 131 S. Ct. 2060, 2068 (2011).

Tomita offered no evidence that Nintendo has taken any actions supporting a finding of inducement.  Tomita did not advance an inducement theory to the jury and did not object to the complete omission of induced infringement from the jury instructions.  In short, Tomita has failed to present sufficient evidence of induced infringement and has abandoned the claim. *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 126 (2d Cir. 1981) (finding a claim to be abandoned where a party failed to "press the [claim] before the jury, requested no jury instruction on the claim, and voiced no objection when no [claim] instruction was given").  Furthermore, Tomita has waived its arguments regarding induced infringement by failing to timely object to their omission from the jury instructions.  *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1375 (Fed. Cir. 2010) (applying Second Circuit law).  Thus,

15

judgment of no induced infringement should be entered.

     **F.**    **There is Insufficient Evidence to Find Infringement Under the Doctrine of Equivalents**

     Recognizing that the doctrine of equivalents is a murky area that could easily lead a jury astray, the Federal Circuit requires that a patentee asserting infringement under the doctrine of equivalents must "present particularized evidence that links the accused products to the patent on *a limitation by limitation basis*."  *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1383 (Fed. Cir. 2007) (emphasis added); *see also Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1296 (Fed. Cir. 2009) ("a generalized showing of equivalency between the claim as a whole and the allegedly infringing product or process is not sufficient to show infringement").  Tomita's "[e]vidence and argument on the doctrine of equivalents cannot merely be subsumed in [its] case of literal infringement,"  *Amgen Inc. v. F. Hoffman-LA Roche Ltd*, 580 F.3d 1340, 1382 (Fed. Cir. 2009) (citation omitted), and mere conclusory statements by expert witnesses are inadequate to satisfy this burden.  *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1365 (Fed. Cir. 2007).  Importantly, "if a jury is to rationally find all three elements of [the test for] equivalence, *it must be told what evidence establishes the equivalence* of the claimed and accused devices as to each element."  *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1427 (Fed. Cir. 1989) (emphasis added).  Tomita did not meet this burden.

     Mr. Merritt testified that the AR games and 3D camera features generally infringe under the doctrine of equivalents, but failed to specify which specific claim limitations were alleged to be infringed by equivalence.  *See, e.g.,* Tr. 329:2-12 ("Because the differences between the 3DS and *the language in the patent claims* does not appear to have any substantial difference.") (emphasis added).  Moreover, Mr. Merritt's testimony regarding the doctrine of equivalents consists entirely of general conclusions of similarity.  *E.g.,* Tr. 329:10-12 ("the language in the

patent claims does not appear to have any substantial difference between the patent and what I observe in the 3DS"), 346:10-347:4, 350:5-11 ("if they are not literally equivalent, then I see no substantial difference between them"), 460:4-11 ("I found that cross-point measuring was conceptually equivalent to measuring the offset between images") (testimony struck as non-responsive).  This testimony is insufficient as a matter of law to prove infringement under the doctrine of equivalents.  *See Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567-68 (Fed. Cir. 1996) (holding that testimony directed to literal infringement combined with conclusory expert testimony on overall similarity was insufficient to establish equivalence).

Accordingly, Tomita has failed to provide sufficient evidence of infringement under the doctrine of equivalents and judgment of non-infringement should be entered.  In the alternative, a new trial should be granted.

## IV.  THERE IS INSUFFICIENT EVIDENCE THAT THE '664 PATENT IS NOT INVALID

### A.  The Claims of the '664 Patent Are Not Enabled

Pursuant to 35 U.S.C. § 112, a patent "specification shall describe 'the manner and process of making and using [the invention], in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the [invention].'"  *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007) (citing 35 U.S.C. § 112) (alterations in original).  This enablement requirement is met "when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation."  *Id.* (citation omitted).  However, "[i]t is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement."  *Id.* at 1283 (citing *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)).

Tomita asserts and the jury found that the 3DS infringes claim 1, despite the existence of

parallel optical axes.  *See supra* at 9-10.  If claim 1 covers the 3DS, then the claimed function of "measur[ing] CP information on the cross-point (CP) of the optical axes of the two video pick up means" must be enabled where the optical axes are parallel.  D.I. 52 at 2; *Auto. Techs.*, 501 F.3d at 1285 ("in order to fulfill the enablement requirement, the specification must enable the full scope of the claims"); *see also Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1000 (Fed. Cir. 2008) ("Because the asserted claims are broad enough to cover both movies and video games, the patents must enable both embodiments.").  The rationale for this requirement is that "[p]atent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable."  *Genentech*, 108 F.3d at 1366.

Measuring CP information from cameras with parallel or non-intersecting optical axes is not enabled by the '664 patent.  As discussed above, the patent specification explicitly acknowledges that "there is no CP information" where the distance to the cross-point is "infinite" ('664 patent, 10:51-52), and the distance to the cross-point is infinite where the optical axes of the two cameras are parallel.[6]  *See* Tr. 393:5-16, 782:6-13.  Mr. Merritt admitted that parallel optical axes do not intersect.  Tr. 374:21-22 ("The only time they don't intersect is when they are actually parallel, which is almost impossible"); *cf. Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) (distinguishing between "parallel" and "generally parallel" claim limitations).  The patent does not describe how to implement the claimed cross-point measuring means in these circumstances.  Where, as here, "the specification teaches against a purported aspect of an invention, such a teaching 'is itself evidence that at least a significant amount of experimentation would have been necessary to practice the claimed

---

[6] This is unrelated to the use of parallel *cameras* with optical axes that move using shifting chips, which was discussed in the Court's claim construction decision.  D.I. 64 at 7; *see* Tr. 783:9-15.

invention.'"  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1379 (Fed. Cir. 2007) (citation omitted).

At trial, Dr. Frahm explained that the claims of the '664 patent were not enabled as to how to measure cross-point information in the case of parallel optical axes.  Tr. 781:17-782:22, 783:23-784:5.  In contrast, Mr. Merritt's rebuttal testimony on enablement, which consisted of a single question and answer, was conclusory and did not even touch the issue of parallel optical axes or explain how the specification teaches measuring cross-point information in a system with parallel optical axes.  Tr. 973:21-974:5.

Because there is clear and convincing evidence that the claims of the patent are not enabled, judgment as a matter of a law that the claims are invalid should be entered.  *See Sitrick*, 516 F.3d at 1000 (finding clear and convincing evidence of invalidity where defendants used "the teachings of the specifications and the opinions of their two experts" and plaintiff's expert testimony was "'conclusory' and 'unsupported by any actual information'").  In the alternative, a new trial should be granted.

### B.     Claim 1 of the '664 Patent is Invalid in Light of Matsugu '408

A claim is invalid if each and every element is found, either expressly or inherently in a single prior art reference.  *Atlas Powder Co. v. Ireco, Inc.,* 190 F.3d 1342, 1346 (Fed. Cir. 1999). "When a claim covers several structures, either generically or as alternatives, the claim is deemed anticipated if any of the structures within the scope of the claim is known in the prior art."  *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001).

Dr. Frahm gave detailed testimony explaining how each element of claim 1 of the '664 patent is disclosed by Trial Ex. AO, U.S. Patent No. 5,625,408, Margulies Dec. Ex. 4 ("Matsugu '408"), including detailed citations to the disclosure.  *See* Tr. 761:24-769:18.  Tomita, through Mr. Merritt, only disputed the sufficiency of Matsugu '408's disclosure in three respects.

First, Mr. Merritt testified that the "per pixel parallax adjustment" of Matsugu '408 is "very different" from the '664 patent.  Tr. 971:5-8, 972:4-12.  There is clear evidence, however, that the offset of the '664 patent is merely a subcase of Matsugu '408, where each pixel is offset by the same amount.  *See* Tr. 837:7-17.  Indeed, any offsetting of images necessarily involves offsetting each pixel, as described in Matsugu '408.  *See* '664 patent, 9:53-58 and 10:14-16 (describing offsetting by synthesizing lines of pixels from the left and right images).

Second, Mr. Merritt testified without elaboration that he did "not find the size of the displayed image as an input to the process," as in the '664 patent.  Tr. 971:9-12, 972:13-21.  Again, Dr. Frahm provided detailed testimony –which Mr. Merritt never addressed – about where this claim element is discussed in Matsugu '408.  *See* Tr. 768:17-769:8, 837:18-839:23.

Third, Mr. Merritt testified without elaboration that Matsugu '408 lacks a manual entry unit corresponding to the claimed offset presetting means.  Tr. 971:13-15, 972:22-973:9.  Again, Dr. Frahm provided detailed testimony of where this element was disclosed in Matsugu '408, which Mr. Merritt never substantively addressed.  *See* Tr. 769:9-18, 771:24-774:16 (describing, alternatively, combination of Matsugu '408 with Trial Ex. AN, Margulies Dec. Ex. 5 (U.S. Patent No. 5,065,236) to render manual entry unit obvious), 839:24-842:24.

Mr. Merritt's bare conclusions cannot rebut the clear and convincing evidence produced by Nintendo.  *See Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1269 (Fed. Cir. 2012) ("the conclusory testimony of an expert witness, however, cannot create an issue of fact if none otherwise exists").  Judgment of invalidity should therefore be entered.  In the alternative, a new trial should be granted.

## V.   TOMITA HAS NOT PROVIDED SUFFICIENT EVIDENCE THAT IT IS ENTITLED TO DAMAGES

Tomita bears the burden of presenting sufficient evidence to establish the amount to be

paid as a reasonable royalty.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).  The entire market value rule is a "narrow exception" to the general rule that "royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (citation omitted).  The entire market value rule may be invoked only "when the feature patented constitutes the basis for customer demand."  *Id.* (citation omitted).

Tomita's damages evidence was based on the entire market value of the 3DS.  Tr. 478:15-479:1, 481:1-17, 547:3-6.  However, Tomita did not present evidence from which a reasonable jury could conclude that the patented features constitute <u>the</u> basis for consumer demand or that the entire 3DS is the smallest saleable patent-practicing unit.  *Laser Dynamics*, 694 F.3d at 67; *see, e.g.,* Tr. 544:20-545:20.  Instead, Mr. Hoeberlein testified that Nintendo does not sell the components of the 3DS separately.  Tr. 479:18-22, 545:21-25.  However, this is insufficient to render the 3DS the "smallest saleable patent-practicing unit."  *See, e.g, Lucent*, 580 F.3d at 1337-38 (vacating award absent evidence that "anyone purchased Outlook because of the patented" date-picker tool, which was one of its many features); *Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1318-20 (Fed. Cir. 2011) (rejecting attempt to use entire market value rule even though the accused Product Activation was an integrated software component); *Mirror Worlds,* 784 F. Supp. 2d 703, 721, 724 (E.D. Tex. 2011) (finding the entire market value rule not satisfied even though Apple "does not sell the [accused] features separately, nor does it attribute specific portions of its revenue to the features of its operating system").  Moreover, Mr. Hoeberlein admitted that he made no effort to apportion the patented components from the non-patented components.  Tr. 547:24-548:3.  Indeed, he *added in* the value of admittedly non-infringing software.  Tr. 554:25-556:3; *see also* Tr. 505:24-506:2.

In contrast, Nintendo's expert, Julie Davis, properly apportioned the value of the '664 patent assuming infringement, and arrived at a total royalty of $2,037,380.  Tr. 904:11-907:24. The Court has discretion to grant remittitur if the verdict appears to be against the weight of the evidence.  *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).  Here, Nintendo is entitled to remittitur because Tomita's improper use of the entire market value of the 3DS erroneously allowed the jury to include all revenue from the 3DS in its damages calculation. Alternatively, if the record does not permit an accurate calculation of damages, Nintendo is entitled to a new trial.

## VI.  A NEW TRIAL IS NECESSARY DUE TO PROCEDURAL ERRORS CAUSING THE JURY TO REACH A SERIOUSLY ERRONEOUS RESULT

### A.  A New Trial Is Necessary Because of the Failure to Instruct the Jury on Claim Construction

At trial, the Court declined to instruct the jury on its claim construction.  *See* Tr. 942:7-943:5.  Nintendo respectfully submits that the failure to provide the Court's claim construction to the jury is error that resulted in prejudice to Nintendo, warranting a new trial.  *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000).

Where, as here, the Court has made specific claim construction rulings, it is required to inform the jury that it "must apply the district court's construction of the terms in its deliberations."  *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1367 (Fed. Cir. 2004).  "The failure of the district court to inform the jury of the court's claim construction and to instruct the jury of its obligation to apply that construction in its infringement deliberations left the jury free to make its own determination of the meaning of the claims and was error."  *Id.*  Allowing the parties to argue claim construction issues to the jury does not remedy the error.  *See Creative Internet Adver. Corp. v. YahooA, Inc.*, 476 F. App'x 724, 728 (Fed. Cir. 2011); *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (holding that "it is improper to argue

claim construction to the jury" and noting that the "risk of confusing the jury is high when experts opine on claim construction"); *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (holding that allowing experts to testify as to claim meaning and counsel to argue conflicting claim constructions was improper).

As construed by the Court, claim 1 includes two means-plus-function elements.  D.I. 52 at 2-3.  Thus, to find infringement, the jury had to determine that the 3DS contained a structure that performs the identical function for each claim element which is identical or equivalent to one of the corresponding structures identified by the Court.  *Frank's Casing*, 389 F.3d at 1378. Each of the Court's constructions included numerous citations to the '664 patent specification, identifying corresponding structure; however, the jury was left to deliberate without this information or any clear understanding as to which structures correspond to which claim term. *See supra* at 6 (discussing alleged fourth structure for the cross-point measuring means).  The Court's decision not to instruct the jury on these requirements "had the effect of leaving a critical question of claim construction to the jury" and was error.  *Creative Internet.*, 476 F. App'x at 728; *see CytoLogix*, 424 F.3d at 1178 (noting that 35 U.S.C. § 112(6) infringement cannot be "based only on a functional, not a structural, analysis").

This error was prejudicial to Nintendo, as it could have "changed the result."  *See Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1374 (Fed. Cir. 2002).  As set forth in the prior sections of this motion, there was sufficient evidence at trial to support a finding of non-infringement. Accordingly, the jury verdict should be set aside and a new trial ordered.

**B.   A New Trial Is Necessary Because the Court Did Not Resolve the Dispute Over the Claim Terms "Cross-Point" and "Optical Axes"**

It is a court's role to resolve any fundamental disputes regarding claim construction.  *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate. . . when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *Id.* at 1361.  In *O2 Micro*, the failure to construe the disputed claim term "only if" allowed the parties to argue its meaning to the jury and the jury to consider those arguments.  *Id.* at 1362.  Such an error is prejudicial and warrants a new trial.  *See id.* at 1363.

Here, the Court found that the terms "cross-point" and "optical axes" needed no construction.  D.I. 52 at 1-2.  This, however, did not resolve the parties' dispute as to these terms, as evidenced at trial.  First, Mr. Merritt's testimony repeatedly conflated the claimed "cross-point" with an "offset" between left and right images upon display.  *See, e.g.,* Tr. 305:23-24 ("the storage cross-point or offset information in this structure"), 315:11-13, 324:1-9, 337:1-12 (noting that "cross-point information" is stored because "the offset that was in effect" when taking a video "also is present when you play it back"); *compare* Tr. 327:4-328:7 with 348:3-22 (asserting that same controls adjust both cross-point and offset).  Consistent with Mr. Merritt, Tomita's counsel also argued during closing argument that "[t]hat offset value, that's cross-point information.  That's infringement."  Tr. 1009:23-24; *see also* Tr. 1008:2-3 ("because that offset value, that's cross-point information"), 1010:4-5.

Claim 1, however, requires that the offset-presetting means determine an offset "based upon . . . cross-point information."  '664 Patent, 21:60-65.  Thus, the cross-point information must be measured *prior* to its use for calculating an offset.  Mr. Merritt concedes this.  Tr. 416:24-417:4, 423:13-424:6, 424:21-425:16.  He also admits that an "offset" between two images is not sufficient to prove that cross-point information has been measured.  Tr. 425:21-24; *see also* Tr. 424:7-10.  Essentially, Tomita and Mr. Merritt make the nonsensical argument that the "offset" used to offset the left and right images for display is determined by that very offset.

Nintendo was prejudiced by the confusion created by Tomita's use of an erroneous definition for an unconstrued claim term.

Second, Tomita presented testimony that the cross-point of the optical axes could be determined based on a "subset" of the camera images.  *See* Tr. 264:4-15, 304:10-305:1.  In one instance, Mr. Merritt testified that "by choosing a subset, [the] 3DS lets you have a wide variety of cross-point in the images that you see."  Tr. 332:12-20.  In another instance, Mr. Merritt testified that the optical axes exist in the camera hardware itself and extend from the center of the image sensor through the center of the camera lens.  Tr. 263:11-15.  This testimony highlights the confusion caused by having no definition of  "optical axes," allowing a "cross-point (CP) of optical axes" to be divorced from the physical camera sensors and lenses.

These types of improper claim construction argument constitute legal error mandating a new trial.  *See O2 Micro*, 521 F.3d at 1363.  Therefore, a new trial should be granted.

### C.   A New Trial Is Necessary Because of the Improper Admission of Mr. Merritt's Unreliable Testimony

Mr. Merritt's testimony regarding the unverified source-code information provided by Mr. Amron should not have been admitted.  *See supra* at 3-5.  While Nintendo's motion in limine to exclude this testimony was denied (Tr. 3:10-12), the admission of Mr. Merritt's testimony was nonetheless an error prejudicing Nintendo.  Consequently, a new trial should be granted.  *Nimley*, 414 F.3d at 400 ("Because there is a distinct possibility that, absent the errors ... the jury would not have reached the verdict that it did, the prejudice caused by them rendered the verdict a 'miscarriage of justice.'").

## VII.   CONCLUSION

For the reasons stated above, Nintendo respectfully requests that the Court enter judgment as a matter of law with respect to each of the foregoing items or, in the alternative, to grant a new trial.

Dated: April 11, 2013
      New York, New York

Respectfully submitted,

KAYE SCHOLER LLP

By:     /s/James S. Blank         
        James S. Blank
        Scott G. Lindvall
        Soumitra Deka
        Paul I. Margulies
425 Park Avenue
New York, New York  10022
Tel:  (212) 836-8000
Fax:  (212) 836-8629
*Attorneys for Defendants*