**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
                                                                       :
TOMITA TECHNOLOGIES USA, LLC, AND TOMITA
TECHNOLOGIES INTERNATIONAL, INC.,                                      :

                                        Plaintiffs,
                                                                       :   Case No. 1:11-cv-04256-JSR
                v.                                                     :

NINTENDO CO., LTD.,  AND
NINTENDO OF AMERICA INC.,                                             :

                                                                       :
                                        Defendants.
                                                                       :
-----------------------------------------------------------------------x

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR**
**JUDGMENT AS A MATTER OF LAW OR,**
**IN THE ALTERNATIVE, FOR A NEW TRIAL**

## TABLE OF CONTENTS

PAGE

I.      INTRODUCTION ........................................................................................ 1

II.     LEGAL STANDARD.................................................................................. 1

III.    NINTENDO IS NOT ENTITLED TO JMOL OF NON-INFRINGEMENT .................... 2

   A.   Substantial Evidence Establishes That The 3DS Includes Structure That Is
        Identical Or Equivalent To The Corresponding Structure Of The "Cross-
        Point Measuring Means"...................................................................4

   B.   Substantial Evidence Establishes That The 3DS Performs The Function Of
        The "Cross-Point Measuring Means" ..................................................8

        1.   Contrary to Nintendo's Assertion, Substantial Evidence Shows that the
             3DS Has and Determines a "Cross-Point (CP) of Optical Axes." ..................9

        2.   Contrary to Nintendo's Assertion, the 3DS Camera Application
             Measures Cross-Point Information. ..............................................10

        3.   Contrary to Nintendo's Assertion, the AR Games Application Measures
             Cross-Point Information..........................................................11

   C.   Substantial Evidence Establishes That The 3DS Performs The Function Of
        The "Offset Presetting Means" ........................................................12

   D.   Nintendo Is Not Entitled To JMOL Based On Its "Preset Value"
        Argument. .................................................................................14

   E.   Nintendo Is Not Entitled to JMOL of No Induced Infringement......................15

   F.   There Was Sufficient Evidence To Find Infringement Under the Doctrine
        of Equivalents ...........................................................................15

IV.     NINTENDO IS NOT ENTITLED TO JMOL OF INVALIDITY...................................16

   A.   Substantial Evidence Supports the Jury's Verdict that the '664 Patent is
        Not Invalid of Lack of Enablement ...................................................16

   B.   Substantial Evidence Supports the Jury's Verdict that the '664 Patent is
        Not Invalid as Anticipated by Matsugu '408................................................17

V.      NINTENDO IS NOT ENTITLED TO RECONSIDERATION OF DAMAGES ........... 18

VI.     NINTENDO IS NOT ENTITLED TO A NEW TRIAL...................................................21

i

**A.**  Failure to Provide the Jury with a Separate Instruction on the Court's Claim Construction was Not Error and was Not Prejudicial ............................................21

**B.**  The Court Resolved the Claim Construction Disputes over the Terms "Cross-Point" and "Optical Axes" ......................................................................................22

**C.**  Admission of Mr. Merritt's Testimony regarding Source Code was Proper ...................24

**VII.**  CONCLUSION............................................................................................................. 25

## **TABLE OF AUTHORITIES**

### CASES

*Agere Systems, Inc. v. Atmel Corp.*,
No. 02cv864, 2005 WL 2994702 (E.D. Pa. Aug. 17, 2005)....................................................15

*Akermanis v. Sea-Land Service, Inc.*,
688 F.2d 898 (2d Cir. 1982)............................................................................................2

*Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001).....................................................................................24

*Cornell University v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ..........................................................................19

*Creative Internet Advertising Corp. v. Yahoo! Inc.*,
476 Fed.Appx. 724 (Fed. Cir. 2011) .............................................................................22

*CytoLogix Corp. v. Ventana Medical Systems, Inc.*,
424 F.3d 1168 (Fed. Cir. 2005).....................................................................................22

*Delta-X Corp. v. Baker Hughes Production Tools, Inc.*,
984 F.2d 410 (Fed. Cir. 1993).......................................................................................21

*LaserDynamics, Inc. v. Quanta Computer Inc.*,
694 F.3d 51 (Fed. Cir. 2012).................................................................................18, 19

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009).............................................................................19, 20

*Marine Polymer Technologies, Inc., v. Hemcon, Inc.*,
672 F.3d 1350 (Fed. Cir. 2012)............................................................................. 19-20

*Mirror Worlds, LLC v. Apple Inc.*,
784 F. Supp. 2d 703 (E.D.Tex. 2011) .....................................................................19, 20

*Nimely v. City of New York*,
414 F.3d 381 (2nd Cir. 2005).................................................................................1, 2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)............................................................................. 24, 25

*Rafter v. Bank of America*,
No. 04cv3341 (JSR), 2011 WL 5579029 (S.D.N.Y. Nov. 15, 2011) ........................................2

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000)......................................................................................................2

*Sulzer Textil A.G. v. Picanol N.V.*,
    358 F.3d 1356 (Fed. Cir. 2004)..................................................................................21

*U.S. Philips Corp. v. Iwasaki Electric Co.*,
    607 F. Supp. 2d 470 (S.D.N.Y. 2009).......................................................................2

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)..................................................................................24

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)............................................................................19, 20

*Uniloc USA, Inc. v. Microsoft Corp.*,
    640 F. Supp. 2d 150 (D.R.I. Sept. 29, 2009) ("*Uniloc II*")......................................20

## STATUTES & RULES

Federal Rule of Civil Procedure 50 .............................................................1, 2, 14, 15

Federal Rule of Civil Procedure 59 ...........................................................................2

NY 74549377v6

## I.    INTRODUCTION

Nintendo's renewed JMOL Motion is written as if on a clean slate, ignoring the substantial evidence of record supporting the jury verdict and disregarding the high burden required to overturn it.  For example, with respect to infringement, Nintendo essentially ignores Mr. Merritt's testimony, and other evidence of record, that establishes that (i) the 3DS includes structure that is the same or equivalent to the structure of the "cross-point measuring means," (ii) the 3DS performs the function of the "cross-point measuring means," and (iii) the 3DS performs the function of the "offset presetting means."  With respect to enablement, Nintendo argues that the '664 patent is invalid for lack of enablement despite Mr. Merritt's clear testimony to the contrary.  With respect to anticipation, Nintendo fails to give any weight to Mr. Merritt's testimony that Matsugu lacks three limitations of claim 1 or to acknowledge Dr. Frahm's testimony on cross-examination that Matsugu essentially lacks one of those limitations, thus foreclosing anticipation.  Nintendo's other arguments suffer similar defects. Nintendo simply seeks to have the Court reweigh the evidence and assess the credibility of the witnesses, which is not the Court's role in considering JMOL.

In sum, Nintendo fails to justify its demands for JMOL, new trial or remittitur.  Tomita's Opposition is supported by the Declaration of Kenneth L. Stein ("Stein Dec.").

## II.    LEGAL STANDARD

Judgment as a matter of law may be granted "only when, considering the evidence in the light most favorable to the non-moving party and drawing all reasonable evidentiary inferences in that party's favor, there [is] no legally sufficient evidentiary basis for a reasonable jury to find in favor of the non-moving party."  *Nimely v. City of New York*, 414 F.3d 381, 390 (2nd Cir. 2005) (internal quotation marks omitted);  Fed. R. Civ. P. 50 ("Rule 50").   The court "may not assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute

1

[its] judgment for that of the jury."  *Nimely*, 414 F.3d at 390 (citation and quotation marks omitted).  "Under Rule 50(b), a jury verdict should be set aside only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him."  *Rafter v. Bank of America*, No. 04cv3341 (JSR), 2011 WL 5579029, at *1 (S.D.N.Y. Nov. 15, 2011) (internal quotation marks and elipses omitted).

Although the record should be reviewed as a whole, the Court "must disregard all evidence favorable to [Nintendo as] the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  Thus, the Court must give full credence to evidence supporting Tomita, but only consider the evidence supporting Nintendo that is "uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Id.* (citations and quotation marks omitted).

Although a motion for a new trial under Rule 59 may be granted even if substantial evidence exists to support the jury's verdict, it "ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  *U.S. Philips Corp. v. Iwasaki Electric Co.*, 607 F. Supp. 2d  470, 480 (S.D.N.Y. 2009) (citations and quotation marks omitted).

"Remittitur is a limited exception to the sanctity of jury fact-finding. It allows trial judges to reduce damages, but only when an award is grossly excessive." *Akermanis v. Sea-Land Service, Inc.*, 688 F.2d 898, 902 (2d Cir. 1982).

## III.   NINTENDO IS NOT ENTITLED TO JMOL OF NON-INFRINGEMENT

Nintendo asserts that it is entitled to JMOL of non-infringement on three bases.  Tomita disagrees and addresses each in turn in the sections that follow.

As an initial matter though, Nintendo attacks Mr. Merritt's competency to testify in this case regarding the 3DS source code.  *See* Nintendo's Br. at 3-5, 25.  The Court, however, already decided that issue in denying Nintendo's Motion to Preclude Plaintiffs' Testifying Expert from Opining About the Operation and Function of the Nintendo 3DS Software.  *See* Tr. 3:10-12[1]; D.I. 88.  Nintendo simply repeats the same arguments already considered and rejected by the Court.[2]  *See, e.g.*, Plaintiffs' Opposition to Nintendo's Motion to Preclude Plaintiffs' Testifying Expert from Opining About the Operation and Function of the Nintendo 3DS Software (filed under seal on Nov. 28, 2012) at 5-11.

Significantly, despite Nintendo's attempts to create an issue regarding the source code, there is, in fact, essentially no dispute over the operation of the 3DS source code.  For example, with respect to the autofocus routine in the 3DS Camera application, Mr. Merritt did not dispute that it uses a 9-zone method.  Tr. (Merritt) 414:25-415:2.  Similarly, with respect to AR Games, Mr. Merritt did not dispute that the source code recognizes the AR card using pattern recognition.  Tr. (Merritt) 420:18-22.  The issue at trial was not the operation of the source code,

---

[1] Trial transcript excerpts cited herein are attached as Exhibit 1 to the Stein Declaration.

[2] Contrary to Nintendo's assertion (Nintendo's Br. at 4), Mr. Merritt did not parrot Mr. Amron's conclusions (which, again is the same argument Nintendo made in its motion to preclude).  In every instance Mr. Merritt's opinions are supported by other evidence in addition to the source code, such as 3DS documentation, internal Nintendo documents, deposition testimony of Nintendo engineers and Mr. Merritt's own extensive testing of the 3DS.  Tr. (Merritt) 257:3-258:14  Mr. Merritt testified that his conversations with Mr. Amron "confirm[ed] what [he] had thought must be in the software" based on his testing of the 3DS and review of the documentation."  *See, e.g.*, Tr. (Merritt) 314:14-315:1; 319:10-12.  In other words, Nintendo's assertion that Mr. Merritt "relied solely on Ken Amron" is incorrect.  Nintendo's hypothetical questions to Merritt regarding what would happen "[i]f Mr. Amron's interpretation of the code" was "incorrect" (Nintendo's Br. at 3-4) does not take into account the fact that (i) Mr. Merritt had experience in creating source code in other programming languages and was simply using Mr. Amron as a "C++ interpreter" (Tr. (Merritt) 314:22; 364:22-365:8); and (ii) Mr. Merritt could assess Mr. Amron's explanations of the source code based on the other evidence that he relied upon.

but whether the 3DS, using that source code, infringes the '664 patent. The jury concluded that it did, and there was substantial evidence of record to support that conclusion.

Nintendo also criticizes Tomita for not calling Mr. Amron as a witness at trial. Nintendo's Br. at 4. However, the Court ruled that Mr. Merritt could testify regarding the source code and, therefore, there was no need to call Mr. Amron.[3] In fact, Mr. Amron's testimony would have been duplicative to the evidence presented. In any event, Nintendo devoted a substantial portion of its closing arguments to the fact that Mr. Amron was not called as a witness (Tr. 1067:18-1070:16) and the jury was free to consider that in assessing the credibility of Mr. Merritt's testimony.

> **A.** **Substantial Evidence Establishes That The 3DS Includes Structure That Is Identical Or Equivalent To The Corresponding Structure Of The "Cross-Point Measuring Means"**

Nintendo asserts that "there is insufficient evidence that the 3DS utilizes any of the three structures, or their equivalents, of the 'cross-point measuring means.'" Nintendo's Br. at 5 (capitalization and formatting from heading adjusted). In so doing, Nintendo simply ignores substantial evidence before the jury relating to this limitation and fails to properly apply the Court's claim construction. Tomita had, in fact, methodically presented to the jury the relevant claim construction and evidence of infringement, as explained below.

*First*, Tomita advised the jury of the Court's construction of the "cross-point measuring means" limitation:

---

[3] Nintendo also asserts that "there is no evidence in the record as to Mr. Amron's qualifications to read and analyze source code." Nintendo's Br. at 4. But the jury could reasonably infer that Mr. Amron was competent to review the code based on his ability to answer Mr. Merritt's questions and on the Nintendo documents and other evidence confirming his findings. It should be noted that Nintendo does not actually challenge Mr. Amron's qualifications to read and analyze the 3DS source code—nor could it, since as Nintendo knows, Mr. Amron is a forensic software analyst with over 20 years of experience in the software industry. As Nintendo also knows, Mr. Amron resides in New York City and Nintendo itself could have called him as a witness.

> The term cross-point measuring means for measuring CP information on the cross-point of optical axes of said pickup means is a means plus function limitation under 35 U.S.C. Section 112(6).  The **function** is to measure CP information on the cross-point CP of the optical actions of the two video pickup means.  The **corresponding structure** is comprised of a cross-point data device that measures the cross-point information as described and shown, for example, in figure one, where it is identified as number 403, and figure three where it is identified as number 12.  And in the '664 patent at column three lines 50 through 67, column four, lines one through six, column eight, lines 11 through 18, column nine, lines 23 through 35, and column 18, line 17 through 42.  This structure also includes equivalents of the structures described above.

Tr. (Merritt) 306:15-307:4 (emphasis added); *see also* D.I. 52 at 2.  Tomita also advised the jury that "CP information" is "information relating to [the] cross-point, including information that can be used to determine the distance from the image pickup means to the cross-point." Tr. (Merritt) 303:21-304:1; *see also* D.I. 52 at 1.

The portions of the '664 patent identified in the Court's claim construction describe various techniques of determining cross-point information, including, *inter alia*, (i) via user input (TX-1 at 9:28-29 (Stein Ex. 2)), (ii) based upon the inclination angle between the optical axes of the left-eye and right-eye cameras (TX-1 at 3:50-62; 4:1-6; 8:11-16; 9:26-28; 18:17-28), and (iii) based upon "the picked-up position of [an] object in [the] two pick-up means (*id.* at 3:62-67; 8:16-18; 18:29-34).[4]

*Second*, the evidence of record establishes that the 3DS includes a cross-point data device comprising the 3DS Camera application, as executed by the System on Chip (SoC) and other circuits in the 3DS, and the 3DS's circle pad and touch screen.  *See, e.g.*, Tr. (Merritt) 326:7-9; 327:4-12; 330:19-331:2.  In particular, the evidence shows that the 3DS Camera application measures "cross-point information" at the time an image is captured in the form of a focus value. *See, e.g.,* Tr. (Delattre) 620:7-15 (explaining that the autofocus routine calculates an average "focus" in the form of an offset).  As Mr. Merritt explained, the focus value is an offset that

---

[4] The '664 patent also mentions a "laser distance measuring technique."  TX-1 at 9:25.

determines the cameras' optical axes, thus determining the location of the cross-point.  *See, e.g.,* Tr. (Merritt) 263:3-264:15 (Merritt Slides 019 and 042 (Stein Ex. 3); 304:2-305:1; 468:3-14; Tr. (Delattre) 652:6-10; Tr. (Frahm) 720:21-721:5; 812:25-813:5.

The evidence of record also establishes that the 3DS Camera application determines the focus value in two ways.  One way is via user input, based on user input from the circle pad or touch screen.  Tr. (Merritt) 293:5-7; 316:1-6; 323:19-324:9; 324:14-22; 331:2-6; 441:1-3; Tr. (Frahm) 799:12-17.  The other way is automatically, based on the position of objects picked up by the 3DS's outer cameras (Tr. (Merritt) 292:10-293:7; 315:2-22, 316:1-319:12; 322:17-323:2; 330:19-331:1; 351:16-352:23; 441:1-3; 460:15-461:6; 465:25-466:11; Tr. (Frahm) 799:7-11).

*Third*, the evidence of record establishes that the 3DS includes a cross-point data device comprising the AR Games application, as executed by the SoC and other circuits in the 3DS.  Tr. (Merritt) 326:7-11.  In particular, the evidence shows that AR Games also measures  "cross-point information" at the time an image is captured in the form of a focus (or focal) value, which sets the optical axes of the cameras, thus determining the location of the cross-point, as explained above.  In this case, the focus value is determined by the position of the AR Game card.  *See, e.g.,* Tr. (Merritt) 306:3-7; 319:14-321:10; 324:23-325:10; 325:23-326:6; 337:13-338:12; 418:17-24; 466:13-467:5; Tr. (Ito) 685:23-686:3; Tr. (Frahm) 829:12-16; 829:20-830:9.

Based on the foregoing evidence, the jury reasonably concluded that the 3DS included structure corresponding to the cross-point measuring means.

Nintendo argues that the Court's *Markman* decision refers to "**three** different techniques" and excludes a "fourth" technique relied upon by Tomita—namely a cross-point measuring means that "calculates the cross-point based upon the position of picking-up of an object" in the cameras.  Nintendo's Br. at 6-7, citing D.I. 64 at 17.  Nintendo is wrong for at least two reasons.

6

*First*, Nintendo misconstrues the Court's claim construction.  At trial, the Court indicated that the "fourth technique" was embraced by the other techniques—not that it was excluded from the claims.  *See* Tr. 669:19-670:5.  For example, the fourth technique, in essence, determines the inclination angle between the optical axes of the left-eye and right-eye cameras (one of the other techniques )—namely, based on the position of an object picked up by the cameras.[5]  *See* Tr. (Merritt) 351:3-15.  Moreover, the Court included in its construction of the structure of the cross-point measuring means portions of the specification that describe the fourth technique.  *See* D.I. 52 at 2, citing, *inter alia*, '664 patent at 3:62-67; 8:16-18; 18:29-34.  And dependent claim 8 expressly recites the fourth technique, and therefore the fourth technique must be within the scope of claim 1 too (dependent claims by definition being narrower than the independent claims from which they depend).  *See* Tr. (Merritt) 351:16-352:23; 460:15-461:6 (addressing TX-1 at 3:64-67); 465:25-466:11; *see also* Tr. (Frahm) 855:9-856:3.  Notably, even Dr. Frahm identified the fourth technique as corresponding structure in his expert report.[6]  Tr. (Frahm) 821:8-21.

*Second*, the evidence of record establishes that the 3DS also determines cross-point information based on user input—one of the other three techniques.  In particular, Mr. Merritt testified that, in the 3DS Camera application, the distance to the cross-point can be manually set by the user at the time of image capture via the circle pad or touch screen.  Tr. (Merritt) 293:5-7; 323:19-324:9; 327:4-12.  That alone is sufficient to establish that this claim limitation is met.

---

[5] Notably, Mr. Merritt testified that the 3DS also infringes claim 7, which specifically recites the "inclination angle" technique.  *See* Tr. (Merritt) 392:22-393:4.

[6] Also, contrary to Nintendo's assertion (Nintendo's Br. at 7), the specification clearly links this fourth technique to the cross-point measuring means.  *See, e.g.*, TX-1, at 3:64-67 ("said cross-point measuring means calculates the cross-point based upon the position of picking up of an object in said two pick-up means which are disposed in a parallel relationship"); 8:16-18 ("The CP information is able to calculate the position of the cross point based upon the picked-up position of the object in the two pick-up means …"); 18:29-34; 22:30-34 (original claim); Fig 3, box 12 ("cross-point data on picking up of image").

7

Nintendo also asserts that "there is insufficient evidence" that the 3DS uses the "fourth technique" because the 3DS Camera application does not focus on objects.  Nintendo's Br. at 7-8.  To the contrary, there was ample evidence before the jury that the 3DS Camera application focuses based on objects in the scene.  *See, e.g.,* TX-45 at NT00010442 (Stein Ex. 4) ("The autofocus tries to focus on the 'closest object', but discards 'unimportant' objects (smaller than about 20% of the screen surface)"); TX-109 at NT00010477 (Stein Ex. 5); TX-FB at NT00103978 (Stein Ex. 6) ("Advantageously, the depth of the major objects of the scene is estimated by dividing images into a plurality of zones and estimating the depth of each zone.");  Tr. (Merritt) 292:10-293:7; 315:2-22, 316:7-319:12; 322:17-323:2; 330:19-331:1; 351:16-352:23; 460:15-461:6.  Moreover, the testimony of Mr. Delattre and Dr. Frahm was impeached and the jury was not required to rely upon it.  Indeed, their testimony was contrary to documentation created by Mr. Delattre and Nintendo prior to this litigation—including documents targeted for software engineers, such as Mr. Delatrre's own patent application (TX-FB) and 3DS manuals (TX-45 and TX-109).  Tr. (Delattre) 647:18-648:13; 648:19-649:16.  Also, the evidence showed potential bias by Mr. Delattre due to his indemnification obligations to Nintendo.  Tr. (Delattre) 645:1-15.  Dr. Frahm's testimony was also contrary to pre-litigation documentation and he relied upon misleading demonstratives that Dr. Frahm admitted were not accurate.  Tr. (Frahm) 803:24-805:2; 811:11-22.  It is not the Court's job now to reweigh the evidence.

## B.    Substantial Evidence Establishes That The 3DS Performs The Function Of The "Cross-Point Measuring Means"

Nintendo asserts that Tomita "failed to present sufficient evidence to prove that the 3DS performs the identical function of the cross-point measuring means."  Nintendo's Br. at 8.  Nintendo is again wrong—such evidence was presented, as explained below.

8

*First*, Tomita advised the jury of the Court's construction of the function of the "cross-point measuring means"—namely, "to measure CP information on the cross-point CP of the optical axes of the two video pick-up means."  Tr. (Merritt) 306:18-20.

*Second*,  as explained above, the evidence shows that both the 3DS Camera application and the AR Games application  measure "cross-point information" at the time an image is captured in the form of a focus value.  *See, e.g.,* Tr. (Delattre) 620:7-15; Tr. (Ito) 685:23-686:3; Tr. (Frahm) 829:12-16; 829:20-830:9.  As Mr. Merritt explained, the focus value is an offset that determines the cameras' optical axes, thus determining the location of the cross-point.  *See, e.g.,* Tr. (Merritt) 263:3-264:15 (Merritt Slides 019 and 042 (Stein Ex. 3)); 468:3-14; 304:2-305:1; Tr. (Delatrre) 652:6-10; Tr. (Frahm) 720:21-721:5; 812:25-813:5.  And, contrary to Nintendo's assertion, there was substantial evidence before the jury that this function is performed by both the 3DS Camera application (*see*, *e.g.*, Tr. (Merritt) 305:9-306:2; 307:8-13; 314:7-319:12; 322:16-323:2) and the AR Games application (*see, e.g.,* 319:14-321:10).[7]

Based on the foregoing evidence, the jury reasonably concluded that the 3DS performed the function of the cross-point measuring means.

### 1. Contrary to Nintendo's Assertion, Substantial Evidence Shows that the 3DS Has and Determines a "Cross-Point (CP) of Optical Axes."

Nintendo argues that "the 3DS does not have or determine a 'cross-point (CP)' of optical axes," because "the optical axes of the 3DS's cameras are parallel and do not intersect." Nintendo's Br. at 9.  Mr. Merritt explained at length, however, how the optical axes of the 3DS's cameras can be set by selecting different subsets of the left and right images with different

---

[7] Contrary to Nintendo's assertion on page 8 of its brief, the jury could reasonable credit Mr. Merritt's observations of the 3DS, based on his extensive testing of the device.  In addition, the snippets of testimony cited by Nintendo at pages 8-9 do not accurately portray the full scope of Mr. Merritt's testimony on this issue.

9

offsets (referred to as focus values) so that they are not parallel, forming a cross-point.[8]  Tr.

(Merritt) 304:2-305:1 (explaining Slide 042 (Stein Ex. 3)); 331:11-332:20; 467:6-469:24; *see

also* Tr. (Frahm) 798:5-799:6.  And, as explained above, the evidence of record establishes that

the 3DS determines cross-point information in the form of a focus value.  *See supra*.  The jury

could reasonably rely on that evidence in concluding that the function of the cross-point

measuring means is performed.[9]

### 2.    Contrary to Nintendo's Assertion, the 3DS Camera Application Measures Cross-Point Information.

Nintendo argues that "the 3D camera application does not measure cross-point

information," because, according to Nintendo, "[a]ll of the relevant evidence at trial

demonstrates that the 3D camera application determines an offset (not a cross-point) …."

Nintendo's Br. at 10.  Nintendo is wrong.  The evidence at trial established that there are two

separate and distinct offsets determined by the 3DS Camera application.  The ***first offset*** is a

focus value determined at the time an image is captured, as explained above.  This first offset

value is cross-point information and it is stored along with the captured left and right images.

*See, e.g.,* Tr. (Merritt) 293:2-15.  For example, when images are stored on an SD card, the focus

---

[8] Nintendo inaccurately asserts that Mr. Merritt explained that the optical axis of the cameras in the 3DS "extends from the center pixel of each of the chips through the center of the lens." Nintendo's Br. at 9 (quotation marks and ellipses omitted).  In so doing, Nintendo cites to Mr. Merritt's testimony describing the shifting chip arrangement—not the fixed chip arrangement, which is what the 3DS has.  *Compare,e.g.*, Tr. (Merritt) 263:4-19 (cited by Nintendo) with 263:20-264:15 ("And this is the method that is used in the 3DS.").  Also, Nintendo's statements regarding "imperfectly parallel optical axes" intersecting "seven light years away" (Nintendo's Br. at 10) is  misleading.  Mr. Merritt testified that the optical axes of the 3DS's "cameras" can form a cross point close to the cameras, as explained above.  Notably, the snippets of Mr. Merritt's testimony cited by Nintendo concerned the "optical axis of the lens" in a parallel camera configuration, not the optical axis of the camera.  *Compare*, *e.g.*, Tr. (Merritt) 373:20 and 372:25.

[9] Nintendo's assertion that "[i]t is undisputed … that the optical axes of the 3DS's cameras are parallel and do not intersect" is wrong (Nintendo's Br. at 9)—again, Mr. Merritt repeatedly explained how the optical axes of the 3DS's cameras intersect, as the citations above demonstrate.

value is stored in the fMPOffsetH field along with the captured left and right images. *See, e.g.,* Tr. (Merritt) 334:4-21; Tr. (Frahm) 734:25-735:6. Mr. Merritt testified how this first offset (the focus value) determines the cross-point in the 3DS. *See supra.* Moreover, contrary to Nintendo's assertion (Nintendo's Br. at 11), the focus value defines a triangle from which the distance to the cross-point can be readily determined.[10] *See, e.g.*, Tr. (Merritt) 262:13-264:15 (referring to Slides 018C, 019 and 042 (Stein Ex. 3)). The ***second offset*** is the offset the 3DS determines (by its offset presetting means) when displaying images—it is based on the cross-point information (*i.e.*, the focus value) and information on the size of the image that is displayed. Tr. (Merritt) 293:2-15; 340:18-341:13; 341:23-342:13; 443:22-444:8.

### 3. Contrary to Nintendo's Assertion, the AR Games Application Measures Cross-Point Information.

Nintendo argues that the "AR Games application does not measure cross-point information," because, while the "AR games application estimates the distance from the device to an AR card," according to Nintendo, that distance "is not the distance to a cross-point or cross-point information." Nintendo's Br. at 11 (capitalization from heading adjusted). But that is incorrect; the evidence of record establishes that AR Games determines cross-point information in the form of a focal value (or focal distance). *See* Tr. (Merritt) 306:3-7; 319:14-321:10; 418:17-24; 466:13-467:5; Tr. (Ito) 685:23-686:3; Tr. (Frahm) 829:12-16; 829:20-830:9.

---

[10] To the extent that Nintendo is arguing that cross-point information cannot be an offset, that is contrary to the Court's claim construction. In particular, the Court explained that the angles formed by the optical axes of the cameras and the relative positions of the cameras form a triangle from which the distance to the cross-point can be determined. *See* D.I. 64 at 11-12. The Court, accordingly, construed cross-point information "to include not only those specific distances, but also any other 'information that can be used to determine' those distances." *Id.* at 12. In a parallel camera configuration, the triangle is defined by an offset—either the offset between shifted chips or, in a fixed-chip configuration, the offset between selected subsets of the chips. *Compare* Merritt Slides 019 and 042 (Stein Ex. 3), Tr. (Merritt) 263:2-264:25. The distance to the cross-point in those configuration can thus be readily determined from the offset information (given that the distance between the 3DS's left and right cameras is known (*see, e.g.* Tr. (Frahm) 802:5-23)).

That focal value is an offset based on the distance from the 3DS to the AR Game card.  *See* Tr. (Merritt) 319:14-321:10; 324:23-325:10; 325:23-326:6; 337:13-21; 418:17-24.

Nintendo criticizes Mr. Merritt for "not identifying where a cross-point might be on the card" (Nintendo's Br. at 11)—but the specific point on the card is not relevant to infringement and Nintendo never explains, either here or to the jury, why it would be relevant.  Indeed, Nintendo's own witnesses explained that AR Games determines the distance to the card without specifying the point on the card.  Tr. (Ito) 682:14-17; Tr. (Frahm) 728:18-24.  Nintendo also argues that "the AR card need not be placed at any particular position" and therefore "the distance to the card cannot be cross-point information."  Nintendo's Br. at 12.  But that argument makes no sense—the AR Games application first determines the location of the AR card and then sets the cross-point based on that location.  *See* cites in previous paragraph above.  Of course, the AR card need not be at a particular location—the point is to set the cross-point to the location of the AR card wherever it may be.  Nintendo also argues that AR Games cannot measure CP information because "the distance is estimated using only a single camera."  *See* Nintendo's Br. at 12.  But the cross-point is determined by the intersection of the optical axes of both of the 3DS's outer cameras—which will be at a particular distance (here, the distance to the AR card).  It does not matter whether that distance is determined using a single camera—the cross-point is determined by both cameras.

### C.     Substantial Evidence Establishes That The 3DS Performs The Function Of The "Offset Presetting Means"

Nintendo asserts that Tomita "did not present sufficient evidence to prove that the 3DS … performs the function of the 'offset presetting means.'"  Nintendo's Br. at 12.  To the contrary, there was substantial evidence before the jury that the 3DS performs that function.  In particular, Tomita advised the jury of the Court's construction of the function of the "offset

presetting means"—namely, "offsetting and displaying said different video images based upon said video image information, said cross-point information and information on the size of the image which is displayed by these stereoscopic video image display device."  *See* Tr. (Merritt) 338:13-339:2.  Tomita then presented substantial evidence that the 3DS performs this function in connection with the 3DS Camera application and the AR Games application.  *See, e.g.*, Tr. (Merritt) 269:21-270:5; 339:3-342:13; 345:5-346:2; 434:10-436:10; 446:7-447:13; Tr. (Ito) 685:23-686:9; TX 152 (Stein Ex. 7).

Nintendo asserts that the evidence that the 3DS performs this function was insufficient for two reasons.  Neither reason has merit and each is addressed in turn below.

*First*, Nintendo asserts that "the 3DS does not have a cross-point of optical axes" and "does not measure any CP information" and, therefore cannot "perform offsetting of images based on cross-point information."  Nintendo's Br. at 13.  But that is the same issue addressed above in connection with the cross-point measuring means and Nintendo is wrong for the reasons explained above.  Nintendo also asserts that Mr. Merritt offered "only a few conclusory statements" on this topic.  In so doing, however, Nintendo cites one short passage from Mr. Merritt's testimony (Tr. (Merritt) 338:22-339:11), while ignoring the remainder of his testimony on that topic.  *See, e.g.*, Tr. (Merritt) 340:18-342:13; 345:5-346:2; 446:7-447:13.

*Second*, Nintendo asserts that the 3DS "does not use information on the size of the image which is displayed" in setting the offset.  Nintendo's Br. at 13 (capitalized from heading adjusted).  But Mr. Merritt explained to the jury how the 3DS uses the size of the displayed image in setting the offset and his testimony was supported by 3DS manuals, the 3DS source code, and other Nintendo documentation.  *See* Tr. (Merritt) 339:3-340:17; 341:23-342:14; 345:5-346:2; 434:10-436:10; 444:25-445:5; 445:8-446:6; 447:14-448:8, 450:10-24; 455:3-14; Tr.

(Frahm) 734:25-735:6; 826:7-827:1; TX-74; TX-76; TX-149; TX-152 at translation of NT00099162 (Stein Exs. 7-10).  Nintendo is basically asking the Court to reweigh that evidence—which would be improper in determining a motion for JMOL.  In addition, contrary to Nintendo's assertions (Nintendo's Br. at 13-14), the evidence of record shows that the pixel information for the 3DS translates directly into a physical size and the 3DS documentation further demonstrates that Nintendo was aware of and translated pixel information into physical size information.  *See* Tr. (Frahm) 802:5-23; 827:12-829:10; TX-105 at NT00010133; TX-99 at NT00009807 (Stein Exs. 11-12).  Nintendo simply ignores that evidence.

### D.      Nintendo Is Not Entitled To JMOL Based On Its "Preset Value" Argument.

Nintendo argues that there was not sufficient evidence before the jury that the 3DS "utilizes a default or preset value … to perform the function of offsetting the two image" and that, as a result, it should be granted JMOL of non-infringement.  Nintendo's Br. at 14.  That argument is without merit and is plainly an afterthought by Nintendo—Nintendo never presented any testimony or argument to the jury that it did not infringe on that basis and Nintendo never made that argument in its Rule 50(a) motion for JMOL or in pre-trial motions.  In fact, in connection with the claim construction proceedings in this case, the Court rejected Nintendo's proposal to include "presetting a[n] offset" as part of the function of the offset presetting means—the Court explaining that "in the absence of any explanation for how 'presetting a[n] offset' constitutes a function, the Court refuses to include that language within the description of the functions performed by the 'offset presetting means.'"  D.I. 64 at 18.  Tomita presented substantial evidence that the 3DS performs the function of the offset presetting means (as described above) and includes the structure of the offset presetting means (which Nintendo does not challenge in its JMOL motion).  Accordingly, the evidence of record establishes that this claim limitation is met.

14

**E.      Nintendo Is Not Entitled to JMOL of No Induced Infringement**

The issue of induced infringement has no bearing on the jury verdict in this case and, therefore, Nintendo's motion for JMOL of no induced infringement is moot.  *See Agere Sys., Inc. v. Atmel Corp.*, No. 02cv864, 2005 WL 2994702, at *30 (E.D. Pa. Aug. 17, 2005) ("The agreed-upon verdict form submitted to the jury in this matter did not include the question of whether the '126 patent was invalid as obvious and therefore, there are no findings of fact for the Court to review on the obviousness of the '126 patent. This motion is therefore denied as moot.").  As Nintendo acknowledges, there was no jury instruction on inducement and, accordingly, the jury could not have relied upon inducement in determining that Nintendo infringed the '664 patent. Nintendo's motion on this ground is therefore moot.

**F.      There Was Sufficient Evidence To Find Infringement Under the Doctrine of Equivalents**

Nintendo asserts that "there is insufficient evidence to find infringement under the doctrine of equivalents," because Mr. Merritt "failed to specify which specific claim limitations were alleged to be infringed by equivalents."  Nintendo's Br. at 16 (capitalization from heading adjusted).  Nintendo is wrong—Mr. Merritt's doctrine of equivalents testimony was specifically directed to each of the "cross-point measuring means" and "offset presetting means" limitations. *See, e.g.*, Tr. (Merritt) 328:24-329:6 (referring to the "previous testimony" regarding the cross-point measuring means); 350:2-11 (referring specifically to the offset presetting means limitation).

Moreover, there was substantial evidence before the jury of infringement under the doctrine of equivalents.  *See, e.g.,* Tr. (Merritt) 272:20-273:4; 323:3-10; 325:19-327:12; 328:8-329:25; 346:10-350:11; 455:17-459:21.  And the Court already considered that evidence in denying Nintendo's earlier Rule 50(a) motion for JMOL.  *See* Tomita's Identification of

15

Testimony Relating to the Doctrine of Equivalents, submitted to the Court on March 8, 2013. Here, Nintendo points to only a few snippets of Mr. Merritt's testimony and does not even attempt to address the bulk of the above-cited testimony on this issue. Tomita respectfully submits that Nintendo has provided no grounds for the Court to reconsider its previous ruling.

## IV. NINTENDO IS NOT ENTITLED TO JMOL OF INVALIDITY

### A. Substantial Evidence Supports the Jury's Verdict that the '664 Patent is Not Invalid of Lack of Enablement

The jury found that that the '664 patent was not invalid—thus, finding that Nintendo failed to prove by clear and convincing evidence that the '664 patent lacked an enabling disclosure.

Nintendo argues that "[m]easuring CP information from cameras with parallel or non-intersecting optical axes is not enabled by the '664 patent." Nintendo's Br. at 18. In actuality, however, Nintendo's non-enablement argument is nothing more than a recast version of its non-infringement argument—namely, that the 3DS's cameras cannot be set to different cross-points. However, Mr. Merritt explained how they could (as addressed in detail above) and the jury agreed with him.

Notably, Mr. Merritt testified that the '664 patent provides an enabling disclosure of the invention. Tr. (Merritt) 973:21-974:5. And Dr. Frahm admitted that parallel camera arrangements were known to those skilled in the art at the time Mr. Tomita filed his patent. Tr. (Frahm) 843:16-19. His testimony on enablement only concerned whether the patent teaches how to measure a cross-point when the optical axes of the cameras are parallel, which, again, is not an issue here. *See* Tr. (Frahm) 843:7-8.

Under the above circumstances, the evidence supports the jury's conclusion that Nintendo failed to prove lack of enablement by clear and convincing evidence.

**B.    Substantial Evidence Supports the Jury's Verdict that the '664 Patent is Not Invalid as Anticipated by Matsugu '408**

The jury found that that the '664 patent was not invalid—thus, finding that Nintendo failed to prove by clear and convincing evidence that the '664 patent was anticipated by Matsugu '408.

Mr. Merritt testified that Matsugu '408 was missing three limitations of the "offset presetting means" of claim 1 of the '664 patent—(i) it does not "offset" the left and right eye images as claimed in the '664 patent, (ii) it does not offset the left and right images "based on the size of the displayed image," and (iii) it does not disclose a "manual entry unit" for changing the size of the offset between the left and right images. *See* Tr. (Merritt) 970:20-973:4.

With respect to the "manual entry unit" for changing the offset between the left and right images, Dr. Frahm essentially admitted on cross-examination that such a manual entry unit is not disclosed in Matsugu '408. Tr. (Frahm) 840:3-842:20. That alone is sufficient for the jury to conclude that Matsugu '408 does not anticipate claim 1 of the '664 patent. [11] Tr. 1089:21-25.

As to the other two missing elements, the jury was entitled to credit Mr. Merritt's testimony. Contrary to Nintendo's assertion, Mr. Merritt did not provide "bare conclusions." Nintendo's Br. at 20. For example, Mr. Merritt explained that the "offset" described in the '664 patent was different than the "per pixel parallax adjustment" in Matsugu '408. Tr. (Merritt) 972:2-12. Also, Mr. Merritt testified that he did not find any description in Matsugu of "using the size of the image that will be displayed as an input to the process." *Id.* 972:17-21. In fact, Dr. Frahm acknowledged that Matsugu never expressly mentions adjusting the offset between the left and right images based on the size of the image that is displayed. Tr. (Frahm) 837:18-23.

---

[11] The only basis for invalidity that Nintendo put to the jury was anticipation of claim 1 by Matsugu. *See* Tr. 929:10-17. And Nintendo agreed to strike jury instructions regarding obviousness. *Id.* To the extent that Nintendo now argues that claim 1 is invalid for obviousness, that is impermissible.

17

Furthermore, Mr. Merritt's testimony revealed a thorough understanding of Matsugu.  *See, e.g.,*

Tr. (Merritt) 976:14-977:11.

Under the above circumstances, the evidence supports the jury's conclusion that

Nintendo failed to prove anticipation of claim 1 by Matsugu '408 by clear and convincing

evidence.

## V.    NINTENDO IS NOT ENTITLED TO RECONSIDERATION OF DAMAGES

Nintendo moves for remittitur or a new trial on damages, arguing that Tomita violated the

entire market value rule (EMVR).[12]  Tomita did not employ the EMVR but instead used the

3DS—the smallest salable patent practicing unit (SSPPU)—as the royalty base.[13]

A patentee can use the SSPPU as a royalty base without application of the EMVR. *See*,

*e.g.*, *LaserDynamics, Inc. v. Quanta Computer Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012)  ("Thus, it

is generally required that royalties be based not on the entire product, *but instead on the 'smallest*

*salable patent-practicing unit*.' (emphasis added)); *id.* at 67-68 (expressing rule as using entire

product "*as opposed to*" the SSPPU).  The record is uncontroverted that the 3DS is the SSPPU.

Nintendo used the cost of 3DS components implicated by the '664 patent to apportion value;

however, such components are not the SSPPU.  *See* Nintendo Br. at 21-22.[14]  Nintendo neither

purchases nor sells components of the 3DS that infringe.  Tr. (Hoeberlein) 479:13-22.  In fact,

---

[12] Nintendo now moves on essentially the same grounds as presented in its motion *in limine* that
Tomita opposed (D.I. 100) and the Court denied. Tr. 4:11-13.

[13] Nintendo blatantly mischaracterizes the methodology of Tomita's expert, arguing "he *added* in
the value of admittedly non-infringing software."  Nintendo Br. at 21 citing Tr. (Hoeberlein)
554:25-556:3, 505:24-506:2.  But that software was considered only in determining the royalty
rate and was *not* included in the royalty base.

[14] Moreover, Nintendo presented no evidence that would tie the use of component cost to the
facts of this case—and indeed, it is contrary to the evidence (TX E (Stein Ex. 13), Tr.
(Hoeberlein) 493:2-6; Tr. (Davis) 965:22-966:16)—and should be disregarded.  *Uniloc*, 632 F.3d
at 1314; *see* D.I. 113, Plaintiffs' Motion *in Limine* No. 7.

NY 74549377v6

Nintendo admits that 3DSs are brought into the United States fully assembled and packaged.  Tr. (Davis) 966:25-967:2.

There is no legal requirement to use components of a product where that product is the SSPPU.  For example, in *LaserDynamics*, plaintiff sought damages based on the value of entire laptop computers containing infringing optical disk drives (ODDs), even though ODDs were separately sold.  *Id.* at 58, 60, 65.  Plaintiff's use of the price of laptops violated the EMVR because "the royalty was expressly calculated as a percentage of the entire market value of a laptop computer *rather than a patent-practicing [Optical Disk Drive (ODD)] alone*."  *Id.* at 68 (emphasis added).  There was no suggestion by the court that plaintiff had to apportion revenue to components of the ODD. *See also Cornell University v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283 (N.D.N.Y. 2009) (finding "the [computer] processor is the smallest salable patent-practicing unit" even though "the claimed invention is a small part of the [buffer], which is a part of a processor").

The cases cited by Nintendo—*Lucent*, *Uniloc* and *Mirror Worlds*—are inapposite.  In *Lucent* the court based its finding on a complete lack of evidence.  Plaintiff's expert conceded that no one ever bought Outlook because of the infringing date-picker tool, which was "but a very small component" that played a "minor role" in Outlook.  *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337-38 (Fed. Cir. 2009); *see Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) quoting *Lucent*, 580 F.3d at 1338 (characterizing *Lucent* as based on a lack of evidence).  Here, there was substantial—not a lack of—evidence (*see*, *e.g.*, Tr. (Hoeberlein) 513:6-527:7, TX-217, 241, 287, 285, 265 (Stein Exs. 14-18); Tr. 958:9-962:4, TX-339, 340, 341 (Stein Exs. 19-21)) that the jury was entitled to credit.  *Marine*

*Polymer Technologies, Inc., v. Hemcon, Inc.*, 672 F.3d 1350, 1360  (Fed. Cir. 2012).[15]  *Lucent* was also based on the expert's disregard of the district court's EMVR evidentiary ruling precluding plaintiff from applying a 1% royalty to the price of the computer.  *Lucent*, 580 F.3d at 1338.  "Being precluded from using the computer as the royalty base, [plaintiffs' expert] used the price of the software [e.g., Outlook], but inflated the royalty rate accordingly [to 8%]."  *Id.* Tomita's expert used no such tactics.

      *Uniloc* is also unlike this case.  In *Uniloc* plaintiff "conceded customers do not buy Office or Windows because of [the infringing Product Activation, which prevents piracy] and said it would not base a royalty calculation on the entire market value of the products." 632 F.3d at 1319 quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d 150, 184-85 (D.R.I. Sept. 29, 2009) ("*Uniloc II*").  Despite its representations, plaintiff repeatedly used the total product revenue to mislead the jury – something Tomita did not do.  *Id.* at 1318-19, 1320; *Uniloc II*, 640 F. Supp. 2d at 184-85.

      Nintendo's reliance on *Mirror Worlds* is equally misplaced as there the court held that plaintiff based damages on the entire computers running the accused software, not just the separately sold software.  *Mirror Worlds, LLC v. Apple Inc.*, 784 F. Supp. 2d 703, 709, 720-21 (E.D. Tex. 2011).  Accordingly, Nintendo's motion for remittitur or a new trial on damages should be denied.

---

[15] *Uniloc* also stated, contrary to Nintendo's characterizations of the law, that the patented feature need not be the only basis for customer demand; it is enough that the patented feature "substantially create[s] the value of the component parts."  *Id.* at 1318 quoting *Lucent*, 580 F.3d at 1336.

## VI.    NINTENDO IS NOT ENTITLED TO A NEW TRIAL

### A.    Failure to Provide the Jury with a Separate Instruction on the Court's Claim Construction was Not Error and was Not Prejudicial

To justify a new trial based on an erroneous jury instruction, it must be both erroneous and prejudicial. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). Nintendo has the burden of proving any error was prejudicial, and prejudicial error exists if the outcome of the case would have been different had the correct instruction been given. *Id.* at 1365.  Nintendo cannot make this showing.

Nintendo cites only to the colloquy at the charging conference (Nintendo Br. at 22, citing Tr. 942:7-943:5) to support its argument that the Court failed to "inform the jury that it 'must apply the district court's construction of the terms in its deliberations'" and that the jury was "left free to make its own determination of the meaning of the claims …."  Nintendo Br. at 22, quoting *Sulzer*, 358 F.3d at 1367.)   However, Nintendo ignores the Court's actual charge, which explained to the jury that the Court determine the meaning of the claim terms before trial:

> As you can see, claim 1 contains both ordinary English words and specialized terms.  One of my jobs is to determine, before trial, the meaning of the specialized terms, and both sides have already presented these definitions to you, so I will not repeat them here.  However, if, while you are deliberating, you have any question as to the meaning of a given term in claim 1 (or any other claim), just send me a note and I will define it for you.

Tr. 1087:7-18.  The jury was not left free to make claim constructions determinations.

This charge was proper, including the Court's consideration of the extent to which the parties already presented its claim construction to the jury.  *See Sulzer*, 358 F.3d at 1364 citing *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 415 (Fed. Cir. 1993) ("the entirety of the proceedings, including the jury instructions as a whole, must be considered"), 1367.  The parties did, indeed, present the Court's claim constructions to the jury.  *See, e.g.*, Tr.

(Merritt) 303:21-304:1; 306:15-307:4; 338:13; Stein Dec. Ex. 3 (Merritt Slides 004H, 004I, 046A).

The present case is unlike *Creative Internet* and *CytoLogix* (relied on by Nintendo at page 23), where the district courts permitted the parties to argue claim construction to the jury.[16] The only specific error Nintendo suggests is that the jury could have relied on what Nintendo calls the "alleged fourth structure" of the cross-point measuring means element; however, during trial the Court's complete construction of this limitation, including citations to the '664 patent and citations to corresponding structure, was presented to the jury.  Tr. (Merritt) 306:15-307:4; Stein Dec. Ex. 3 (Merritt Slide 004I).  Claim construction was not left to the jury, and there was no prejudicial error.

   **B.     The Court Resolved the Claim Construction Disputes over the Terms "Cross-Point" and "Optical Axes"**

Nintendo further argues for a new trial because, according to Nintendo, the Court improperly construed the terms "cross-point" and "optical axes" as having their ordinary meanings and failed to resolve the parties' dispute, citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008).  To the contrary, the Court acknowledged *and resolved* the disputes between the parties during claim construction and explicitly addressed *O2 Micro*.

---

[16] In *Creative Internet*, the patent at issue related to instant messaging, and the parties disputed whether the claim elements (pertaining to receiving, inserting and transmitting) required acting on the same message. *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 476 Fed.Appx. 724, 725-27 (Fed. Cir. 2011).  "[T]he district court left that claim construction issue unresolved and allow [patentee] to invite the jury to find infringement on a theory that is contrary to the proper construction…." *Id.* at 729.

   In *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005), despite the agreement of the parties, it was improper for the district court to forego a *Markman* hearing and permit the parties to argue conflicting claim constructions to the jury.  *Id.* at 1172.

The Court resolved the main dispute between the parties—namely, whether the claim scope encompassed parallel camera arrangements—and explicitly construed the claim to encompassed them.  *See* D.I. 64 at 5-7, 12 ("cross-point information"), 14-15 ("optical axes"). The Court also resolved the particular disputes relating to each of the "cross-point" and "optical axes" terms, rejecting Nintendo's proposed construction that the cross-point will "lie on the surface or plane of the object captured" (*see* D.I. 64 at 10-11) and Nintendo's proposed construction that the optical axis must "coincide with the axis of rotational symmetry of the lens of the pick-up means."  *See id*. at 13. Notably, these arguments play no part in Nintendo's motion for a new trial.

With respect to the Court's construction of "cross-point" and "optical axes," the Court explicitly acknowledged *O2 Micro* in its claim construction Memorandum and explained that use of the ordinary meaning (i.e., that term requires no construction) was a rejection of the narrow constructions proposed by Nintendo.  D.I. 64 at 7-8.

With the Court's claim construction having addressed the real dispute, Nintendo now apparently attempts to manufacture others by mischaracterizing Tomita's trial evidence. Contrary to Nintendo's post-trial arguments, Mr. Merritt did not "repeatedly conflate the claimed 'cross-point' with an 'offset' between left and right images upon display" and did not present a "nonsensical argument that the 'offset' used to offset the left and right images for display is determined based on that very offset."  Nintendo Br. at 24.  As explained by Mr. Merritt (and addressed in Sections III.A. and III.B.1, *supra*), the 3DS determines two offsets – one, a focus value (cross-point information) when the images are captured which is stored with the captured image information, and the other, an offset that is determined when images are displayed, which is based on the focus value (cross-point information) and information on the size of the displayed

image (*i.e.* the scaling factor).  Similarly, contrary to Nintendo's position that having no definition of "cross-point" and "optical axes" permits them to be "divorced from the physical camera sensors and lenses" (Br. at 24), Mr. Merritt testified that by selecting different subsets of the captured left and right images (*e.g.,* at varying offsets from each other), different optical axes and thus cross-points can be achieved.  *See, e.g.*, Tr. (Merritt) 263:3-264:15; 304:2-305:1; 468:3-14; Stein Ex. 3.

In any event, Nintendo's reliance on *O2 Micro* is misplaced. *O2 Micro* did not create a universal rule prohibiting a court from construing a term according to its plain and ordinary meaning.  *See O2 Micro*, 521 F.3d at 1362 citing *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) and *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Furthermore, the circumstances in *O2 Micro* justifying remand are not present here.  As part of claim construction, the district court expressly acknowledged the parties' dispute as to the scope of the claim, but failed to address it – which is not what the Court did here.  *See id.* at 1357, 1361.

### C.   Admission of Mr. Merritt's Testimony regarding Source Code was Proper

Relying on its prior arguments, Nintendo seeks a new trial based on the admission of Mr. Merritt's testimony regarding the 3DS source code.  *See* Nintendo's Br. at 25.  The motion should be denied for at least the reasons discussed in Section III, *supra*.  Importantly, Mr. Merritt's opinion was not solely based on Mr. Amron's input, but was also based on other evidence, such as 3DS documentation, internal Nintendo documents, deposition testimony of Nintendo's engineers and Mr. Merritt's own extensive testing of the 3DS.  Moreover, Mr. Merritt, having programmed in source code, was qualified to testify as to its operation despite using Mr. Amron as a C++ interpreter.  *See, e.g.*, Tr. (Merritt) 314:22.  And despite Nintendo's claims of unreliability, Nintendo was unable to impeach Mr. Merritt or provide a

credible alternate explanation for its source code documentation.  The jury was entitled to rely on Mr.

Merritt's testimony in reaching its verdict.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny Nintendo's renewed motion for JMOL

and motions for a new trial and remittitur.

STROOCK & STROOCK & LAVAN LLP

Dated:  April 29, 2013

*/s/ Kenneth L. Stein*

Joseph Diamante
Kenneth L. Stein
Ian G. DiBernardo
180 Maiden Lane
New York, NY  10038
(212) 806-5400
(212) 806-6006
Email:  kstein@stroock.com

*Attorneys for Plaintiffs*
TOMITA TECHNOLOGIES USA, LLC,
AND TOMITA TECHNOLOGIES
INTERNATIONAL, INC.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x
                                                                    :
TOMITA TECHNOLOGIES USA, LLC, AND TOMITA
TECHNOLOGIES INTERNATIONAL, INC.,                                   :

                              Plaintiffs,                           :

              v.                                                        Case No. 1:11-cv-04256-JSR

NINTENDO CO., LTD.,  AND                                            :
NINTENDO OF AMERICA INC.,                                           :

                              Defendants.                           :
--------------------------------------------------------------------x


**CERTIFICATE OF SERVICE**

        I hereby certify that on April 29, 2013, I caused a true and correct copy of the foregoing

PLAINTIFFS' OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT

AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL to be served via

ECF and email in accordance with the Federal Rules of Civil Procedure, and/or the Local Rules

of this Court, upon the following parties and participants:

                        **James S. Blank, Esq.**
                        **Scott G. Lindvall, Esq.**
                        Kaye Scholer LLP
                        425 Park Avenue
                        New York, New York 10022
                        Tel: (212) 836-8000
                        Fax: (212) 836-8629
                        jblank@kayescholer.com
                        slindvall@kayescholer.com


                                        _____
                                        /s/ *Kenneth L. Stein*
                                             Kenneth L. Stein


1