```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
TOMITA TECHNOLOGIES USA, LLC; TOMITA  :
TECHNOLOGIES INTERNATIONAL, INC.      :
                                      :      11 Civ. 4256 (JSR)
              Plaintiffs,             :
                                      :      MEMORANDUM ORDER
         -v-                          :
                                      :
NINTENDO CO., LTD.; NINTENDO OF       :
AMERICA INC.,                         :
                                      :
              Defendants.             :
------------------------------------ X
```

JED S. RAKOFF, U.S.D.J.

Beginning on February 25, 2013, the Court conducted a jury

trial on claims by Tomita Technologies USA, LLC and Tomita

Technologies International (collectively, "Tomita") that the

Nintendo 3DS, a handheld gaming console created and sold by Nintendo

Co., Ltd., and Nintendo of America, Inc. (collectively, "Nintendo"),

infringed U.S. Patent No. 7,417,664 (the "'664 patent"), owned by

Tomita. On March 13, 2013, the jury returned a verdict for Tomita in

the amount of $30,200,000.00, finding that the 3DS infringed the

'664 patent and that the '664 patent was not invalid. The same day,

the Court ruled that, as a matter of law, Tomita had failed to prove

that Nintendo had willfully infringed the '664 patent by clear and

convincing evidence, which it confirmed in a written Memorandum and

Order. See Memorandum and Order, No. 11 Civ. 4256, ECF No. 128

(S.D.N.Y. Mar. 13, 2013). On March 14, 2013, the Court entered

judgment in favor of Tomita. Judgment, No. 11 Civ. 4256, ECF No. 127

(S.D.N.Y. Mar. 14, 2013).

On April 11, 2013, Nintendo filed motions seeking judgment as a matter of law or a new trial as to liability, or, alternatively, remittitur or a new trial as to damages. Tomita, for its part, filed a motion to alter or amend the judgment under Rule 59 with respect to a number of issues related to its damages award and ongoing royalty payments. For the following reasons, the Court grants Nintendo's motion for remittitur or a new trial on damages; grants Tomita's motions in part; but otherwise denies the motions.

At the outset, a brief summary of the relevant technologies is in order. The '664 patent is a patent relating to stereoscopic (or 3D) imaging technology and includes four major elements: (1) "a stereoscopic video image pick-up device" (i.e., two cameras), (2) a " stereoscopic video image display," (3) a "cross-point measuring means for measuring [cross-point] information on the cross-point (CP) of optical axes," and (4) an "offset presetting means for offsetting and displaying said different video images." U.S. Patent No. 7,417,664 col. 2, 1.44-65. Tomita claims that Nintendo uses the '664 patent's technology in the 3DS's two outer cameras. Thus, only the 3DS's camera application (which allows the user to take and view 3D photos and videos) and the augmented reality ("AR") game card application (which allows some games to be superimposed over real-world images captured by the 3DS's cameras) are at issue. The 3DS's

2

other applications, including its 3D display, do not rely on the '664 patent.[1]

In its motion for judgment as a matter of law, Nintendo – reiterating many of the arguments it unsuccessfully advanced prior to and/or during trial - argues that it is entitled to judgment as a matter of law for the following reasons: (1) the testimony of John Merritt, Tomita's infringement and validity expert, was conclusory and unreliable and therefore was insufficient to support the jury's verdict; (2) Tomita failed to prove that the 3DS infringes claim 1 of the '664 patent; (3) Tomita failed to show that Nintendo induced infringement; and (4) clear and convincing evidence established that the '664 patent was invalid.

"Judgment as a matter of law is appropriate when 'a party has been fully heard on an issue' and 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" Caceres v. Port Auth. of New York & New Jersey, 631 F.3d 620, 622 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). In deciding such a motion, a court must "consider the evidence in the light most favorable to the party against whom the motion was made" and "give that party the benefit of all reasonable inferences that

---

[1] Although prior to trial, Tomita had taken the position that the 3DS infringed upon claim 1 of the '664 patent (the patent's only independent claim) and also upon various dependent claims that were, in effect, variations on claim 1, nonetheless, since a finding of infringement as to any dependent claim would require a finding that claim 1 was also infringed, Tomita consented to a jury instruction to make findings regarding infringement only as to claim 1.

3

the jury might have drawn in his favor from the evidence." Id. (quoting Tolbert v. Queens Coll., 242 F.3d 58, 70 (2d Cir. 2001)). Thus, "[u]nder Rule 50(b), a jury verdict should be set aside only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." Rafter v. Bank of Am., No. 04 Civ. 3341, 2011 WL 5579029, at *1 (S.D.N.Y. Nov. 15, 2011), aff'd, 2013 WL 1595116 (2d Cir. Apr. 16, 2013). Against this demanding standard, the Court turns to each of Nintendo's four arguments.

Nintendo first argues that Tomita's evidence at trial regarding whether the 3DS infringes on the '664 patent consisted entirely of the conclusory and unreliable testimony of Tomita's infringement expert, Mr. John Merritt, such that judgment as a matter of law should be granted in Nintendo's favor, or, alternatively, a new trial should be granted. As Nintendo asserted in its motion in limine - which the Court denied prior to trial - Mr. Merritt cannot read the C++ programming language in which the 3DS's source code is written, see Trial Transcript ("Tr.") 364:22-365:8, understanding of which, Nintendo claims, is critical to the issue of infringement because the 3DS's software dictates how the 3DS's 3D camera and AR games features function. Because he could not read the source code,

4

Mr. Merritt relied on the analysis of Ken Amron, a forensic software consultant hired by Tomita who did not testify at trial. Tr. 362:4-7, 436:22-24. In this way, Nintendo argues that Merritt merely parroted Mr. Amron's conclusions, rendering Merritt's opinions unreliable. Additionally, because Mr. Merritt could not read the source code, Nintendo claims that Mr. Merritt's opinion consisted merely of cursory observations as an ordinary user of the 3DS, which Nintendo claims cannot provide a sufficient basis for expert analysis as to how the 3D camera and AR games features actually function. Nintendo claims that such conclusory testimony is insufficient to sustain a finding of infringement.

However, Mr. Merritt's observations of the 3DS extended far beyond merely "cursory observations as an ordinary user." Mr. Merritt reviewed documentation for the 3DS, internal Nintendo documents, and deposition testimony of Nintendo engineers – in addition to his own testing of the 3DS and Mr. Amron's translation of the source code, see Tr. 257:3-285:14 – and applied to that information his extensive experience in stereoscopic imaging so as to arrive at his expert opinion with respect to the operation of the 3DS. See Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 169 (S.D.N.Y. 2012) ("Where a testifying expert has expertise in the field covered by a consulting expert and independently verifies the latter's conclusions, there is no danger that the former is acting as a mere 'mouthpiece or conduit' of the latter."). Moreover,

Nintendo devoted a substantial portion of its closing arguments to
Mr. Amron's absence, so the jury was free to consider that alleged
insufficiency in addressing the credibility of Mr. Merritt's
testimony. See Arista Records LLC v. Lime Group LLC, No. 06 Civ.
5936, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) ("[C]laims that
the assumptions relied on by an expert are unfounded is generally an
argument that goes to the weight rather than the admissibility of
the evidence.").

     What is more, the actual operation of the 3DS source code was
relatively undisputed, as Mr. Merritt conceded that the 3DS's 3D
camera and AR games applications operated largely as Nintendo
claimed. See Tr. 414:25-415:2, 420:18-22. Rather, the central issue
at trial was whether those methods were in fact merely methods of
employing the '664 patent's technology or were in some meaningful
way a different technology. Whether Mr. Merritt could read the
source code had little bearing on that issue. Based on the totality
of the evidence presented at trial, including testimony from
Nintendo's own expert witness, Dr. Jan-Michael Frahm, the jury
resolved this central question in favor of Tomita, and the Court
sees no reason to overturn that determination at this juncture.
Thus, the Court denies Nintendo's motion for judgment as a matter of
law and motion for a new trial to the extent it is based on a
challenge to the reliability of Mr. Merritt's expert testimony.

Nintendo's second argument for judgment as a matter of law -
that Tomita failed to prove that the 3DS infringed the '664 patent
either literally or under the doctrine of equivalents - encompasses
various issues related to each of the '664 patent's key features:
whether Tomita identified at trial any structure in the 3DS that is
identical or equivalent to the corresponding "cross-point measuring
means" in the '664 patent and that performs the identical function;
whether Tomita proved by sufficient evidence that the 3DS performs
the function of "measuring [cross-point] information on the cross-
point (CP) of optical axes" of its outer cameras; whether Tomita
demonstrated that the 3DS performs offsetting based upon "cross-
point information" and "information on the size of the image," as
required to perform the function of the '664 patent's "offset
presetting means"; and whether Tomita showed that the 3DS uses a
preset value that serves as the baseline for calculating the claimed
offset to perform the function of the "offset presetting means."

At the heart of Nintendo's motion is its claim that the
evidence at trial unequivocally showed that the 3DS's two outer
cameras are configured such that their optical axes remain parallel.
From this follows the notion that, because the axes are parallel,
they never intersect, and so the 3DS never determines a cross-point.
Rather, Nintendo claims, the evidence at trial showed that the 3DS's
3D camera feature determines an "offset" based on the brightness of
the individual pixels that make up the two camera's images, not

based on distance information, and therefore does not rely on cross-point information. Similarly, Nintendo claims that, with respect to the AR games feature, the evidence showed that the distance to the AR card is estimated using only a single camera, which cannot create a cross-point on its own, and that the AR games application relies upon the shape and size of the AR card to determine if it is the proper distance away, and does not use any cross-point information.

However, the evidence at trial, viewed as it must be on Nintendo's motion most favorably to Tomita, established that the 3DS camera application operates through a combination of the operations of the 3DS's "System on a Chip," other circuits in the 3DS, and the 3DS's circle pad and touch screen. See Tr. 326:7-327:12, 330:19-331:2. In this system, "cross-point information" is measured at the time an image is captured in the form of the offset. The offset is determined by selecting a subset of the image captured by the software chips, and this information is used to determine the angle of intersection of the cameras' optical axes, or the location of the cross-point. Explained another way, the optical axes may be set by selecting outer or inner subsets of the left and right images as captured by the cameras' chips, which moves the cross-point closer or farther away, respectively. See, e.g., Tr. 304:2-305:1. This focus value can be determined based on user input from the circle pad or touch screen, or automatically based on the position of objects picked up by the 3DS's cameras, satisfying the alternative

methodologies outlined in the patent. Thus, the evidence supported the jury's finding that, whereas the cameras themselves may be parallel, the optical axes are not.

Turning to the two uses of the '664 patent in the 3DS, the evidence, again taken in the light most favorable to Tomita, supported Tomita's claim that the 3D camera application uses two different offsets: the first is the offset or focus value, described above, which constitutes cross-point information that is stored with the left and right images, see Tr. 293:2-5; the second is the offset that the 3DS's software determines (by its offset presetting means) when displaying images, based on the focus value (cross-point information) and information on the size of the image that is displayed, see, Tr. 293:2-15. Although the 3DS's screen is measured only in pixel information, which does not inherently relate to physical size, documentation for the 3DS demonstrates that there was a known correlation in the context of the 3DS between the 3DS's pixel information and the physical size of the screen. In the AR games application, the 3DS determines the "focus value" using the location of the AR game card, which is then used to determine the cross-point based on that location. See, e.g., Tr. 319:14-321:10. Thus, even if the distance to the game card is measured only by one camera, the distance information, under Tomita's theory, is not the cross-point itself, but is merely used to determine the cross-point.

9

Although individual moments of Mr. Merritt's testimony may have been less than illuminating, as a whole Mr. Merritt presented a coherent vision of how the 3DS's operations meet each requirement of claim 1 of the '664 patent. While Nintendo's motion papers refer to comments by Mr. Merritt that were, out of context, conclusory, the papers ignore other testimony by Mr. Merritt that provided more factual detail. Overall, the Court finds, there was substantial evidence to support the jury's finding as to each of the claim limitations of claim 1 of the '664 patent.

Nintendo's third argument for judgment as a matter of law, respecting Tomita's claim for induced infringement, is curious, since, at trial, Tomita abandoned this claim, both by not pressing it and by not objecting to the omission of any jury instruction on this claim. Since, therefore, the claim was not presented to the jury, this prong of Nintendo's motion is moot.

Nintendo's final argument for judgment as a matter of law is that no reasonable jury could find that claim 1 of the '664 patent is valid, because, Nintendo claims, clear and convincing evidence showed both that the patent is not enabled and that it was anticipated by the prior art. Nintendo argues that claim 1 is not enabled where the two cameras are configured to have parallel optical axes, as Nintendo claims is present in the 3DS, because no reasonable jury could find that the patent teaches how to practice such an embodiment without undue experimentation. However, as

10

discussed above, it is clear that the jury rejected Nintendo's claim that the optical axes of the 3DS's cameras are parallel; thus, whether claim 1 is enabled in such a configuration is completely irrelevant, and Nintendo's motion with respect to enablement is denied.

As to whether claim 1 of the '664 patent was anticipated by the prior art, Nintendo claims that the "Matsugu '408" patent is a preexisting patent that disclosed each and every element of claim 1. See Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." (internal quotation marks omitted)). At trial, the parties' experts disputed whether the Matsugu '408 patent anticipated the '664 patent with respect to three elements: whether the "per pixel parallel adjustment" of the Matsugu '408 patent is meaningfully different from the offsetting of the '664 patent, see Tr. 971:5-972:12, 837:7-17; whether "the size of the displayed image" was "an input to the process" in the Matsugu '408 patent; and, finally, whether the Matsugu '408 patent lacks a manual entry unit corresponding to the offset-presetting means, as required by the '664 patent, see Tr. 768:17-769:18, 840:3-842:20, 971:9-973:9. The burden was on Nintendo to prove by clear and convincing evidence that claim 1 of the '664 patent was anticipated by the Masugu '408

11

patent, and the jury concluded that Nintendo had not met this burden.

On this motion, therefore, Nintendo bears the burden of proving that the jury's resolution of this dispute between experts was unreasonable as a matter of law. Yet the jury was fully entitled to credit Mr. Merritt's testimony rather than Dr. Frahm's, as Mr. Merritt's testimony revealed a thorough understanding of the Matsugu patent and clearly explained the elements missing from the Matsugu '408 patent. See 976:14-977:1. In short, there was substantial evidence in the record to support the jury's finding that the '664 patent was not anticipated by the Matsugu '408 patent.

For the foregoing reasons, the Court hereby denies Nintendo's motion for judgment as a matter of law. Nintendo next moves for a new trial as to liability. "Unlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." Caruolo v. John Crane, Inc., 226 F.3d 46, 54 (2d Cir. 2000) (internal quotation marks omitted). However, even though the standard is less stringent than a motion for judgment as a matter of law, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Id. (internal quotation marks omitted). And, once again, the Court is obligated to

12

"view the evidence in the light most favorable to the nonmoving party." Id.

Nintendo argues that a new trial is required because the parties' claim-construction disputes were not resolved prior to submission of the case to the jury, and because the jury was not instructed on the Court's claim construction. As to the first issue, the Court, in its Markman decision, held that the terms "cross-point" and "optical axes" needed no construction and explicitly rejected Nintendo's proposed narrowing constructions in favor of the ordinary meaning of those terms. See Memorandum, No. 11 Civ. 4256, ECF No. 64 (S.D.N.Y. Feb. 22, 2012) at 10-11. Despite this, Nintendo argued at trial and continues to contend here that the Court failed to resolve the parties' dispute as to these terms. Nintendo claims that this purported failure allowed Tomita and Mr. Merritt to conflate the terms "offset" and "cross-point" in ways that misled the jury and to discuss the "optical axes" of the cameras in ways that were inconsistent and confusing.

The Court disagrees with Nintendo's characterization. As an initial matter, the Court once again reaffirms its claim-construction decision, as it did at trial when Nintendo raised this issue. Additionally, the Court rejects Nintendo's claim to have been prejudiced by this purported error, as Tomita's (and Mr. Merritt's) use of the terms "offset" and "cross-point" were proper. These terms were appropriately employed to explain the functioning of the 3DS

13

and the '664 patent to the jury, and their usage reflected the
notion that, as discussed above, the 3DS used the focus value or
offset to determine the cross-point and then used that information
in determining the offset for displaying the image on the 3DS's
screen. Similarly, to the extent that Mr. Merritt testified that he
did not know every detail of how the 3DS functions, it is perfectly
logical that Mr. Merritt would testify to alternative ways in which
the 3DS might "tilt" the optical axes of its cameras to form a
cross-point. Thus, the Court finds no justification for Nintendo's
request for a new trial with respect to its resolution of claim-
construction disputes.

As to the second issue, Nintendo argues that where the district
court makes "specific claim construction rulings," it is "required
to inform the jury that it . . . must apply the district court's
construction of the terms in its deliberations," so that the jury is
not left "free to make its own determination of the meaning of the
claims." Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1367
(Fed. Cir. 2004). At trial, the parties presented the Court's claim
construction in their closing statements, and there was no dispute
presented to the jury regarding the terms of the Court's ruling. As
a result, the Court in its instruction to the jury, after explaining
that it had already determined the meaning of the claim terms, which
the jury was obligated to apply, simply stated that "both sides have
already presented these definitions to you, so I will not repeat

14

them here." Tr. 1087:7-18.  Since there was no dispute over the
claim terms that the jury had to resolve, and since both sides had
amply and accurately defined those terms in their closing arguments
(as well as at numerous other times throughout the trial),
reiterating those definitions in the Court's instructions would only
have created confusion. As the Federal Circuit has made clear, there
is no error in such a situation in failing to repeat the claim
construction to the jury, let alone prejudicial error. Cf. Sulzer,
358 F.3d at 1357 (finding no prejudicial error where the court did
not instruct the jury as to its claim construction and "[t]he
evidence presented at trial reflected the court's claim
construction"). Accordingly, Nintendo's motion for a new trial as to
liability is denied.

Finally, the Court turns to Nintendo's motion for remittitur or
for a new trial on damages. District courts have discretion "to
enter a conditional order of remittitur, compelling a plaintiff to
choose between reduction of an excessive verdict and a new trial [on
damages], 'in at least two distinct kinds of cases: (1) where the
court can identify an error that caused the jury to include in the
verdict a quantifiable amount that should be stricken, . . . and (2)
more generally, where the award is "intrinsically excessive" in the
sense of being greater than the amount a reasonable jury could have
awarded, although the surplus cannot be ascribed to a particular,
quantifiable error.'" Kirsch v. Fleet St., Ltd., 148 F.3d 149, 165

(2d Cir. 1998) (ellipsis in original) (quoting Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 337 (2d Cir. 1993)). For cases in the latter category, a jury's damage award may be set aside as excessive where "the award is so high as to shock the judicial conscience and constitute a denial of justice." Id. In that circumstance, a court may reduce the jury's award to "the maximum that would be upheld by the trial court as not excessive." Trademark Research Corp., 995 F.2d at 337.

Nintendo moves for remittitur on the ground that Tomita's damages expert, Mr. Wayne Hoeberlein, used the "entire market value" of the 3DS as the royalty base for calculating the reasonable royalty owed to Tomita, which, according to Nintendo, erroneously allowed the jury to include all revenue from the 3DS in its determination of damages. Nintendo derives this criticism from the rule that, in calculating damages for multi-component products accused of infringement, royalties must "be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting Cornell Univ. v. Hewlett-Packard Co., 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). "The entire market value rule is a narrow exception to this general rule. If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as

16

a percentage of revenues or profits attributable to the entire product." Id. at 67.

Whether the entire market value rule is implicated thus turns on the question of whether the 3DS constitutes the "smallest salable patent-practicing unit" in which the '664 patent's technology is utilized.  As the Court found in denying Nintendo's motion in limine on this issue, Mr. Hoeberlein properly looked to the 3DS itself as the "smallest salable patent-practicing unit," and therefore did not rely on the entire market value rule. Nintendo neither purchases nor sells components of the 3DS that infringe the '664 patent; the individual components cannot practice the patent before they are assembled and programmed with Nintendo's software; and the 3DS is imported to the United States fully assembled.  Cf. LaserDynamics, 694 F.3d at 68 (finding the entire market value rule violated because optical disk drives, which separately infringed the relevant patent, were sold separately). In these circumstances, the entire market rule was not violated, so it can provide no basis to reject the jury's damages award.

The Court concludes, nonetheless, that the jury's $30.2 million damages award is "intrinsically excessive" and unsupported by the evidence presented at trial. See Kirsch, 148 F.3d at 165. An analysis of factors set forth in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), which the jury was instructed to employ in determining its damages award,

cannot support the very large award the jury reached. Although the jury's award amounted to a royalty rate of just under three percent of the sale price of the 3DS, which is less than that paid to Tomita under the licensing agreement presented to the jury as a "comparable" agreement, there are special circumstances relating to the 3DS that strongly suggest that such a royalty rate is excessive in this context.

To begin with, the evidence at trial showed that the 3DS console is not itself profitable. See Tr. 903:16. Although Tomita's expert testified that Nintendo derives substantial profits from the sale of games designed solely for the 3DS and therefore those profits should be considered in determining the profitability of the 3DS gaming system as a whole, the evidence at trial also established that the vast majority of games designed for the 3DS do not require or even utilize the technology covered by the '664 patent.  Tr. 484:17-485:15; 555:23-559:4. Thus, it seems that the jury, in coming to such a substantial damages award, likely weighed too heavily the somewhat unrelated profit that Nintendo earns on games for the 3DS.

Additionally, although the entire market value rule does not apply on the facts of this case, the concerns that motivate the doctrine nonetheless speak to whether the jury's damages award was appropriate. Thus, while there is no smaller patent-practicing unit than the 3DS as a whole, the '664 patent's technology was used only in two features – the 3D camera and the AR games application – and

18

thus was in some sense ancillary to the core functionality of the 3DS as a gaming system. Tr. 905:19-906:12. In addition, the evidence presented at trial showed that consumer reception for the patent-related features was mixed. Tr. 550-552. Based on these factors and the fact that the 3DS is not itself profitable, the Court finds that it surpasses reasonable belief that Nintendo would, in a hypothetical negotiation, agree to a "reasonable royalty" payment anywhere near as large as that awarded by the jury.

For these reasons, the Court finds that the jury's damages award was at least twice as large as the amount a reasonable jury could have awarded based on the evidence presented at trial and thereby must have involved the degree of excessive speculation that "shocks the judicial conscience." See Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1335 (Fed. Cir. 2009) (vacating damages award where it appeared the jury's award was "not supported by substantial evidence" and was "based mainly on speculation or guesswork"). Accordingly, the Court hereby gives Tomita the choice between accepting either a remittitur of the damages award from $30.2 million to $15.1 million or undertaking a new trial on damages.

Turning to Tomita's motion to amend the judgment, Tomita seeks the following additions to its now-vacated damages award: (a) damages for sales of infringing 3DS devices occurring before judgment was entered but not included in the jury's verdict; (b)

19

prejudgment interest; (c) post-judgment interest; and (d) ongoing royalties at an enhanced rate. The Court addresses each of these motions to the extent practicable given its determination on Nintendo's motion for remittitur.

The Court grants Tomita's uncontested motion for damages based on sales of infringing 3DS devices not included in the jury's verdict from December 31, 2012 (the latest date for which Nintendo had produced sales data as of trial) through the entry of judgment on March 14, 2013. See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., No. 2:10CV248, 2011 WL 4899922, at *2 (E.D. Va. Oct. 14, 2011), aff'd, 694 F.3d 1312 (Fed. Cir. 2012) ("Where a patent infringer is found to have infringed one or more patents, the patentee is entitled to damages for the entire period of infringement and should therefore be awarded supplemental damages for any periods of infringement not covered by the jury verdict."). However, because the implied royalty rate will change based on whether Tomita accepts remittitur or whether a new damages award is determined at trial, the Court leaves to later briefing the determination of the amount of damages to be awarded.

Tomita next seeks an award of prejudgment interest. Under 35 U.S.C. § 284, "prejudgment interest should ordinarily be awarded" in patent infringement cases, since "[a]n award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole," given that "his damages

20

consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment." General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-56 (1983). "The normal procedure under Devex is to award prejudgment interest from the date of infringement to the date of payment." Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 967 (Fed. Cir. 1986). In determining what amount of interest to award, courts "must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'" Id. (quoting Devex, 461 U.S. at 655).

Nintendo does not contest that Tomita is entitled to an award of prejudgment interest from the date of infringement. However, the parties disagree as to the appropriate interest rate to be used in calculating such interest. Tomita argues that the proper interest rate to be applied is the prime rate, which represents the interest rate that a corporate borrower with good credit would pay for a loan, while Nintendo argues that the Court should apply the Treasury Bill rate, which represents the return that an investor would receive on a risk-free investment. Because Tomita fails to suggest that it borrowed money during the infringement period and therefore should be compensated at the higher prime rate, the Court hereby awards prejudgment interest at the Treasury Bill rate. See Laitram

Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997) (finding no abuse of discretion where the district court awarded interest at the Treasury Bill rate and "found that there was no evidence that [the plaintiff had] borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded"). However, because, again, the damages award amount is indeterminate at this time pending Tomita's decision on remittitur, the amount of prejudgment interest owed to Tomita cannot be calculated at this time.

Third, Tomita requests that the Court enter an award of post-judgment interest under 28 U.S.C. § 1961. However, the amount of such an award is yet to be determined, not only because the amount of the judgment is uncertain, but also because an appeal by Nintendo is likely. Thus, while an award of post-judgment interest would be appropriate if the Court's judgment were to be upheld on appeal, such an award would be premature at this time.

Fourth and finally, Tomita seeks ongoing royalties for Nintendo's continued infringement of the '664 patent. Specifically, Tomita seeks an order that: (1) for the period the '664 patent is in force, Nintendo shall pay ongoing royalties on the 3DS; (2) such payments shall be made on a quarterly basis, within thirty days following the end of each quarter, along with a certified report stating the number of sales during such quarter; (3) the order shall be non-assignable, non-transferable, and non-sublicensable; and (4)

Nintendo shall mark all covered products covered by the order with "U.S. Patent No. 7,417,664."

While the Court accepts as a general matter that it would be appropriate for Nintendo to pay an ongoing royalty for future sales of the 3DS, it would be nonetheless premature to set an ongoing royalty rate in light of the uncertainty regarding Tomita's damages award and the royalty rate that the award implies. Thus, the Court defers ruling on Tomita's motion until after the issue of remittitur is resolved. However, given that the Court intends to award an ongoing royalty that will fully protect Tomita's interest in the '664 patent, the Court denies Tomita's request that Nintendo mark the 3DS with "U.S. Patent No. 7,417,664."

In sum, the Court denies all of Nintendo's motions except its motion for remittitur. By August 23, 2013, Tomita must inform the Court in writing of its choice whether to accept a $15.1 million damages award or whether to proceed to a new trial on damages. Furthermore, the Court grants Tomita's motion as it relates to damages based on sales of infringing 3DS devices not included in the jury's verdict, prejudgment interest, and ongoing royalty payments, with all amounts to be determined upon resolution of the remittitur issue, and denies the motion for post-judgment interest without prejudice to renewal after any appeal has been decided.

The Clerk of the Court is hereby directed to close items number 149 and 155 on the docket of this case.

23

SO ORDERED.

Dated: New York, New York
       August 13, 2013                        _____
                                              JED S. RAKOFF, U.S.D.J.