

James S. Blank
+1 212 836 7528 office
james.blank@kayescholer.com

425 Park Avenue
New York, NY 10022-3598
+1 212 836 8000 main
+1 212 836 8689 fax

September 17, 2013

**VIA ECF AND HAND DELIVERY**

Hon. Jed S. Rakoff
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY  10007-1312

Re:     Ongoing royalty in *Tomita Technologies USA, LLC v. Nintendo Co., Ltd.*, 11-civ-4256-JSR (S.D.N.Y.)

Dear Judge Rakoff:

In granting remittitur, the Court found that "the jury's damages award was *at least* twice as large as the amount a reasonable jury could have awarded . . . ."  D.I. 166 at 19 (emphasis added).  Nevertheless, Tomita represented during a conference call with the Court on September 9, 2013, that it now seeks an ongoing royalty of double the remittitur amount, effectively asking the Court to reinstate the jury's rejected damages award as an appropriate measure of ongoing royalties.  However, Tomita stated that it was content to rest on its prior briefing and declined to offer any explanation of why an ongoing royalty rate equivalent to the jury's unsupported award is appropriate.  Accordingly, Nintendo respectfully requests that the Court set the ongoing royalty rate *no higher* than the accepted remittitur royalty rate of 1.36% of the wholesale price of the 3DS.[1]

As authorized by the Court during the conference call with the parties, Nintendo submits this letter to supplement its earlier briefing on the issue of post-judgment ongoing royalties in light of the remittitur, which is now before the Court.  The issue of ongoing royalties has been previously briefed with the submission of Tomita's motion to amend the judgment (Tomita Br.[2] at 1),

---

[1] The Court has denied Nintendo's JMOL motion and indicated its intention to grant an ongoing royalty.  Given this procedural posture, Nintendo provides its current assessment of an ongoing royalty, reserving all rights to appeal the underlying issues of infringement, validity, and damages.

[2] "Tomita Br." refers to the Memorandum of Law in Support of Plaintiffs' Motion to Alter or Amend the Judgment, filed under seal at D.I. 156.

Chicago          Los Angeles      Shanghai
Frankfurt        New York         Washington, DC
London           Palo Alto        West Palm Beach

61582224.DOCX

Hon. Jed S. Rakoff          September 17, 2013  |  Page 2

Nintendo's opposition to the motion (Nintendo Opp.[3]),  and Tomita's reply.  D.I. 165.  On August 13, 2013, the Court issued its Memorandum Order offering "Tomita the choice between accepting either a remittitur of the damages award from $30.2 million to $15.1 million or undertaking a new trial on damages."  D.I. 166 at 19.  The Court also ruled that it would be "premature to set an ongoing royalty rate in light of the uncertainty regarding Tomita's damages award and the royalty rate that the award implies."  D.I. 166 at 23.  On August 21, 2013, Tomita accepted remittitur of the damages award.  D.I. 167.

Nintendo's prior submissions explain why an ongoing royalty should be no more than the royalty rate the jury award implies (which has now been reduced by the remittitur).  The approach Nintendo set forth in its prior briefing remains applicable despite the remittitur and Nintendo readopts and incorporates that briefing by reference here.  Specifically, the appropriate ongoing royalty should be set no higher than the pre-verdict reasonable royalty that the Court determined to be approximately 1.36% (equivalent to $2.22 per 3DS device).

At trial, Tomita sought a 6% royalty on the $163 "average wholesale selling price" of the 3DS, or $9.78 per unit.[4]  The jury awarded damages of $30.2 million, equivalent to a royalty of approximately 2.73% of the average wholesale selling price of the 3DS, or $4.45 per 3DS.[5]  *See* D.I. 166 at 18 ("the jury's award amounted to a royalty rate of just under three percent of the sale price of the 3DS").  The accepted remittitur halved the jury's verdict from $30.2 million to $15.1 million (D.I. 166 at 19), which is equivalent to a royalty of approximately 1.36% of the average wholesale selling price, or $2.22 per 3DS.[6]

Nintendo respectfully requests that the ongoing royalty be set as a percentage of wholesale price, rather than a naked dollar amount, to avoid granting Tomita a windfall and penalizing Nintendo should the price of the 3DS be reduced in the future.  Indeed, as the testimony at trial makes clear, Nintendo has already reduced the price of the 3DS once.  *See, e.g.,* Ex. A, Trial Tr. 552:18-553:2 and 900:12-17.  Moreover, the Nintendo 3DS was released to consumers in the beginning of 2011.  *Id.* at 479:2-7.  As the product, already nearly 2.5 years on the market, advances through its lifecycle, it is reasonable to expect further price reductions, as with any consumer product.  Whereas a royalty set at $2.22 would unfairly benefit Tomita should the price of the 3DS be further reduced, a royalty of no more than 1.36% "will fully protect Tomita's interest in the '664 patent" without disproportionately impacting Nintendo.  D.I. 166 at 23.

---

[3] "Nintendo Opp." refers to Defendants' Memorandum in Opposition to Plaintiffs' Motion to Alter or Amend the Judgment, filed under seal on April 29, 2013.

[4] Ex. A, Trial Tr. 547:3-6; *id.* at 480:24-481:11.  The parties agree that the jury's verdict covered 6,791,268 3DS units.  *See* Post-Judgment Declaration of Wayne A. Hoeberlein, D.I. 156 ("Hoeberlein Dec.") ¶ 3.

[5] The jury's verdict of $30.2 million divided by 6,791,268 units is approximately $4.45 per unit.  $4.45 divided by the average wholesale selling price of $163 equals a royalty rate of approximately 2.73%.

[6] The remittitur amount of $15.1 million divided by 6,791,268 units is approximately $2.22 per unit.  $2.22 divided by the average wholesale selling price of $163 equals a royalty rate of approximately 1.36%.

Hon. Jed S. Rakoff          September 17, 2013 | Page 3

## Tomita Has Not Met Its Burden

While Tomita previously argued that the jury's implied royalty rate of approximately $4.45 per unit should be doubled to $8.90 per unit as an ongoing royalty  (Tomita Br. at 19), Tomita noted on the recent conference call that it now seeks an ongoing royalty rate that is *double* the remittitur rate of approximately $2.22 per unit, namely $4.45 per unit.[7]  However, Tomita's arguments in its prior briefing do not translate to or support a doubling of the remittitur royalty rate.

A reasonable royalty analysis cannot be speculative. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("a reasonable royalty analysis requires a court to hypothesize, not to speculate"); *see also Whitserve, LLC v. Computer Packages, Inc.,* 694 F.3d 10, 29 (Fed. Cir. 2012) (vacating damages award after finding expert's "opinion regarding a reasonable royalty rate to be speculative").  Critically, even in the context of an ongoing royalty, "the burden of proving damages remains with" Tomita. *Creative Internet Adver. Corp. v. Yahoo! Inc.*, 674 F. Supp. 2d 847, 855 (E.D. Tex. 2009) (citing *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1376 (Fed. Cir. 2002)).  Tomita's prior briefing which it relies upon does not meet this burden and therefore should be rejected.

## The Court Already Rejected a Royalty Rate of $4.45 per Unit

Tomita's requested ongoing royalty rate that simply doubles the remittitur rate to $4.45 per unit is inherently flawed because it is exactly the same rate that the Court, in granting remittitur, has already rejected as an unreasonable, excessive royalty.  D.I. 166 at 17 ("the jury's $30.2 million damages award is 'intrinsically excessive' and unsupported by the evidence presented at trial") and 19 ("it surpasses reasonable belief that Nintendo would, in a hypothetical negotiation, agree to a 'reasonable royalty' payment anywhere near as large as that awarded by the jury").  Yet Tomita's prior briefing, upon which it now relies, is premised on a renewed hypothetical negotiation conducted by its expert using the now-rejected $4.45 as a *starting* point.  Hoeberlein Dec. ¶ 58.  It is mere speculation to suggest that $4.45 is now the *result* of the negotiation.

Moreover, Tomita does not justify how $4.45 per unit makes sense after the Court held it was excessive.  In fact, the Court found that the "jury's damages award was *at least* twice as large as the amount a reasonable jury could have awarded" and therefore "must have involved the degree of excessive speculation that 'shocks the judicial conscience.'" D.I. 166 at 19 (emphasis added).  Tomita has declined to provide any reason why a $4.45 per unit ongoing royalty would not still amount to "excessive speculation."  Indeed, after the Court cut and Tomita accepted a halved damages award, there is simply no justification for reinstating it as an ongoing royalty.

## In Light of the Remittitur, the PIT License Agreement Does Not Justify a $4.45 per Unit Ongoing Royalty

In its earlier briefing, Tomita argued that the existence of a purported license between PIT, Inc. and Tomita Technologies USA, LLC (the "PIT License Agreement") would impact the *Georgia-Pacific* analysis in the ongoing royalty context.  Tomita Br. at 9-10.  Nintendo

---

[7] Because of rounding to the nearest cent, $2.22 would effectively double to $4.45.

Hon. Jed S. Rakoff                September 17, 2013 | Page 4

continues to object to the use of this license agreement, as set forth in its own prior briefing. Nintendo Opp. at 7-11.

Even if the Court were to take into account the PIT License Agreement, Tomita's analysis does not support its new request for a $4.45 per unit ongoing royalty. In support of its motion for an ongoing royalty, Tomita's expert, Wayne Hoeberlein, opined that a renewed hypothetical negotiation between the parties would result in a royalty 60% higher than the jury's damages award. He reached this opinion by taking the 8% royalty in the PIT License Agreement and comparing it with the 5% rate set forth in the KFE license agreement, which both sides discussed at trial. Hoeberlein Dec. ¶ 41. Because the 8% license rate is 60% greater than the 5% license rate, Mr. Hoeberlein reasoned that the ongoing royalty should likewise be enhanced by 60%. Hoeberlein Dec. ¶ 41; *see also id.* ¶¶ 62-63. Tomita adopted this reasoning in its prior briefing. Tomita Br. at 10.[8]

Tomita's prior briefing fails to take into account that the Court granted remittitur even though "the jury's award amounted to a royalty rate of just under three percent of the sale prices of the 3DS, which is less than that paid to Tomita under the [KFE] licensing agreement . . . ." D.I. 166 at 18. In other words, the Court found that the jury's "royalty rate is excessive" even though it was less than 3%, well below the 5% of the KFE license agreement. D.I. 166 at 18. For Tomita to continue to argue that an adjustment to the remittitur rate is warranted based on the difference between the PIT License Agreement and KFE license is arbitrary and unsupported, because the Court has already rejected the jury's lower royalty rate. Tomita's prior briefing provides no reason why the post-verdict ongoing royalty analysis should reinstate what the Court has rejected.

## Profit Earned From 3DS Games Has No Impact On An Ongoing Royalty Rate

As set forth in Nintendo's prior brief, the *Read v. Portec* factors – developed for use after a finding of willful infringement – should not have any bearing on the ongoing royalty rate. Nintendo Opp. at 13-15. Tomita argued previously, however, that *Read* factor four concerning Nintendo's financial condition weighs in favor of an enhancement of the ongoing royalty rate. In particular, Tomita relied upon revenue Nintendo earns from software games for the 3DS, both its own and those developed by third parties. Tomita Br. at 16; *see id.* at 7 (attempting to justify proposed ongoing royalty rate by comparing to profit from games).

This rationale has been rejected by the Court. In support of its remittitur decision, the Court noted that "the '664 patent's technology was only used in two features" of the 3DS, "and thus was in some sense ancillary to the core functionality of the 3DS as a gaming system." D.I. 166 at 18-19. The Court also found that "the evidence at trial . . . established that the vast majority of games designed for the 3DS do not require or even utilize the technology covered by the '664 patent." *Id.* at 18. Moreover, "the evidence at trial showed that the 3DS console is not itself profitable." *Id.* at 18, 19. In light of this, the Court stated: "it seems that the jury, in coming to such a substantial damages award, likely weighed too heavily the somewhat unrelated profit that

---

[8] To be clear, Tomita previously used Mr. Hoeberlein's analysis to argue for enhancing royalties by 60%, from the jury's implied rate of $4.45 per unit to $7.12 per unit. Tomita Br. at 10. The remainder of the $8.90 per unit Tomita previously sought came from other enhancements outside of the *Georgia-Pacific* analysis.

Hon. Jed S. Rakoff          September 17, 2013  |  Page 5

Nintendo earns on games for the 3DS." *Id.*  Thus, Tomita's prior briefing does not provide any reason why profits for games now should be brought back into the determination of an ongoing royalty by readopting the jury's now-rejected verdict.

## Amounts for Prejudgment Interest and Supplemental Damages[9]

In its August 13, 2013 Memorandum Order, the Court awarded Tomita supplemental damages, but left open the determination of the amount to be awarded "because the implied royalty rate will change based on whether Tomita accepts remittitur . . . ."  D.I.  166 at 20. Similarly, the Court awarded prejudgment interest to Tomita at the Treasury Bill Rate.  D.I. 166 at 21.  However, the Court noted that the amount was "indeterminate . . . pending Tomita's decision on remittitur." *Id.* at 22.

Now that Tomita has accepted remittitur of the jury's damages award by half, the parties agree that the supplemental damages and prejudgment interest awards should be halved. Accordingly, the amount of supplemental damages due Tomita is $211,747.50.[10]  The amount of prejudgment interest is $29,483.50.[11]

For the foregoing reasons and for the reasons set forth in Nintendo's prior briefing, Nintendo respectfully requests that the Court set an ongoing royalty rate of no more than 1.36% of the 3DS wholesale price, set supplemental damages at $211,747.50, and set prejudgment interest as $29,483.50.

Respectfully submitted,

James S. Blank
*Attorneys for Defendants*

cc: Counsel of record for Tomita (*via ECF*)

---

[9] Again, given the procedural posture of the case, Nintendo provides the amounts the Court has determined appropriate for prejudgment interest and supplemental damages.  However, Nintendo reserves alls rights to appeal the underlying issues of infringement, validity, and damages.

[10] The calculation is:  $30,623,495 for damages through March 13, 2013 (Dec. of Julie Davis, filed under seal on April 29, 2013 ("Davis Dec.") ¶ 3) minus $30,200,000 jury verdict  equals $423,495, which is divided by two because of the remittitur.

[11] The calculation is $58,967 prejudgment interest determined according to the Treasury Bill Rate (Davis Dec. ¶¶ 4-5), divided by two because of the remittitur.

# EXHIBIT A

381

```
     D343TOM1
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2
 3   TOMITA TECHNOLOGIES USA, LLC,
 3   AND TOMITA TECHNOLOGIES
 4   INTERNATIONAL, INC.,
 4
 5                   Plaintiffs,
 5
 6           v.                          11 Cv. 4256 (JSR)
 6
 7   NINTENDO CO., LTD., AND
 7   NINTENDO OF AMERICA, INC.,
 8
 8                   Defendants.
 9
 9   ------------------------------x
10
10                                   March 4, 2013
11                                   9:40 a.m.
11
12   Before:
12
13                   HON. JED S. RAKOFF
13
14                                   District Judge
14
15                       APPEARANCES
15
16   STROOCK & STROOCK & LAVAN LLP
16        Attorneys for Plaintiffs
17   KENNETH L. STEIN
17   IAN DiBERNARDO
18   JOSEPH DIAMANTE
18
19   KAYE SCHOLER LLP
19        Attorneys for Defendants
20   SCOTT G. LINDVALL
20   JAMES S. BLANK
21
21
22
22
23
23
24
25
```

D343TOM5                    Hoeberlein - direct

1    3DS unit that's accused of infringing.

2    Q.  Going back to the royalty base here.  The 6.79 million 3DS

3    devices, does that pertain to any particular timeframe?

4    A.  Yes.  It begins on the date that the 3DS unit was first

5    sold which was March 27, 2011.  And this particular number

6    accumulates through the end of this past year, so December 31,

7    2012.

8    Q.  Why only through December 31, 2012?

9    A.  Well, I believe Nintendo continues to sell the 3DS unit,

10   but the documents produced to this point in time only go

11   through December 31, 2012.  So there is a cutoff at some point,

12   but it is continuing to be sold.

13   Q.  Thank you.  Just to be clear, does Nintendo purchase from a

14   supplier any individual component of the 3DS that's accused of

15   infringing the '664 patent?

16   A.  No.  There is no component I believe that's accused of

17   infringing.  They do purchase components, however.

18   Q.  Does Nintendo sell components of the 3DS that are accused

19   of infringing the '664 patent?

20   A.  No, I don't believe so.  The components such as a screen or

21   the cameras, Nintendo purchases those and puts them together to

22   form a 3DS game player.

23   Q.  That 6.79 million 3DSs, where did you get that number from?

24   A.  That is straight from Nintendo's accounting records.

25   Q.  Sir, have you reviewed any documents that indicate how the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

D343TOM5                    Hoeberlein - direct

1    number of sales of the 3DS stacks up against other products?

2    A.  I have, yes.  In particular I have in mind a press release

3    from Nintendo after the release of the product, about eight

4    months in.

5            MR. DiBERNARDO:  If we can put up for identification

6    purposes PX 205.  If you can blow up the top of that.

7    Q.  Mr. Hoeberlein, do you recall reviewing this document in

8    connection with preparing your opinion?

9    A.  I do, that's what I was just referring to.

10           MR. DiBERNARDO:  We move PX 205 into evidence.

11           MR. BLANK:  No objection.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 205 received in evidence)

14   Q.  Mr. Hoeberlein, can you explain how you considered this

15   press release.

16   A.  It's just an indication, the data contained in here, as to

17   the initial success of the 3DS game player when it was

18   released.  It says that in these first eight months, it sold

19   more than 1.65 million units in the United States.  And that

20   put it on track to surpass the first year total of Nintendo DS

21   which was to that point of time was the best selling game

22   platform in U.S. history.  So the 3DS after it was initially

23   let out into the market did very well.

24   Q.  Thank you.  If we go back to slide 51B.  Let's move on to

25   the royalty rate then.

D343TOM5                    Hoeberlein - direct

1          You mentioned you calculated 6 percent royalty rate.

2     Did you also determine how much that is in dollars?

3     A.   I did, yes.  If you look what I've done, I found basically

4     the wholesale price, Nintendo's price that they sell to their

5     retailers for.  Not what a customer would buy it in a Best Buy,

6     but what Best Buy pays Nintendo.  That's a price of $163.  If

7     you take the 6 percent royalty rate times $163, you arrive at

8     per unit royalty of $9.78.  That's another way of expressing

9     royalty.

10    Q.   Where did you get that $163 selling price from?

11    A.   That is from Nintendo's records.

12    Q.   So then, sir, with the 6.79 million 3DSs sold and your

13    $9.78 royalty rate, what is the reasonable royalty that you

14    determined in this case?

15    A.   If you multiply the infringing units of the royalty base

16    times the royalty rate of $9.78, you arrive at reasonable

17    royalties or damages for this case of $66.4 million.

18    Q.   Do you have a slide that compares your application of this

19    formula to Ms. Davis' application of the formula?

20    A.   I do, yes.

21    Q.   If we could have slide 51C, please.

22          Sir, could you explain how Ms. Davis used this

23    formula.

24    A.   Sure.  As I mentioned before we have the same formula, the

25    royalty base times royalty rate equals reasonable royalty.  And

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

543

C358TOM1

1  UNITED STATES DISTRICT COURT
1  SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
2
3  TOMITA TECHNOLOGIES USA, LLC,
3  AND TOMITA TECHNOLOGIES
4  INTERNATIONAL, INC.,
4
5             Plaintiffs,
5
6        v.                              11 Cv. 4256 (JSR)
6
7  NINTENDO CO., LTD., AND
7  NINTENDO OF AMERICA, INC.,
8
8             Defendants.
9
9  ------------------------------x
10
10                                 March 5, 2013
11                                 9:50 a.m.
11
12 Before:
12
13               HON. JED S. RAKOFF
13
14                                 District Judge
14
15                   APPEARANCES
15
16 STROOCK & STROOCK & LAVAN LLP
16      Attorneys for Plaintiffs
17 KENNETH L. STEIN
17 IAN DiBERNARDO
18 JOSEPH DIAMANTE
18
19 KAYE SCHOLER LLP
19      Attorneys for Defendants
20 SCOTT G. LINDVALL
20 JAMES S. BLANK
21
21
22
22
23
23
24
25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

C358TOM1                    Hoeberlein - cross

1    of this line of questioning.

2            THE COURT:  Sustained.

3    Q.  In coming up with your opinion as to what the royalty base

4    in this case is, you used Nintendo's average wholesale selling

5    price for the 3DS to retailers, right?

6    A.  Right.  I believe it was $163.

7    Q.  And in coming up with your royalty base opinion, you did

8    not attempt to apportion the cost of the components allegedly

9    implicated by the '664 patent from the cost of the components

10   not implicated by the '664 patent, right?

11           MR. DiBERNARDO:  Objection, your Honor.  Relevance.

12           THE COURT:  Overruled.

13   A.  I understand your question, but it wouldn't be relevant to

14   compare what Nintendo pays, the cost of a particular item

15   versus the cost of any other item.  That's not relevant to an

16   analysis of determining what a royalty base would be.

17   Q.  That wasn't my question.

18           THE COURT:  So, on the one hand, the witness needs to

19   answer the question put rather than volunteering his views,

20   which may or may not be accurate, of what is or is not

21   relevant.  On the other hand, counsel needs to just put

22   questions, not comment upon.  So let's start this question

23   over.

24   Q.  In coming up with your royalty base opinion in this case,

25   did you apportion the cost of the components allegedly

C358TOM1                         Hoeberlein - cross

1    A.  I do, yes.

2    Q.  Now, on this slide, one consumer stated, "I don't like the

3    camera.  I was disappointed.  It seems more gimmicky than

4    anything else."  Do you see that?

5    A.  I do.

6    Q.  And another person stated, "The camera I can do without.

7    It's not necessary."  Do you see that?

8    A.  I do.

9    Q.  And a third consumer said, "I don't like that when you take

10   a picture that it looks horrible."  Do you see that?

11   A.  I do.

12   Q.  Now, you didn't include any of these consumer reactions on

13   any of your slides yesterday, did you?

14   A.  Not these three particular ones.  What I have included is

15   the data two pages prior to that, page 30, which talks about

16   the 3-D camera being the second most appealing feature in the

17   entire 3DS.  So that was my focus.

18   Q.  Now, in August of 2011, Nintendo dropped the price of the

19   3DS because it wasn't selling well, right?

20   A.  I believe that's correct, yes.

21   Q.  So when the 3DS was first launched in March 2008, the

22   retail price was $249.99, right?

23   A.  That was the launch price, I think the highest price ever

24   for a game released at that point in time.

25   Q.  And then five months later, in August 2011, the retail

C358TOM1                    Hoeberlein - cross

1    price dropped by $80 or 32 percent to 166.99, right?

2    A.  That is correct.

3    Q.  And Nintendo actually loses $15 per unit on the sales of

4    3DS hardware, right?

5    A.  On the hardware, yes.  But not counting games.

6    Q.  On the hardware?

7    A.  Right.

8    Q.  And where Nintendo makes its profits for the 3DS is on the

9    game software, right?

10   A.  Yes, as I testified yesterday.

11   Q.  Now, if we can take a look at your slide 60 from yesterday.

12           Now, on this slide, you told us yesterday that, quote,

13   Nintendo charges more 3DS games and makes a greater profit from

14   them, right?

15   A.  That's correct.

16   Q.  And that was in comparison to the DS, right?

17   A.  It was, yes.

18   Q.  And on the same slide you told us that Nintendo has, quote,

19   earned an extra 15.50 to 21.40 from 3DS games, right?

20   A.  That is correct.

21   Q.  And you took into account Nintendo's profits on games in

22   your opinion regarding a reasonable royalty in this case,

23   right?

24   A.  I have, yes.  One of the factors I have considered.

25   Q.  In fact, you said yesterday that it was very critical?

```
        D3B8TOM1
 1      UNITED STATES DISTRICT COURT
 1      SOUTHERN DISTRICT OF NEW YORK
 2      ------------------------------x
 2
 3      TOMITA TECHNOLOGIES USA, LLC,
 3      AND TOMITA TECHNOLOGIES
 4      INTERNATIONAL, INC.,
 4
 5                      Plaintiffs,
 5
 6               v.                        11 Cv. 4256 (JSR)
 6
 7      NINTENDO CO., LTD., AND
 7      NINTENDO OF AMERICA, INC.,
 8
 8                      Defendants.
 9
 9      ------------------------------x
10
10                                      March 11, 2013
11                                      10:20 a.m.
11
12      Before:
12
13                          HON. JED S. RAKOFF
13
14                                      District Judge
14
15                          APPEARANCES
15
16      STROOCK & STROOCK & LAVAN LLP
16           Attorneys for Plaintiffs
17      KENNETH L. STEIN
17      IAN DiBERNARDO
18      JOSEPH DIAMANTE
18
19      KAYE SCHOLER LLP
19           Attorneys for Defendants
20      SCOTT G. LINDVALL
20      JAMES S. BLANK
21
21
22
22
23
23
24
25
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
```

D3B3TOM6                        Davis - direct

1   the products that actually made a difference to potential

2   buyers.

3   Q.  What did you learn from Mr. Chavez?

4   A.  What he explained both in his deposition and to me in my

5   interview of him, was that while the consumers that had the

6   opportunity to test the 3DS were wowed by some of the features,

7   like the AR games, for example, it wasn't sufficient for them

8   to want to buy the product.  He described the AR games in

9   particular as being thin, which I understood to be in his

10  marketing speak a word that meant it just wasn't sufficient wow

11  there to make somebody want to buy the product.

12  Q.  Did there come a time when Nintendo dropped the price of

13  the 3DS hardware?

14  A.  Yes.  That happened five months after they launched the

15  product in the U.S.  So that was in August of 2011.  They

16  dropped the price from $250 at retail to $170 at retail.  That

17  $80 price drop is a 32 percent drop.

18  Q.  Did Mr. Chavez explain to you whether a price drop like

19  that was consistent or inconsistent with Nintendo's business

20  practices?

21  A.  He explained to me that that was completely inconsistent.

22  It was unprecedented in the history of Nintendo, as far as he

23  knew.

24  Q.  Have you also reviewed documents regarding the number of

25  games that have been commercially released for the 3DS?